20 CV S 02314

NORTH CAROLINA
DURHAM COUNTY

GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20-CVS-_____

THE INTERCOLLEGIATE WOMEN'S
LACROSSE COACHES ASSOCIATION
(IWLCA),

        *Plaintiff,*

    *v.*

CORRIGAN SPORTS ENTERPRISES, AND
RICHARD LEE CORRIGAN, JR., in his
individual and official capacities,

        *Defendants.*

VERIFIED
COMPLAINT

JURY TRIAL DEMANDED

Respectfully submitted by:

Robert C. Ekstrand
Stefanie Sparks Smith
EKSTRAND & EKSTRAND LLP
    *110 Swift Avenue*
    *Durham, NC 27705*
    *Tel. (919) 416-4590*
    *rce@ninthstreetlaw.com*
    *sas@ninthstreetlaw.com*

Counsel for the IWLCA

# INDEX

THE PARTIES ................................................................................................ 4

JURISDICTION AND VENUE ........................................................................ 6

FACTS ............................................................................................................ 7

   A. The Context of this Dispute .................................................................. 7

   B. The IWLCA Tournaments .................................................................. 13

   C. The IWLCA Hired CSE to Manage the IWLCA Tournaments in
      2018, 2019 and 2020. .......................................................................... 14

   D. The IWLCA Canceled All 2020 IWLCA Tournaments Due to the
      COVID-19 Pandemic and Directed CSE to Issue Refunds to All
      Registrants. ......................................................................................... 17

   E. CSE Refused to Comply with the IWLCA's Directive to Issue
      Refunds, Converted the IWLCA's Funds to its Own Use, and
      Made False Public Statements Calculated to Mislead Registrants
      into Believing the IWLCA Tournaments were "Not Canceled" and
      "Still On" ............................................................................................. 18

   F. Days After Falsely Claiming that the IWLCA Tournaments were
      "Not Canceled," CSE Cancels the First Two Tournaments and
      Refuses to Recognize and Communicate State-Issued Directives........... 21

   G. CSE is Now Leveraging its Wrongful Conversion of the IWLCA's
      Funds to Extort Agreements from the IWLCA's Registrants to
      Apply their Registration Fees to a Future, Unrelated CSE Event
      or Accepting a Lesser Refund than the IWLCA Directed CSE to
      Give................................................................................................... 23

RESPONDEAT SUPERIOR ......................................................................... 24

CAUSES OF ACTION.................................................................................. 24

   I. CONSTRUCTIVE FRAUD......................................................................... 24

   II. VIOLATIONS OF THE LANHAM ACT  (15 U.S.C. §§ 1051, *et
      seq.*)....................................................................................................... 26

Case 1:20-cv-00425-TDS-LPA   Document 7   Filed 05/14/20   Page 2 of 79

III.  UNFAIR OR DECEPTIVE TRADE PRACTICES, ACTS, AND
    METHODS OF COMPETITION (N.C. Gen. Stat. §§ 75-1.1, *et
    seq.*).................................................................................................... 29

V. BREACH OF CONTRACT.......................................................................... 30

VI.  UNJUST ENRICHMENT .......................................................................... 32

VII. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR
    DEALING.............................................................................................. 32

VIII. PUNITIVE DAMAGES ............................................................................ 34

PRAYER FOR RELIEF...................................................................................... 35

JURY TRIAL DEMAND .................................................................................... 36

VERIFICATION ................................................................................................ 38

Case 1:20-cv-00425-TDS-LPA   Document 7   Filed 05/14/20   Page 3 of 79

The Intercollegiate Women's Lacrosse Coaches Association, upon information and belief, alleges the following:

## THE PARTIES

1.     PLAINTIFF THE INTERCOLLEGIATE WOMEN'S LACROSSE COACHES ASSOCIATION, INC. ("IWLCA") is a North Carolina non-profit corporation and does business in North Carolina. The IWLCA's membership is comprised of coaches of NCAA college women's lacrosse programs, in all three NCAA divisions and the NAIA. Each year, the IWLCA hosts six tournaments for high school club lacrosse teams from all over the country ("IWLCA Tournaments"). All but one of the IWLCA's Tournaments are for female student-athletes who are eligible to be recruited by NCAA and NAIA lacrosse programs and want to play in tournaments designed and attended by IWLCA's membership (*i.e.*, college coaches).[1] The IWLCA Tournaments require nominal marketing; each tournament "sells out" within minutes after registration opens; lacrosse clubs across the country register for them immediately. The 2020 IWLCA Tournaments were scheduled to be held as follows:

a.  The IWLCA Champions Cup, June 19-21, 2020 in Midlothian, Virginia. Last year, 228 lacrosse teams (roughly 8,000 players, parents, and coaches) traveled from all over the country to compete in this IWLCA tournament. IWLCA expected similar numbers to travel to Midlothian for the 2020 IWLCA Champions Cup.

b.  The IWLCA New England Cup, June 26-28, 2020, in Amherst, Massachusetts. Last year, 110 lacrosse teams (roughly 3,800 players, parents, and coaches) from all over the country traveled to Amherst to compete in this IWLCA

---

[1] The IWLCA Debut Tournament is for student-athletes who will be eligible for recruiting under NCAA rules the following year; this is the only IWLCA tournament that is not designed to facilitate evaluation and recruiting of prospective student-athletes for its member coaches, rather its purpose is to provide a top notch playing experience for first-time high school players.

Case 1:20-cv-00425-TDS-LPA   Document 7   Filed 05/14/20   Page 4 of 79

tournament. This year, IWLCA expected similar numbers to travel to Amherst for the 2020 IWLCA New England Cup.

c. The IWLCA Midwest Cup, July 11-12, 2020 in Aurora, Illinois. Last year, 71 lacrosse teams (roughly 2,400 players, parents, and coaches) from all over the country traveled to Illinois to compete in in this IWLCA tournament. This year, IWLCA expected similar numbers to travel to Illinois for the 2020 IWLCA New England Cup.

d. The IWLCA Capital Cup, July 16-19, 2020 in North East, Maryland. Last year, 209 lacrosse teams (roughly 7,300 players, parents, and coaches) from all over the country traveled to Maryland to compete in this IWLCA tournament. This year, IWLCA expected similar numbers to travel to Maryland for the 2020 IWLCA Capital Cup.

e. The IWLCA Presidents Cup and the IWLCA Debut, November 20-22, 2020 in Wellington, Florida. Last year, 445 lacrosse teams (roughly 15,500 players, parents, and coaches) from all over the country traveled to Florida to compete in these IWLCA tournaments. This year, IWLCA expected roughly similar numbers to travel to Florida for the 2020 IWLCA Presidents Cup and IWLCA Debut.

f. In all, the 2020 IWLCA Recruiting Tournament Series would cause 37,000 people from all over the country to travel from all over the country to 5 locations where they would engage in close contact athletic competitions with each other, multiple games each day against different teams for several days, and then to travel back to their homes all across the country. In normal circumstances, the convergence of teams from all over the country to compete in close contact athletic events poses no serious health risk. But the 2020 IWLCA Tournaments were to take place in the midst of a pandemic.

2. DEFENDANT CORRIGAN SPORTS ENTERPRISES, INC. ("CSE") is a Maryland corporation that does business in Durham, North Carolina, including transactions that give rise to this action.

3. DEFENDANT RICHARD LEE CORRIGAN, JR., is the president of CSE, a citizen and resident of Maryland, and transacts business in Durham, North Carolina, including transactions that give rise to this action.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action because it arises under the laws of the State of North Carolina.

5. This Court has personal jurisdiction over the parties because they consented to the Court's jurisdiction over them; the parties regularly transact business in this State including specific transactions giving rise to this action; and because the Plaintiff is a North Carolina domestic corporation that maintains a registered office and its principal office in this State pursuant to a certificate of authority from the Secretary of State.

6. Durham County is the proper venue in this action because events giving rise to this action occurred in Durham County; and because this is an action brought by a domestic corporation against a corporation created by or under the law of another state and Durham County is the county in which Plaintiff resides under Article 7 of the North Carolina General Statutes.

7. The Superior Court of Durham County is the proper judicial division to adjudicate this action because the amount in controversy exceeds $25,000 exclusive of interest and costs.

Case 1:20-cv-00425-TDS-LPA   Document 7   Filed 05/14/20   Page 6 of 79

## FACTS

A. **The Context of this Dispute**

8. This action arises out of the coronavirus (COVID-19) pandemic.

9. The coronavirus outbreak was declared a pandemic on March 11, 2020.[2]

10. Few historical moments have been as challenging as the dual public health and economic crises arising out of the COVID-19 pandemic, and Defendants have chosen to shift their losses to student-athletes and their families from all over the country, furthering their financial hardship and exposing them to unacceptable risks to their health and safety.

11. Over 70,000 Americans have died from COVID-19, and more than 60,000 of them died in the last month alone. Nearly one million Americans have been infected by the virus. And more than 26 million Americans have filed initial unemployment claims – soaring numbers unlike anything this country has seen in modern times.[3]

12. Aside from the physical and emotional toll this pandemic is causing, the devastation of the American economy during the first two quarters of this year has driven millions of Americans into dire economic straits.

13. While many businesses across this country have acted lawfully and ethically by providing consumers with refunds for events that cannot be held safely, if at all, during this pandemic, sometimes at the risk of bankruptcy; Defendants Lee Corrigan

---

[2] Helen Branswell & Andrew Joseph, *WHO declares the coronavirus outbreak a pandemic*, STAT (March 11, 2020), https://www.statnews.com/2020/03/11/who-declares-the-coronavirus-outbreak-a-pandemic/.

[3] Andy Kiersz, *The US states where the most jobs have been destroyed by the coronavirus crisis, in one map*, BUSINESS INSIDER (Apr. 26, 2020),
https://www.businessinsider.com/initial-unemployment-claims-by-state-coronavirus-2020-4.

and CSE are refusing to issue the maximum refund for the registration fees paid by the clubs, student-athletes and their families who registered for the IWLCA Tournaments. Defendants collected these fees as a fiduciary on behalf of the IWLCA, the fees belong to the IWLCA, and the IWLCA has directed Defendants to issue the maximum refund to those who paid them.[4]

14.   Because social distancing is the primary means of ensuring the health and safety of all Americans, states and cities have imposed strict limits on gatherings of people. For example, in Virginia, where the first IWLCA tournament was to be held, gatherings of more than 10 people are prohibited by an executive order entered April 1, 2020 and effective until June 10, 2020.[5]

15.   Social distancing is crucial to the effort to "flatten the curve" and prevent outbreaks because COVID-19 is extraordinarily contagious, a person can be infectious without having any symptoms for up to 14 days, and the virus does not "go to ground" when it is aerosolized by shouting, breathing heavily, coughing or sneezing. As such, plumes of the virus "hang in the air" undetectable for long periods of time.

---

[4] The IWLCA has requested that Defendants issue a full refund less any documented unrecoverable costs incurred prior to the IWLCA's cancellation of the COVID-19 affected IWLCA Tournaments. The IWLCA has made multiple requests to Defendants for a detailed accounting of any unrecoverable costs; however, to date, the Defendants have not claimed or produced evidence of any unrecoverable costs. *See infra* Part C "The IWLCA Hired CSE to Manage its Tournaments in 2018, 2019, and 2020."

[5] TEMPORARY STAY AT HOME ORDER DUE TO NOVEL CORONAVIRUS (COVID-19), Va. Exec. Order No. 55, (Apr. 1, 2020),
https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf.

.

- 8 -

16.   Large gatherings of people who travel from disparate regions of the country are uniquely hazardous, not only to those involved in the gathering but also to the national population as a whole. The IWLCA Tournaments are precisely that kind of large gathering. The tournaments draw teams and their coaches and parents from all over the country, particularly form the Northeast and Mid-Atlantic regions; push all of those people through the transportation system (planes, trains, and automobiles), where they can pick up the virus at any point; bring them all together for close physical contact (i.e., multiple lacrosse games); arrange them in a way that they play multiple teams each day (thereby compounding the exposure risk); and then send them all back to their hometowns all across the country.

17.   The firm Tectonix produced a visual image of what that looks like in the context of the preseason baseball games in Florida, which also drew fans from all over the country. The image depicting the travel patterns of the 8,000 fans who attended one of the last preseason games is stunning:



Figure 1: Tectonix image demonstrates the dangerous, national consequence of sporting events that draw people from across the country to one venue during the COVID-19 pandemic.[6]

18.    As all large gatherings of people are prohibited for the foreseeable future – and unadvisable in any event – the club lacrosse teams, student-athletes and their families are stuck with expensive and unusable "tickets" to participate in the IWLCA Tournaments that the IWLCA has canceled, in the midst of this economic crisis.

19.    Moreover, under the pretext of "postponing" the first two 2020 IWLCA Tournaments – which Defendants have no authority to do – Defendants are refusing to issue the maximum refunds that the IWLCA directed them to issue.

20.    Congressional leaders publicly condemned a similar practice. For example, on April 16, 2020, U.S. Representatives, Katie Porter (D-CA) and Bill Pascrell, Jr. (D-NJ), wrote a scathing letter to Live Nation and Ticketmaster, who were refusing to refund the price of tickets for major league baseball games that were not played as scheduled and would likely not be played at all due to social distancing requirements to avoid the spread of the coronavirus. They wrote:

> We write to you today incredulous at Ticketmaster's announced policy to refuse refunds to all requesting fans for ticketed events postponed by the ongoing COVID-19 pandemic.
>
> With Americans weathering the brutal and continuing impacts of this global crisis, your decision to confiscate their money is reprehensible and should be reversed immediately. . . .
>
> Many of these suffering Americans are your customers. Their burden in the coming months is heavy. But instead of helping them lift that burden, your company has decided to make it heavier. . . .

---

[6]    Real Sports with Bryant Gumbel, *Dangerous Games,* HBO (Apr. 28, 2020), https://www.hbo.com/real-sports-with-bryant-gumbel/all-episodes/april-2020.

> In effect, your company is holding hostage money that could constitute a rent check, electric bill, or groceries to feed children.[7]

21.    All of this is equally applicable to Defendants' conduct here.

22.    Until the Defendants remediate the damage they have caused to the IWLCA, and the IWLCA's members, customers, and consumers – college coaches, club teams, student-athletes and their families – the IWLCA and the IWLCA's customers and consumers continue to absorb the loss that Defendants have caused by unlawfully retaining, misappropriating, and converting Plaintiff's funds to their own use.

23.    The IWLCA has directed Defendants to immediately refund the registration fees paid by those who registered for the IWLCA's Tournaments, less any documented unrecoverable costs incurred prior to the IWLCA's cancellation of the COVID-19 affected IWLCA 2020 Tournaments.

24.    Defendants have refused to issue the maximum refunds.[8] Instead, Defendants have converted the IWLCA's registration fees to their own use and are

---

[7] Letter from Bill Pascrell & Katie Porter to Live Nation & Ticketmaster, (Apr. 16, 2020), https://pascrell.house.gov/uploadedfiles/ticketmaster_covid-19_letter.pdf.

As well, on April 16, The New York Times reported that State Senator James Skoufis, Chairman of the Senate Investigations and Government Operations Committee, urged the New York Attorney General to open a formal investigation into Ticketmaster's "recent change of policy regarding refunds on concerts that have been postponed as a result of the crisis" – "I ask the Attorney General to intervene in any means necessary, including a criminal inquiry, and strongly urge these corporations to reconsider their newly adopted policies and refund consumers who are struggling to survive." Ben Sisario & Graham Bowley, *New York Lawmaker Asks for Probe Into Ticketing Refund Policies*, THE NEW YORK TIMES (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/arts/music/aeg-presents-ticketmaster-refunds.html.

[8] "If you can no longer participate in the tournament on the rescheduled date, you can:
   1) Request a transfer of your registration to a different CSE tournament in 2020.
   2) Request a deferment of your registration which will apply a credit of your registration fees to a CSE tournament in 2021.

leveraging their control over the IWLCA's funds for Defendants' own benefit while causing Plaintiff to suffer damages. Currently Defendants are leveraging their conversion of Plaintiff's registration fees to coerce the IWLCA's customers to register for later CSE events or to accept a fraction of their registration fees. And to support this scheme, Defendants are making false and misleading statements to consumers designed to confuse and mislead them into believing that the IWLCA's events are not canceled; that CSE is still hosting the IWLCA Tournaments, and that CSE's events will be "the same" as the IWLCA events that they registered for. Furthermore, to support these false claims, Defendants are using the IWLCA's trademarks for the IWLCA Tournaments to lend validity to them.

25.   As a result, Plaintiff will suffer irreparable harm in the absence of a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining Defendants from —

   a.   Continuing to confuse consumers by using the IWLCA trademarks and deceptively similar marks to mislead them into believing that Defendants are hosting the 2020 IWLCA Tournaments;

   b.   Continuing to make and publish false statements about the cancellation of the 2020 IWLCA Tournaments;

   c.   Continuing to refuse the IWLCA's directive to refund the registration fees that Defendants collected and hold solely as an agent and fiduciary of the IWLCA;

---

3) Request a refund for your registration. Please know that this will be a partial refund due to the fact that some expenses have already been paid.
Please respond no later than Monday, April 27th. If you have any questions please let us know!"
E-mail from Kelly Sullivan, CSE Director of Women's Athletics, to registered club teams (Apr. 23, 2020, 10:51 EST).

d.  Continuing to convert the IWLCA's funds to Defendants' own use;

e.  Leveraging their wrongful conversion of the IWLCA's registration fees to extort consumers -- the IWLCA's customers -- into registering for events Defendants claim they will hold sometime in the future; and

f.  Engaging in the unlawful conduct described herein.

B.  **The IWLCA Tournaments**

26.  All of the IWLCA Tournaments were created by the IWCLA, and are owned and controlled by the IWLCA:

a.  The IWLCA created the IWLCA Champions Cup in December of 2006, and hired an event management firm (USTC) to manage it for the IWLCA according to IWLCA's specifications and control. The IWLCA has held the Champions Cup annually since then.

b.  The IWLCA created the IWLCA Capital Cup in December of 2007, and hired an event management company (USTC) to manage the event for the IWLCA according to IWLCA's specifications and control. The IWLCA has held the Capital Cup annually since then.

c.  The IWLCA created the IWLCA President's Cup in December of 2009 and issued a Request for Proposals ("RFP") seeking proposals to manage the event from event management companies, and awarded the contract to manage the event to CSE according to IWLCA's specifications and control. IWLCA has held the President's Cup annually since then.

d.  The IWLCA created the IWLCA Western Cup in 2013 and hired CSE to manage the event for the IWLCA according to IWLCA's specifications and control. The IWLCA held the Western Cup annually until the IWLCA merged the Western

- 13 -

Cup with the Midwest Cup, and IWLCA has held the Midwest Cup annually since.

e.  The IWLCA created the IWLCA New England Cup in 2014 and hired CSE to manage the event for the IWLCA according to IWLCA's specifications and control. The IWLCA has held the New England Cup annually since 2014.

f.  The IWLCA created the Midwest Cup in 2015, and hired CSE to manage the event for the IWLCA according to IWLCA's specifications and control. The IWLCA has held the Midwest Cup annually since 2015.

g.  The IWLCA created the IWLCA Debut Tournament to be held in conjunction with the IWLCA President's Cup beginning in 2017 and hired CSE to manage the event according to IWLCA's specifications and control. IWLCA has held the IWLCA Debut annually in conjunction with the IWLCA President's Cup since 2017.

C.  **The IWLCA Hired CSE to Manage the IWLCA Tournaments in 2018, 2019 and 2020.**

27.  On February 6, 2017, the IWLCA published a RFP for the hosting of the IWLCA Tournaments for the years 2018, 2019 and 2020, which detailed the "Host Bid Specifications and Requirements" ("the 2017 RFP"). A true copy of the 2017 RFP is annexed hereto as Attachment No. 1.

28.  In response to the 2017 RFP, the IWLCA received proposals from multiple providers of event management services, including Defendant CSE. A true copy of CSE's response to the 2017 RFP is annexed hereto as Attachment No. 2.

29.  On May 10, 2017, The IWLCA Board of Directors accepted CSE's proposal to host the IWLCA Tournaments in 2018, 2019 and 2020 pursuant to the terms set out in the RFP.

- 14 -

30.   Upon the IWLCA's acceptance of CSE's proposal, the terms of the 2017 RFP and CSE's response to it became a binding and enforceable contract between CSE and the IWLCA to govern the 2018, 2019, and 2020 IWLCA Tournaments.

31.   The IWLCA did employ CSE to host the IWLCA Tournaments in 2018 and 2019, and the IWLCA compensated CSE for its services.

32.   On March 30, 2020, the IWLCA published a Request for Proposals to provide event management services for the IWLCA Tournaments in 2021, 2022, 2023 and 2024 (the "2020 RFP"). A true and accurate copy of the IWLCA's 2020 RFP is annexed hereto as Attachment No. 3.

33.   CSE notified the IWLCA Board of Directors by letter dated March 15, 2020, that CSE intended to submit a proposal in response to IWLCA's RFP to provide event management services for the IWLCA Tournaments in 2021, 2022, 2023 and 2024. A true copy of CSE's notice is annexed hereto as Attachment No. 4.

34.   More than a dozen other event management firms have notified the IWLCA Board of Directors that they also intend to submit a proposal in response to the 2020 RFP to manage the IWLCA's Tournaments in 2021, 2022, 2023, and 2024.

35.   Between December of 2019 and April of this year, the IWLCA's Executive Director directed CSE to produce information and documents relating to the 2020 IWLCA Tournaments, all of which were necessary to enable the IWLCA's Board of Directors to evaluate the IWLCA's exposure in the event that any or all of the 2020 tournaments would be canceled as a result of the COVID-19 pandemic. For example, the IWLCA requested:

a.  Copies of all insurance policies that CSE was required to obtain for each of the 2020 IWLCA Tournaments;

- 15 -

b.  Copies of all agreements relating to the 2020 IWLCA Tournaments (*e.g.*, sponsorship agreements, vendor agreements, and all use permits CSE obtained from state or local governments for each of the 2020 IWLCA Tournaments);

c.  A listing of the teams registered for each of the 2020 IWLCA Tournaments, and the amount each team had paid in deposits and registration fees for those tournaments; and

d.  An accounting of the expenses incurred to date in connection with the 2020 IWLCA Tournaments.

36.  Defendants refused – and continue to refuse – to produce any of the foregoing information, policies, contracts, and other materials, and Defendants continue to withhold these pertinent materials and information from the IWLCA.

37.  Defendants have all of the information and materials the IWLCA requested.

38.  CSE is required to produce the requested information and materials that the IWLCA requested pursuant to CSE's contract with the IWLCA, CSE's duty of loyalty to the IWLCA, CSE's fiduciary duty to the IWLCA, and because CSE obtained the information and materials in furtherance of its contract with the IWLCA and while acting as the IWLCA's agent and fiduciary.

39.  While Defendants were refusing to produce the information and documentation the IWLCA Board of Directors needed to evaluate the safety and viability of holding the 2020 IWLCA Tournaments, Defendants filed applications seeking to convert ownership of the trademarks for the IWLCA Tournaments to themselves. Notably, Defendants were applying for ownership of the IWLCA's marks for CSE, not the IWLCA. Defendants never disclosed this to the IWLCA; the IWLCA learned of CSE's trademark applications from a third-party.

- 16 -

### D. The IWLCA Canceled All 2020 IWLCA Tournaments Due to the COVID-19 Pandemic and Directed CSE to Issue Refunds to All Registrants.

40.    From April 10 through April 13, 2020, the IWLCA Board of Directors met virtually to discuss and decide whether the 2020 IWLCA Tournaments could go forward as scheduled, and whether they should go forward as scheduled in light of the health and safety risks that such events pose to the student-athletes, coaches, families, officials, event staff, and the IWLCA's member coaches.

41.    On April 13, 2020, the IWLCA Board of Directors voted to cancel all 2020 IWLCA Tournaments based on the extraordinary risks to health and safety and to the national economy posed by gatherings of *thousands of people from all over the country* to engage in close physical contact during the COVID-19 pandemic that had already infected over a million Americans.[9]

42.    The IWLCA notified Defendants of its decision to cancel all 2020 IWLCA Tournaments.

43.    Because Defendants had collected the IWLCA's registration fees and deposits as part of its management responsibilities, the IWLCA directed Defendants to issue full refunds of registration fees and deposits to the registrants, less a prorated amount of documented unrecoverable expenses CSE previously incurred, if any.

44.    Similarly, in 2017, the IWLCA canceled the IWLCA Recruit Experience Tournament, directed CSE to process full refunds to all registrants, and CSE promptly announced the cancellation and processed full refunds to all registrants.

---

[9] The number of infected Americans is based only on the number of Americans who tested positive, and only 2% of Americans have been tested for COVID-19. The actual number of infected Americans is orders of magnitude greater than the roughly one million "confirmed cases."

- 17 -

45. Based on prior years' expenses, the unrecoverable expenses incurred to that point, if any, would not exceed a prorated amount of $100.00 per team, yielding a refund of $1,700.00 to each team who paid the full registration fee for any tournament, and a full refund of deposits that have been paid for the final tournaments in the schedule.

46. The IWLCA had previously discussed with CSE and Lee Corrigan the possibility that the tournaments would be canceled and, upon making the decision, the IWLCA immediately notified Defendants of its decision. Defendants were the first to be informed of the IWLCA's decision.

47. The IWLCA notified its membership of the decision to cancel the 2020 IWLCA Tournaments, and, following that, the IWLCA released a public statement to notify the lacrosse community and the registrants of the 2020 IWLCA Tournaments that the tournaments were canceled.

48. When the registrants began asking for the refund of their registration fees and deposits for the 2020 IWLCA Tournaments, Defendants refused to issue the refunds and converted the IWLCA's funds to their own use.

E. **CSE Refused to Comply with the IWLCA's Directive to Issue Refunds, Converted the IWLCA's Funds to its Own Use, and Made False Public Statements Calculated to Mislead Registrants into Believing the IWLCA Tournaments were "Not Canceled" and "Still On"**

49. The IWLCA was unable to communicate directly with the registrants of the 2020 IWLCA Tournaments because Defendants refused the IWLCA's repeated request for a list of clubs registered for the 2020 IWLCA Tournaments. Defendants thereby blocked the IWLCA from communicating its decision to cancel all 2020 IWLCA Tournaments and to issue refunds directly to the registrants of those tournaments.

- 18 -

50. All while withholding the list of clubs registered for the 2020 IWLCA Tournaments and blocking the IWLCA's ability to communicate its decision to cancel and issue refunds to registrants, Defendants engaged in a series of communications that were calculated to deceive the IWLCA's customers and consumers into believing that the IWLCA had not canceled the 2020 IWLCA Tournaments, and that all of the IWLCA Tournaments would be held as scheduled. Defendants' communications consisted of false and misleading statements to the IWLCA's customers and consumers, including, for example:

a. A statement falsely asserting that the 2020 IWLCA Tournaments "are not canceled" and that they would be held as scheduled;

b. On April 18, 2020, Defendants issued a "press release" falsely asserting, in part:

> Contrary to the IWLCA's announcement earlier today, Corrigan Sports Enterprises plans to host the scheduled 2020 New England Cup, Junk Brands Midwest Cup, STX Capital Cup, Junk Brands Champions Cup and Brine Presidents Cup Presented by New Balance. We regret that the IWLCA Board of Directors has decided to step away from its "official involvement" with the tournaments this year.[10]

c. Also, on April 18, 2020, CSE posted a public "announcement" to Twitter stating, "DESPITE THE RUMORS, GIRLS LAX TOURNAMENTS ARE STILL ON! MORE INFO COMING SOON – VISIT CSELAX.COM."[11] CSE's post prominently displayed IWLCA's trademarks, including the names and logos of

---

[10] CORRIGAN SPORTS OFFICIAL STATEMENT, https://medium.com/@CSELax/corrigan-sports-official-statement-131a7657b8dc (last visited May 6, 2020); *see also* @CSELax, TWITTER (Apr. 18, 2020, 2:52 PM), https://twitter.com/CSELax/status/1251584431644606472.

[11] @CSELax, TWITTER (Apr. 18, 2020, 3:32 PM), https://twitter.com/CSELax/status/1251594736470831111.

each of the IWLCA Recruiting Tournaments (modified only by removing "IWLCA" from each tournament's trademark name and logo).

    d.  This April 18 press release prominently displayed the IWLCA Tournament trademarks – modified to remove IWLCA's name from them – shown below.



Figure 2: Extracted image from CSE's April 18 press release highlights the confusion caused by the use of the IWLCA Tournament trademarks without the IWLCA name.[12]

    e.  On April 20, 2020, in another public statement, CSE admitted that its conflicting statements caused confusion among the IWLCA's customers and consumers, but then proceeded to exacerbate the confusion – and the damage to the IWLCA – by arrogating to itself the names of all of the IWLCA Tournaments.

In CSE's April 20 statement:

    i.  CSE renames the IWLCA Capital Cup as the "CSE Capital Cup";

    ii.  CSE renames the IWLCA Champions Cup as "CSE Champions Cup";

---

[12] CORRIGAN SPORTS OFFICIAL STATEMENT, https://medium.com/@CSELax/corrigan-sports-official-statement-131a7657b8dc (last visited May 6, 2020); *see also* @CSELax, TWITTER (Apr. 18, 2020, 2:52 PM), https://twitter.com/CSELax/status/1251584431644606472. *Compare* Figure 2, *with* Attachment No. 5.

Case 1:20-cv-00425-TDS-LPA   Document 7   Filed 05/14/20   Page 20 of 79

    iii.  CSE renames the IWLCA New England Cup as the "CSE New England Cup";

    iv.  CSE renames the IWLCA Midwest Cup as the "CSE Midwest Cup";

    v.  CSE renames the IWLCA President's Cup and Debut as the "CSE President's Cup and Debut"; and

    vi.  CSE renames the IWLCA Recruiting Series as the "CSE Recruiting Series."

    f.  As well, CSE falsely asserted that these tournaments "will look and feel the exact same as they always have," knowing that to be false because there never has been a CSE Capital Cup, a CSE Champions Cup, a CSE New England Cup, a CSE Midwest Cup, a CSE President's Cup and Debut, or a CSE Recruiting Series. Again, CSE's false statements were calculated to mislead the IWLCA's customers and consumers generally into believing that the IWLCA's events were not canceled and would be "the exact same" as the IWLCA events that devoted customers and consumers have grown to trust over the last 14 years.

## F.  Days After Falsely Claiming that the IWLCA Tournaments were "Not Canceled," CSE Cancels the First Two Tournaments and Refuses to Recognize and Communicate State-Issued Directives

    51.  On April 23, 2020, Defendants canceled the IWLCA Champions Cup (which the IWLCA had announced as canceled on April 18, 2020). This tournament was scheduled to take place on June 19-21, 2020, in Midlothian, Virginia. Defendants did not issue refunds to the registrants. Instead, Defendants claim that "the same," "recruiting" event will be held on August 7-9, 2020. But of those dates are within a "dead period" under NCAA rules, during which NCAA rules prohibit coaches from watch prospective student athletes compete in person – that is, events like the IWLCA Champions Cup. Promising to provide a "recruiting tournament" during a

dead period is deceptive standing alone, and even more so in light of Defendants'
contemporaneous public statement that the 2020 recruiting tournaments will have
"even more college coach involvement" than in the past.

52.  On April 30, 2020, Defendants canceled the IWLCA New England Cup
(which the IWLCA had announced as canceled on April 18, 2020). This tournament
was scheduled to take place on June 26-28, 2020, in Amherst, Massachusetts.
Defendants did not issue refunds to the registrants. Instead, Defendants claim that
"the same," "recruiting" event will be held July 24-26, 2020 in Amherst,
Massachusetts. Massachusetts, however, has barred all events like the New England
Cup. Specifically, "all athletic events and activities that bring participants into close,
physical contact, whether they are conducted indoors or outdoors, are prohibited,
even those involving 10 or fewer people."[13]  Moreover, Massachusetts has the third
highest number of COVID-19 cases among all states. Yet Defendants fail to disclose
these facts in their public statements assuring registrants and others that the New
England Cup will go on as planned, knowing that the majority of registrants are not
from Massachusetts and therefore would be unlikely to know that the tournament's
activities are specifically banned in Massachusetts.

53.  Defendants refuse to comply with the IWLCA's directive to issue refunds to
the registrants of the canceled IWLCA Midwest Cup, previously scheduled to take
place July 11-12, 2020 in Aurora, Illinois. Illinois has 58,505 confirmed cases of
COVID-19 and 2,559 deaths; it ranks fourth in the number of COVID-19 cases and
deaths. On April 30, 2020, Illinois' Governor issued an executive order prohibiting "all

---

[13] Exec. Office of Health & Human Services, REVISED GUIDANCE REGARDING THE ORDER
BY THE GOVERNOR PROHIBITING ASSEMBLAGES OF MORE THAN 10 PEOPLE AND ON-
PREMISES CONSUMPTION OF FOOD AND BEVERAGES ISSUED (March 23, 2020),
https://www.mass.gov/doc/march-23-assemblage-guidance/download.  Commissioner  Monica
Bharel's Guidance has the force of law and violations are punishable by civil and criminal penalties.
*Id.*

public and private gatherings of any number of people occurring outside a single household or living unit."[14] Moreover, the Executive Order prohibits all travel "except Essential Travel and Essential Activities," none of which include travel to or from a club lacrosse tournament. Yet Defendants fail to disclose these facts in their public statements assuring registrants and others that the Midwest Cup will go on as planned, knowing that the majority of registrants are not from Illinois and therefore unlikely to know that the tournament's activities – *including traveling to the tournament* – are specifically banned in Illinois.

54.    Defendants also refused to comply with the IWLCA's directive to issue refunds to the registrants of the canceled IWLCA Capital Cup, previously scheduled to take place July 16-19, 2020 in North East, Maryland.

55.    Defendants also refused to comply with the IWLCA's directive to issue refunds to the registrants of the canceled IWLCA Presidents Cup and the IWLCA Debut, previously scheduled to take place on November 20-22, 2020 in Wellington, Florida. This tournament is the largest of all IWLCA events and involves air travel of approximately 90% of the participants.

G.  **CSE is Now Leveraging its Wrongful Conversion of the IWLCA's Funds to Extort Agreements from the IWLCA's Registrants to Apply their Registration Fees to a Future, Unrelated CSE Event or Accepting a Lesser Refund than the IWLCA Directed CSE to Give**

56.    Knowing that the 2020 IWLCA Tournaments have been canceled and that CSE's claim to be "going forward" with "the same" IWLCA events is false, CSE

---

[14] Ill. Exec. Order No. 2020-32 (Apr. 30, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-32.aspx.

nonetheless refuses to comply with the IWLCA's directive to refund the registration fees, less unrecoverable expenses, to the registrants.

57.    Instead Defendants are holding the IWLCA's registration fees hostage while attempting to extort an agreement from the registrants to accept a lesser refund than the IWLCA directed CSE to give or apply the full registration fee (which belongs to the IWLCA) to a "future" CSE event.

58.    In light of CSE's misappropriation and conversion of the IWLCA's funds and trademarks to its own use and other unlawful conduct, "future CSE events" will certainly not be the IWLCA events.

59.    And the registrants want to attend the IWLCA events, since the events' purpose is "recruiting" of student-athletes by the IWLCA's membership; that is, the coaches of NCAA and NAIA women's lacrosse programs.


## RESPONDEAT SUPERIOR

60.    Liability for the wrongful conduct of Lee Corrigan described herein is imputed to CSE by operation of the doctrine of *respondeat superior* because his conduct was authorized and/or ratified by CSE; it was within the scope of his employment and agency with CSE and in furtherance of CSE's business interests, and CSE has profited and continues to profit from it.


## CAUSES OF ACTION

## I. CONSTRUCTIVE FRAUD
(Breach of Fiduciary Duty, Duty of Loyalty, Misappropriation of Funds)

- 24 -

*Against CSE and Lee Corrigan, in his individual and official capacities*

61.    Plaintiff incorporates all of the foregoing allegations by reference here.

62.    By agreeing to collect deposits and registration fees from lacrosse club teams and coaches for the IWLCA's 2020 Tournaments – and by collecting more than one million dollars in deposits and registration fees for the IWLCA's 2020 Tournaments, CSE and Lee Corrigan placed themselves in a position of confidence and trust with respect to Plaintiff's funds, creating in CSE and Lee Corrigan a fiduciary duty and a duty of loyalty towards the IWLCA.

63.    CSE and Lee Corrigan wrongfully retained, misappropriated, and converted to their own use the funds entrusted to them by Plaintiff by:

    a.    Willfully refusing to comply with the IWLCA's directive to refund the registration fees and deposits, less any documented unrecoverable expenses CSE incurred prior to the IWLCA's cancellation of the COVID-19 affected IWLCA Tournaments, to the club teams and coaches when the IWLCA's Board of Directors canceled the IWLCA's 2020 Tournaments;

    b.    Misappropriating and wrongfully converting to their own use over one million dollars of the IWLCA's funds, which Defendants collected as a fiduciary of the IWLCA and solely for the purpose of funding the IWLCA's 2020 Tournaments;

    c.    Requiring the club teams and coaches who paid for the canceled IWLCA's Tournaments to either accept a smaller refund than the refund the IWLCA directed Defendants to give (*i.e.*, a full refund less any unrecoverable expenses CSE incurred prior to the IWLCA's cancellation of the COVID-19 affected IWLCA Tournaments) or agree to apply their IWLCA tournament fees towards a future CSE event wholly unrelated to the IWLCA.

- 25 -

64. Defendants' wrongful retention, conversion and misappropriation of the IWLCA's funds for their own use constitutes a breach of Defendants' fiduciary duty owed to Plaintiff.

65. The foregoing breaches of Defendants' fiduciary duty and duty of loyalty constitute constructive fraud.

66. As a result of Defendants' wrongful conduct, Plaintiff has been injured in an amount to be determined by a jury, and will suffer harms for which there is no adequate remedy at law and, as such, Plaintiff is entitled to injunctive relief requested below.

67. The IWLCA further requests an order disgorging the IWLCA's funds from Defendants and all profits or gains Defendants wrongfully obtained by converting the IWLCA's funds to their own use, and award to the IWLCA full restitution of all funds that Defendants wrongfully retained, misappropriated, and/or converted to their own use.

68. The IWLCA further requests that the Court impose a constructive trust on all of the fees and deposits for the 2020 IWLCA Tournaments that Defendants collected from registrants; and on Defendants' assets to the extent necessary to ensure that the IWLCA recovers the funds that Defendants have wrongfully retained, misappropriated, and/or converted to their own use; and on all revenues Defendants derived from the unlawful conduct described herein.

## II. VIOLATIONS OF THE LANHAM ACT (15 U.S.C. §§ 1051, *ET SEQ.*)
### *Against CSE and Lee Corrigan, in his individual and official capacities*
69. Plaintiff incorporates all of the foregoing allegations by reference here.

70. The Lanham Act protects a trademark – including the words, symbols, phrases, slogans or logos used to identify the goods, services, or event of a particular entity – against the use of the same or similar marks by competitors.

71. The IWLCA has trademarks for each of the IWLCA Tournaments, which include words, symbols, phrases, slogans, and logos, which identify the IWLCA Tournaments. A true and accurate reproduction of the IWLCA's trademark is set out in Attachment No. 5 (collectively, "the IWLCA Trademarks").

72. The IWLCA has used the IWLCA Trademarks in commerce to promote and brand the IWLCA Tournaments in commerce for years, and the IWLCA was the first to use the IWLCA Trademarks in commerce.

73. The IWLCA Trademarks are distinctive; each one has the capacity to identify and distinguish particular goods, services, and events as emanating from one producer or source and not another.

74. The IWLCA has a valid and legally protectable trademark in the tournament names and logos that the IWLCA has used in commerce to promote and brand the IWLCA Tournaments, which are reproduced in Attachment No. 5.

75. The IWLCA owns each mark set out in Attachment No. 5.

76. Defendants' use of the IWLCA's Trademarks and deceptively similar marks (e.g., the marks set out in Attachment No. 6), constitute infringement upon, dilution by blurring, and dilution by tarnishment of the IWLCA's Trademarks in violation of the Lanham Act.

77. Defendants use in commerce of IWLCA's Trademarks and deceptively similar marks, false or misleading descriptions of fact, and false or misleading representation of fact, as alleged herein are:

a. likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of CSE with the IWLCA, or as to the origin, sponsorship, or approval of CSE's goods, services, or commercial activities by the IWLCA; and/or

b. in CSE's commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of CSE's goods, services, or commercial activities as "the same as" those of the IWLCA, including the IWLCA Tournaments

78. As a result of the foregoing, the IWLCA believes that it is or is likely to be damaged by CSE's use of the IWLCA Trademarks and the virtually identical marks CSE has used since the IWLCA canceled the 2020 IWLCA Tournaments.

79. In fact, Defendants' use of the IWLCA's Trademarks and similar marks has already caused consumer confusion and dilution. And this is no accident. Defendants are deliberately using the IWLCA's Trademarks to create consumer confusion, hoping to mislead consumers into believing that their events are "the same" as the IWLCA Tournaments. This is just one dimension of Defendants' deceptive scheme that includes Defendants' public and private statements designed to mislead consumers into believing that (a) the 2020 IWLCA Tournaments have not been canceled, knowing that IWLCA has canceled them; (b) that Defendants are holding the 2020 IWLCA Tournaments, which they are not; and (c) that Defendants will continue to hold the IWLCA Tournaments in the future, knowing that those representations are false, likely to dilute the IWLCA's Trademarks, and likely to confuse customers and consumers of the IWLCA Tournaments.

80. Defendants engaged in the foregoing conduct intentionally, willfully, and in callous disregard of the IWLCA's Trademarks.

- 28 -

81.   As a result of Defendants' violations of the Lanham Act, the IWLCA is entitled to preliminary and permanent injunctive relief including, *inter alia*, an order barring Defendants from using any of the marks set out in <u>Attachment No. 5</u> and <u>Attachment No. 6</u> and any similar marks.

82.   The IWLCA is entitled to all remedies available for violations of the Lanham Act for Defendants' unlawful use of the IWLCA's Trademarks in their attempt to mislead consumers into believing that the canceled IWLCA Tournaments are "postponed" or otherwise not canceled in furtherance of Defendants' scheme to unlawfully retain, misappropriate, and convert to their own use the IWLCA's funds. Such remedies include, without limitation –

    a.   A preliminary and permanent injunction preventing CSE from using IWLCA's trademarks or any similar mark in commerce;

    b.   Disgorgement of the registration fees Defendants fail to refund to registrants;

    c.   Disgorgement of Defendants' profits;

    d.   Damages sustained by the IWLCA;

    e.   The costs of the action; and

    f.   An award of up to three times the amount found as actual damages, or, if the amount of the recovery based on profits is inadequate, such sum as the Court shall find to be just.

### III. UNFAIR OR DECEPTIVE TRADE PRACTICES, ACTS, AND METHODS OF COMPETITION (N.C. GEN. STAT. §§ 75-1.1, *et seq.*)

*Against CSE and Lee Corrigan, in his individual and official capacities*

83.   Plaintiff incorporates all of the foregoing allegations by reference here.

- 29 -

84. The conduct of Defendants described herein constitute unfair or deceptive acts or practices in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1.

85. The conduct of Defendants described herein constitute unfair methods of competition in or affecting commerce in or affecting commerce, in violation of N.C. Gen. Stat § 75-1.1.

86. As a result of the Defendants' unfair or deceptive acts or practices in or affecting commerce, Plaintiff is entitled to recover compensatory damages in an amount to be determined by a jury, and Plaintiff is further entitled to have their compensatory damages awards trebled in the judgment.

87. As a result of the Defendants' unfair methods of competition in or affecting commerce, Plaintiff is entitled to recover compensatory damages in an amount to be determined by a jury, and Plaintiff is further entitled to have their compensatory damages awards trebled in the judgment.

## V. BREACH OF CONTRACT

*Against CSE*

88. Plaintiff incorporates all of the foregoing allegations by reference here.

89. The parties entered into a contract whereby CSE would be employed by IWLCA to provide management services for the 2020 IWLCA Tournaments.

90. The terms of the parties' contract are set out in the IWLCA's 2017 RFP, and the proposal CSE submitted in response, and in the course of dealing between the parties.

91. CSE breached the contract in all the ways alleged herein, including, for example, by:

- 30 -

a. Refusing to produce the information, contracts, policies, permits, and registration information CSE collected pursuant to the contract upon the IWLCA's request;

b. Refusing to comply with the IWLCA's directive to process refunds to the registrants for all 2020 IWLCA Tournaments;

c. Converting the IWLCA's funds to CSE's own use after CSE collected the funds in its capacity as the IWLCA's fiduciary and agent;

d. Converting the IWLCA's trademarks to its own use in furtherance of its ongoing effort to mislead the IWLCA's customers and consumers into believing that the IWLCA's Tournaments are not canceled, that they will still be held, and that CSE is going to host "the same" IWLCA Tournaments.

e. Leveraging its wrongful retention and conversion of the IWLCA's funds to extort agreements from IWLCA's customers and consumers to redirect the registration fees they paid for the IWLCA Tournaments to an unspecified CSE event in 2021 that will have nothing to do with the IWLCA.

f. Leveraging its wrongful retention and conversion of the IWLCA's funds to extort agreements from IWLCA's customers and consumers to accept a refund of only 60% of the refund IWLCA directed CSE to issue to all registrants; thereby producing a windfall of hundreds of thousands of dollars for events that CSE will not host.

g. Failing to procure insurance against the losses from the cancellation of the IWLCA Tournaments.

h. Breaching its fiduciary duty and duty of loyalty to the IWLCA; and

i. In other ways alleged above and to be shown at trial.

92. As a direct and proximate result of the foregoing breaches, CSE has caused the IWLCA to suffer damages.

93. The IWLCA is therefore entitled to an award of damages for CSE's breaches in an amount to be determined by a jury.

## VI. UNJUST ENRICHMENT
*Against CSE and Lee Corrigan, in his individual and official capacities*

94. Plaintiff incorporates all of the foregoing allegations by reference here.

95. Defendants were unjustly enriched by their wrongful retention, misappropriation, and conversion of the IWLCA's funds to their own use after the IWLCA directed Defendants to issue refunds to all registrants of the 2020 IWLCA Tournaments.

96. Defendants are liable for the return of all registration fees and deposits collected in connection with the 2020 IWLCA Tournaments, as well as any other improper fees and charges Defendants imposed upon the IWLCA's registrants

97. Plaintiff is entitled to money damages from Defendants on account of Defendants' unjust enrichment through unscrupulous and unfair practices in the wrongful retention, misappropriation, and conversion to its own use of the funds that Defendants collected in their fiduciary capacity for the IWLCA.

## VII. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
*Against CSE and Lee Corrigan, in his individual and official capacities*

98. Plaintiff incorporates all of the foregoing allegations by reference here.

99. Defendants owed Plaintiff the common law duty of good faith and fair dealing in connection with their collection of deposits and registration fees for the IWLCA's 2020 Tournaments. Defendants covenanted that they would deal with Plaintiff fairly, openly, and honestly in collecting and safeguarding the IWLCA's funds.

100. Defendants failed to do so.

101. Defendants breached their duties of good faith and fair dealing in the following respects:

a. By engaging in unfair and deceptive trade practices and acts which affected commerce and which proximately resulted in injury to the IWLCA;

b. By breaching their fiduciary duty and duty of loyalty they owe to the IWLCA;

c. By failing to properly issue refunds of deposits and registration fees Defendants collected for the IWLCA Tournaments that the IWLCA has now canceled in violation of IWLCA's clear and repeated directive to do so;

d. By, immediately after IWLCA announced the cancellation of the 2020 IWLCA Tournaments, making public statements falsely asserting that the IWLCA Tournaments were not canceled, that all of them would be held, and then, days later, purporting to "postpone" the first two IWLCA 2020 Tournaments, knowing that Defendants would not actually host those or any other IWLCA 2020 Tournament;

e. By using a purported "postponement" of tournaments as a pretext to unlawfully retain, misappropriate, and convert Plaintiff's funds to Defendants' own use;

- 33 -

f. By taking unfair advantage of their position of control over Plaintiff's funds and the IWLCA's property to unlawfully retain, misappropriate, and convert those assets to Defendants own use for their benefit and to the harm of Plaintiff;

g. By attempting to register the IWLCA's trademarks for the purpose of confusing and misleading the registrants of the IWLCA's Tournaments into believing that the 2020 IWLCA Tournaments were not canceled and to facilitate Defendants' scheme to retain and convert the IWLCA's funds to Defendants' own use;

h. By engaging in unfair and unscrupulous practices as alleged above; and

i. In other ways to be proved through discovery and at trial.

102. As a direct and proximate result of Defendants' breach of their duty of good faith and fair dealing, Plaintiff has suffered damages and is entitled to recover damages from Defendants in an amount to be determined by a jury.

## VIII. PUNITIVE DAMAGES
*Against CSE and Lee Corrigan, in his individual and official capacities*

103. All of the foregoing allegations are incorporated by reference here.

104. The conduct giving rise to the liability of Lee Corrigan on the foregoing causes of action for compensatory or nominal damages was accompanied by fraud, malice, and willful or wanton conduct of Lee Corrigan

105. Officers, directors, or managing employees of CSE, including Lee Corrigan, participated in, condoned, or ratified the fraud, malice, and willful or wanton conduct that accompanied the conduct giving rise to liability on the foregoing causes of action.

106.     Therefore, Plaintiff is entitled to an award of punitive damages against Lee Corrigan and an award of punitive damages against CSE in an amount to be determined by a jury.

<u>PRAYER FOR RELIEF</u>

107.     To redress the injuries Plaintiff suffered as a result of Defendants' conduct and to prevent the substantial risk of irreparable injury to Plaintiff as a result of the Defendants' misconduct alleged herein, Plaintiff respectfully requests the following relief:

a.   Declare Defendants' conduct to be unlawful;

b.   Enter a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction that:

   i.   Cease any and all use of the IWLCA trademarks and deceptively similar marks;

   ii.   Cease any and all public and private statements about the IWLCA and the 2020 IWLCA Tournaments; and

   iii.   Immediately refund the registration fees, less any documented unrecoverable costs incurred prior to the IWLCA's cancellation of the COVID-19 affected IWLCA 2020 Tournaments, to be approved by this Court.

   iv.   Immediately provide the IWLCA with the information and materials the IWLCA has requested and those the IWLCA is entitled to, including, for example:

      1. Copies of all insurance policies that CSE was required to obtain for each of the 2020 IWLCA Tournaments;

- 35 -

2. Copies of all use permits issued by state or local governments (or universities) for each of the 2020 IWLCA Tournaments, including all revocations of such permits;

3. Copies of all agreements relating to the 2020 IWLCA Tournaments (*e.g.*, sponsorship agreements, vendor agreements, and all use permits CSE obtained from state or local governments for each of the 2020 IWLCA Tournaments);

4. A listing of the teams registered for each of the 2020 IWLCA Tournaments, the current contact information for each registrant, and the amount each team has paid in deposits and registration fees for those tournaments; and

5. Documentation of any expenses CSE has incurred in connection with any of the 2020 IWLCA Tournaments.

c. Award Plaintiff compensatory damages in an amount to be established at trial;

d. Award Plaintiff exemplary damages in an amount to be established at trial;

e. Award Plaintiff the costs of this action, including Plaintiff's reasonable attorneys' fees as allowed by law; and

f. Award Plaintiff all other and further relief the Court deems just and proper.

## JURY TRIAL DEMAND

108.     Plaintiff demands a jury trial on all issues that may be tried to a jury.

Respectfully submitted. 6 May 2020

Robert C. Ekstrand
N.C. Bar No. 26673
Stefanie Sparks Smith
N.C. Bar No. 42345
EKSTRAND & EKSTRAND LLP
110 Swift Avenue
Durham, NC 27705
rce@ninthstreetlaw.com
sas@ninthstreetlaw.com
Tel. (919) 416-4590
Counsel for the IWLCA

- 37 -

## VERIFICATION

I have reviewed the foregoing Complaint, and I affirm, under the penalties for perjury, that the factual allegations set out therein are true except those allegations made upon information and belief, and, as to those allegations, I believe them to be true.

Elizabeth Robertshaw

Executive Director of the IWLCA

Case 1:20-cv-00425-TDS-LPA   Document 7   Filed 05/14/20   Page 38 of 79



**Request for Proposal**

**IWLCA 2018, 2019, & 2020**
**New England Cup Recruiting Tournament**
**Champions Cup Recruiting Tournament**
**Midwest Cup Recruiting Tournament**
**Capital Cup Recruiting Tournament**
**Debut/Uncommitted Tournament**
**Presidents Cup Recruiting Tournament**

**Host Bid Specifications and Requirements**

## INTRODUCTION

The Intercollegiate Women's Lacrosse Coaches Association ("IWLCA" and/or "Association") is pleased to offer interested organizations the opportunity to submit a proposal to host the 2018, 2019 & 2020 IWLCA Recruiting Tournaments.

## THE IWLCA

The IWLCA is a membership-led nonprofit association representing the nation's intercollegiate women's lacrosse coaches within Division I, II & III of the National Collegiate Athletic Association (NCAA). The IWLCA is a 501c Non-Profit educational organization.

## THE TOURNAMENT

**The student-athletes eligible to participate in this tournament will be female student-athletes who will be entering their sophomore, junior and senior years in high school.**

The IWLCA recruiting tournaments must be hosted and conducted as stand alone events and not incorporated in or advertised as a division or sub-division of another event or tournament.

## FINANCIAL ARRANGEMENTS

Your proposal must include a proposed budget and financial report that reflects all revenue sources, championship expenses, and commitments by the bid respondent and a revenue sharing agreement with the IWLCA.

## BID PHASE:

**BID PHASE NO. 1: REQUESTS FOR BIDS**
The information contained in this document provides the minimum bid specifications for hosting a future IWLCA recruiting tournament, as well as essential information that will provide assistance in the development of a creative, comprehensive and competitive bid proposal.

**BID PHASE NO. 2: QUESTIONS AND ANSWERS**
All questions can be addressed to Gothard Lane, Executive Director of the IWLCA.

**BID PHASE NO. 3: BID SUBMISSION**
Completed bid proposals will be due by 5:00PM ET, Friday, March 10, 2017

**BID PHASE NO. 4: COMMENT PERIOD**
The IWLCA will review and analyze completed proposals, and may seek further clarification from one or more of the proposed hosts in connection with their respective proposals.

**BID PHASE NO. 5: HOST DETERMINED**

The IWLCA will review all materials and determine the winning proposal. Such decisions are not considered final until they are approved by the IWLCA Board of Directors.

## Bid Submission

*The bid documents referenced herein shall become the property of the IWLCA upon submission thereof. The IWLCA shall not be liable or responsible for any costs, expenses or other liabilities associated with the preparation and/or submission of the bid documents referenced herein.*

## BID SPECIFICATIONS AND REQUIREMENTS

## Entry Fee

Team entry fee shall be $1800.00.

The fee for an individual athlete to participate on a house team during an IWLCA tournament shall not exceed $90.00

All other fees proposed by HOST with regard to or related to the tournament must be approved by the IWLCA in advance.

## Proposed Event Dates

New England Cup: Saturday & Sunday, June 9 & 10, 2018, June 8 & 9, 2019 & June 13 & 14, 2020

Champions Cup: Friday, Saturday & Sunday, June 15, 16 & 17, 2018, June 14, 15 & 16, 2019, June 19, 20 & 21, 2020

Midwest Cup: Saturday & Sunday, July 14 & 15, 2018, July 13 & 14, 2019, July 11 & 12, 2020

Capital Cup: Thursday, Friday, Saturday & Sunday, July 19, 20, 21 & 22, 2018, July 18, 19, 20 & 21, 2019, July 16, 17, 18 & 19, 2020

Uncommitted Tournament:  Saturday, October 20, 2018, October 19, 2019, October 17, 2020

President Cup: Friday, Saturday & Sunday: November 16, 17 & 18, 2018, November 22, 23 & 24, 2019, November 20, 21 & 22, 2020

## Event Competition & Support Facility Requirements

- Thursday of the event – Facilities available to all teams: 12:00 – 11:00pm
- Friday of the event – Facilities available to all teams: 12:00 – 11:00pm
- Saturday of the event – Facilities available to all teams: 6:00am – 11:00pm
- Sunday of the event - Facilities available to all teams: 6:00am – 5:00pm


## HOST INFORMATION

- **Experience:** describe your event management history and references.

- **Staff**: list your full-time staff and their roles and responsibilities in your organization as well as in regard to this tournament.

- **Equipment**: what type of equipment (tents, tables, chairs etc.) does your group/company OWN in regard to this tournament? List specific quantities?

- **Management Fee structure:** what is your proposed management fee and what services does this cover?

- **Facility/Facilities:** what facility/facilities do you propose as the host for the tournament? List the site's features including the projected number of teams that the facility could accommodate during the tournament?

- **Registration:** Describe your team and player registration process?

- **Facility Set-up:** What is your suggested set up for fields/vendor area/welcome area/college coach area/club registration area?

- **College Coach Benefits**: What is your plan for the treatment for College Coaches?

- **Recruiting:** How do you distribute **players' bios** to college coaches? What data fields are included?

- **Sponsorship:** What relationships do you have with **potential sponsors and vendors**? Give an estimated price range of the additional revenue you could contribute from these parties?

- **Associations:** Are you or your group/company associated to any female club team/organizations?  If so who?


## FACILITY REQUIREMENTS

- A **minimum** of 20-30 full size (60yds x 105yds to 70yds x 120yds) athletic fields, for the Champions, Capital & Presidents Cups, and 10-15 fields for the New England & Midwest

Cup), if lighted, within walking distance of each other and if more than one facility is required, that facility should be within a short driving distance with shuttle service provided by the host. If the fields are not lighted, then a minimum of 25-30 fields will be required.
- Host will appoint a Tournament Manager, Venue Liaison & Hotel Liaison

- The facility must supply permanent or temporary scoring systems for each field.

- The Host will provide adequate on site or adjacent free parking for at least 1500 cars.

- The Host to provide one (1) certified athletic trainer (ATC) for every Four Fields.

- The Host will provide water and ice for each field for the duration of the event.

- The Host will provide adequate staff, including one (1) Field Manager for each field and one (1) Field Area Supervisor for every four (4) fields

- The Host will provide a Hospitality area with food and refreshment for the IWLCA coaches & game officials during the tournament.  Seven meals over the course of the tournament will be served to the coaches.

- The Host will provide two (2) officials for each contest.

- The Host will provide a communication system (walkie-talkies) sufficient in number so that each Field Manager, Field Area Supervisor, ATC Trainer and tournament supervisor may be in continuous contact.


## HOST REPRESENTATIVES

The HOST shall appoint individuals to assume the following duties and responsibilities (understanding that the IWLCA may ask for modifications in the duties assigned to the HOST at its sole discretion).

The responsibilities of these individuals are as follows:

1. **Tournament Manager.** The tournament manager shall work with the IWLCA to ensure that games management responsibilities are fulfilled. Responsibilities include but are not limited to:

- Team Registration Website - Setup and maintain internet website for the registration of teams attending the event.
- Development of Participant/Team Information
- Staff Tournament Check in areas for both Participating Teams and College Coaches
- Receipt of Team Rosters & the Publication of a Tournament Program and College Coaches Recruiting  Book
- Ordering of Champion and Runner Up Awards – Plaques and Medals if needed

- Hiring of Field Managers and Field Area Supervisor
- Hiring of ATC Trainers
- Hiring of Game Officials
- Development of the Tournament Competition Schedule
- Publication of Tournament Program
- Games management
- Volunteer Recruitment

2. **Competition Venue Liaison.** The competition/practice venue(s) shall appoint a knowledgeable member of its staff to serve in this position. Responsibilities include but are not limited to:

- Supervision of competition venue
- Setup and Staff Tournament Check in areas for both Participating Teams and College Coaches
- Setup of College Coaches Observation Area for Each Field (25 Chairs)
- Setup of a Headquarter/Information Tent
- Vendor Booths Organization
- Concessions
- External venue décor
- Security
- Posting and Recording of Competition Results
- Supply game equipment
- Two (2) goals per field
- Game Balls
- Table(s) for Field Managers
- Tent(s) for competing teams, field area managers and ATC Trainer (One per every Four (4) Fields)

3. **Lodging Liaison.** This individual should be a convention and visitors' bureau staff member or a professional hotel account manager. Responsibilities include the administration of the hotel blocks, assistance with securing overflow hotel properties, managing hotel information desk volunteers.


### Hotel Requirement

**Americans with Disabilities Act**

All hotels used for the IWLCA Recruiting Tournaments shall be responsible for complying with the public accommodation requirements of the Americans with Disabilities Act (ADA).


### Permits and Approvals

The municipality in which the competition venue(s) are located shall, through the Host, provide all permits as well as review and approval services at no cost to the IWLCA.

## Competition Venue Guidelines

**Operational Control.** The IWLCA will retain the right to determine and approve all aspects related to the competition venue operations during the tournament.

**Exclusivity.** The IWLCA shall have the exclusive right to the entire competition venue.

**Venue Space Condition.** The competition venue will be provided fully-cleaned with all venue areas in good working condition at no cost to the IWLCA..

## Competition Venue Insurance

1. **Certificate of Insurance.** The competition venue, at its own expense and not subject to reimbursement, shall carry and maintain its own insurance during the entire term of the Agreement, with the following insurance programs provided by insurers rated A.M. Best, A-VII or better. A certificate of insurance evidencing such program must be submitted to the IWLCA no later than six months prior to the tournament, and at any other time requested by the IWLCA. Such policies must contain express conditions that:

a. The IWLCA is given 30 days advance written notice of any modification or termination of any insurance program.

b. The competition venue's insurance providers agree to waive any rights of subrogation they may have against the IWLCA. Failure on the part of the competition venue to procure or maintain required insurance shall constitute a material breach of contract upon which the IWLCA may immediately terminate the Agreement.

2. **Liability Insurance.** The competition venue's insurance will be the primary coverage. When providing the required limits of insurance using a combination of primary and umbrella and/or excess policies, the competition and practice venue will confirm on the certificate of insurance that the umbrella and/or excess policies follow form to the primary insurance and will drop down in the event of exhaustion of the primary insurance. Such liability insurance will name the IWLCA and each of its officers, directors, agents, employees, sponsors and licensees as additional insureds. Such insurance must include the following:

Comprehensive Commercial General Liability insurance, on an occurrence form, with a combined single limit for Bodily Injury and Property Damage, including Products Liability (including completed-operations coverage), coverage for contractual liability, independent contractors, broad form property damage, personal and advertising injury, and no exclusion for beverage alcohol liability, and no exclusion for liability arising from food-borne illness, in an amount of at least Two Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate.

3. **Workers' Compensation Insurance.** The competition venue shall carry a program of workers' compensation insurance in an amount and form which meets all applicable statutory requirements

and which specifically covers all employees who provide services by or on behalf of the competition venue and all risks to such persons under the competition venue agreement.

4. **Competition Venue Destruction Insurance.** In the event the competition venue cannot be used for any reason, with the exception of the sole, active fault or negligence of the IWLCA, thus creating a situation or circumstance where the tournament may not proceed on the dates specified, the competition venue agrees to exercise its best effort to relocate the event, with the final authorization of the new location subject to IWLCA approval.

5. **Event Insurance.** Host will be required to acquire event insurance in order to cover all expenses incurred prior to the tournament in case the tournament is cancelled due to inclement weather, national emergency, or other circumstances.

## Media Rights

The IWLCA possesses the exclusive media rights.

## Volunteers

The Host is responsible for the creation, implementation and execution of an extensive volunteer program, including a comprehensive recruiting and a shift assignment program.

## Age Requirement

Volunteers must be 16 years of age or older. For liability purposes, waiver forms will be provided by the IWLCA for each volunteer and must be collected by the HOST prior to the first day of the tournament.

## Tax Exemption

The IWLCA is a 501c (3) tax exempt organization. and the bid respondents shall include any tax exemption from sales or admission taxes from the state or local governments. If tax exemption is not applicable then all applicable tax rates shall be disclosed and any increases in tax rates from the time of the bid submission shall be absorbed by the bid respondent or rebated back to the IWLCA.

## Payment of Funds

IWLCA shall receive a financial report within 90 days after the conclusion of the tournament. All money payable to the IWLCA shall be paid within 120 days by check or wire transfer pursuant to transfer instructions provided by the IWLCA.

**Financial Audit**

The IWLCA shall have the right to conduct a full financial audit on the tournaments revenues sources and expenditures.

**For Bid Information**

For any questions and/or to submit a bid/proposal for this event, please contact:

Gothard Lane
Executive Director
Intercollegiate Women's Lacrosse Coaches Association
P.O. Box 1124
Grand Lake, CO  80447
P. (443) 951-9611
C. (410) 963-7354
E. glane.iwlca@comcast.net



## CORRIGAN SPORTS ENTERPRISES

### Response to RFP

*IWLCA 2018, 2019, & 2020*

**New England Cup Recruiting Tournament**

**Champions Cup Recruiting Tournament**

**Midwest Cup Recruiting Tournament**

**Capital Cup Recruiting Tournament**

**Presidents Cup Recruiting Tournament**

### Submitted By

**Corrigan Sports Enterprises, Inc.**

**6725 Santa Barbara Ct.  Suite 114**

**Elkridge, MD 21075**

Corrigan Sports Enterprises, Inc. proposal, which follows, contains information and data, which are privileged, confidential, and/or proprietary to this solicitation.   This information and data is commercially sensitive and/or financial in nature, is not made available for public review, and is submitted to the IWLCA on a confidential basis only in response to a specific request.  The Trade Secrets Act, as codified, and any improper use, distribution, protects the information contained herein, among other things, or reproduction is specifically prohibited. No license or right of any kind whatsoever is granted to unidentified party to use the information contained herein unless a written agreement exists between all Corrigan Sports Enterprises, Inc. and any other entity and/or individual which desires access to the information. The information contained herein is submitted to the IWLCA for purposes of review and evaluation in connection with Corrigan Sports Enterprises, Inc. response to the specific request denoted herein. No other use of the information and data contained herein is permitted without the express written permission of Corrigan Sports Enterprises, Inc. "Under no condition, should the information contained herein be provided in any manner whatsoever to any party without first receiving the express written permission of Corrigan Sports Enterprises, Inc.

## REQUESTED HOST INFORMATION

1. **Experience:** describe your event management history and references.

2. **Staff**: list your full-time staff and their roles and responsibilities in your organization as well as in regard to this tournament.

3. **Equipment**: what type of equipment (tents, tables, chairs etc.) does your group/company OWN in regard to this tournament? List specific quantities?

4. **Management Fee structure:** what is your proposed management fee and what services does this cover?

5. **Facility/Facilities:** what facility/facilities do you propose as the host for the tournament? List the site's features including the projected number of teams that the facility could accommodate during the tournament?

6. **Registration**: Describe your team and player registration process?

7. **Facility Set-up:** What is your suggested set up for fields/vendor area/welcome area/college coach area/club registration area?

8. **College Coach Benefits**: What is your plan for the treatment for College Coaches?

9. **Recruiting:** How do you distribute **players' bios** to college coaches? What data fields are included?

10. **Sponsorship:** What relationships do you have with **potential sponsors and vendors**? Give an estimated price range of the additional revenue you could contribute from these parties?

11. **Associations:** Are you or your group/company associated to any female club team/organizations?  If so who?

1. **Company Experience/ Overview**

   Corrigan Sports Enterprises (CSE) was established in 1991 with the goal of creating, managing and implementing athletic events and event marketing platforms nationwide. In that time, CSE has grown into one of the strongest marketing "hands on" organizations in the Mid-Atlantic. CSE and its senior staff have worked closely with the NCAA, ACC, SEC, PGA, AVP, RRCA, USTFA, USA Volleyball and all major sport media outlets. The senior staff spans over 30 continuous years of experience with all aspects of sports management and marketing.

   CSE puts on dozens of lacrosse and running events each year, many of significant magnitude. One of our larger events, the *Baltimore Running Festival*, attracts 25,000 runners annually. According to the various tourism studies, CSE events generates an estimated $65 million in economic impact for the local economies annually. More importantly, more than $2.2 million was raised for local and national charities in 2016.

   A major advantage that CSE offers is a <u>full-time staff of 28</u>, who are dedicated to specific areas of expertise. We also <u>own</u> the majority of the equipment it takes to put on large lacrosse tournaments. Because of our full-time staff and equipment, we minimize our expenditures and "outsourcing", which, under our revenue share model, ultimately translate to a larger net profit for our clients like the IWLCA.

   CSE's strives to meet the needs of the college coaches by providing the best recruiting experience possible. CSE has the capability and flexibility of putting on a superior tournament anywhere in the country. We offer the IWLCA a "Turn-Key" experience and produce high quality tournaments.

**Lacrosse Experience**

CSE first introduce the current revenue sharing model by truly "partnering" with IWLCA. This model allows the IWLCA to monetize the reputation and good will that is created by partnering with the event. Long term, this model assists the IWLCA in amassing significant funding that will give the organization options and the ability to adjust to the ever changing NCAA and high school women's lacrosse landscape.

CSE currently manages all of the IWLCA recruiting tournaments; the IWLCA Champions Cup, the IWLCA Capital Cup, the IWLCA Mid-West Cup, New England Cup and the IWLCA Presidents Cup. CSE introduced the IWLCA "Recruit Experience" in 2016 and is in preparation for introducing the two new IWLCA "Debut" events in 2017.

Corrigan Sports also owns and operates the ***Under Armour All-America Lacrosse*** event.

This event is entering its 11th year and has grown into the premier All-America showcase in the nation. Both the Girl's and Boy's Senior game were nationally televised live in 2016 on ESPNU. The underclassman tournament is the culmination of an extensive two-month national tryout network.

Tryouts are held in eleven geographic regions; Baltimore, Washington, D.C., New England, West Coast, Upstate NY, Long Island, Philadelphia, New Jersey, South, Southwest and the Midwest. A boys and girls team from each region is created to compete in this highly competitive tournament that attracts hundreds of college coaches.

In addition to the actual tournament that occurs on event weekend, CSE handles all aspects of the tryouts in each region that attract over 6,000 players from all over the country. Also important to note is the fact that scores of college coaches attend all of the regional tryouts.

Corrigan Sports owns and operates *CSE TV*, which is the self-contained video production branch of Corrigan sports.

CSETV is capable of creating High Definition Television quality videos to enhance to the experience of all of our events, as well as drastically increase the value of sponsorship elements. CSETV has or can produce and distribute the following,

- ✓      Coaches Roundtable discussions
- ✓      Recruiting Seminars
- ✓      Q & A sessions with coaches for parents & players
- ✓      Custom IWLCA Video Player for use on the IWLCA website
- ✓      Post event highlight videos
- ✓      Marketing video for sponsors

## 2. Staff

CSE will dedicate 28 <u>full time</u> employees to manage the IWLCA events. The following is a snapshot of the "Key Staff" with direct responsibilities for the IWLCA events,

**Lee Corrigan**:            Founder; Executive Director

Lee has over 30 years of sports marketing experience at the highest level. He has worked with the Univ. of Maryland, ACC, SEC, NCAA and the PGA. He has also coached lacrosse for over 20 years at the high school and club level. Lee is a Univ. of Maryland graduate.

**Morgan Cook**:            Women's Lacrosse Director

Day-to-day contact for IWLCA; liaison with college and club coaches; assist in venue selection and management. Prior to rejoining CSE in 2013, Morgan worked at US Lacrosse as the Manager of the First Stick Program that provided equipment and team development resources to new and developing lacrosse teams across the country. Morgan graduated from the University of Delaware, where she played varsity lacrosse.

**Jess Hicks**:            Tournament Administrator/Scheduler

Jess shares duties with Morgan and is responsible for developing team schedules for all of CSE's lacrosse events. Jess is in charge of facilitating the online registration process. Having a dedicated central point of contact for coaches and players provides a consistent source for information, concerns and changes to registration and tournament details. Prior to joining CSE, Jess worked with US Lacrosse. She is a graduate of George Washington University, where she played lacrosse.

**Susan Warpinski:**          Chief Financial Officer

Susan is responsible for all of the Financial/Accounting aspects for the events. Prior to joining CSE, her related work includes working with the Capital Centre (former home of NBA Washington Wizards and NHL Washington Capitals) as a Staff Accountant.

**Don Abramson:**          V.P. Development

Don serves multiple roles for the IWLCA events. This includes venue negotiations and selection, sports commission and tourism bureau liaison, venue management, and onsite operations. He secures grant funding when available. Don has over 30 years of sports management experience which includes working with the University of Maryland, ACC & NCAA lacrosse championships. Don played football and is a graduate of the University of Maryland.

**Andy Biello:**          V.P. of Events

Andy Bilello has more than 27 years of professional experience in sports marketing and public relations. At CSE, he is responsible for developing new initiatives in lacrosse events. Onsite, he oversees the coach's hospitality areas. Andy has an MBA from Univ. of Michigan.

**Chris Tomlinson:**          V.P. of Marketing

Chris manages the websites and marketing efforts. During the event, Chris manages the College Coaches' Tent to assure that the IWLCA coaches have everything they need. He is a Univ. of Maryland graduate and served as the manager of the Men's basketball team.

**Whitney Snoopes:**          Marketing Director

Whitney assists Chris Tomlinson in all things marketing. A former basketball player and graduate of McDaniel College, she also manages our Coaches Hospitality tent.

**Ryan Heacock:**          Director of Sales

Ryan is responsible for sponsorship and vendor sales. He also oversees sponsorship fulfillment as a liaison with all of the clients associated with the event. He also serves as event day staff coordinator. Ryan graduated and played lacrosse at St Mary's College

**Ryan Corrigan:**          National Sales

Ryan is a full time sponsorship salesman for CSE. He produces all sales material and develops "in-kind" trade deals that greatly offset event expenses. Ryan graduated and played lacrosse at Belmont Abbey College.


**Media Staff:**

**Dave Gell:**          Public Relations Director

Dave serves as the Director of Communications for CSE. He is responsible for all media relations. Prior to CSE, he was the media relations director for the University of Maryland (College Park) men's lacrosse and football teams. Concurrently, he assisted with media relations for the NCAA Men's Lacrosse Championships.

**Booker Corrigan:**          Director of Media

Booker oversees all of the video production and works with our marketing staff to produce marketing inventory and post event videos. He is also an "on air" personality for lacrosse at ESPN.

**Michael Valente:**          Video Manager

Michael is CSE's in-house video production guru and artist. He produces all of our video work.

**Amanda Corrigan:**          Social Media Director

Amanda coordinates our ever growing "Social Media" efforts. As a recent grad at WVU, she "in tune" with the social media world and leads our efforts to communicate with the players.


**Operations Crew:**

**Matt Cornell:**          Director of Lacrosse

Matt is responsible for developing the operations plan for all of CSE's lacrosse events. Onsite, he oversees all aspects of the operations. Matt graduated from Ohio State University where he played lacrosse.

**Mark Clem:**          Operations Director

Mark negotiates pricing and procures all of our equipment and event supply needs. Mark oversees operations "pre-event" and makes sure everything arrives on time. Mark also oversees the staff of thirty Summer interns. Mark is a Towson University graduate.

**Chuck Higgins:**          Operations Manager

Chuck oversees the warehouse and makes sure that the convoy of event trucks are fully loaded. Onsite, he oversees set up, breakdown and in event operations. Chuck in a JMU graduate.


**Event Staff:**

CSE employs up to (40) forty event day staff, many with several years' experience with our lacrosse events.  Event staff serves as field managers and labor.


**Team Travel Source:**  Housing Partner

CSE employs Team Travel Source (TTS) to handle all aspects of the event housing. This national company has the power to negotiate great rates and assures us of having enough rooms for our coaches, officials and teams.

TTS provide teams with a one stop online booking process and provides a full time call center with dedicated event staff.

Team Travel Source owners are Serena Andrews, and April LaFramboise. Combined they have over 40 years of **sports travel planning** experience with a wide variety of sporting events, including the *IWLCA* and *USA Volleyball*.

**3.Equipment**

CSE owns an extensive inventory of event equipment and assets that are housed in our warehouse. This greatly reduces the event's operating budget by reducing costly rental fees. This also allows us to provide the IWLCA events with "perks" that other events don't offer such as shade tents for the team benches, numerous college coaches' hospitality tents and abundant coolers at each bench, just to name a few.

Partial Listing;

(200+)   Tents of various sizes

(100+)   Coolers/ Ice chests

(50)   Large Flip Scorers

(1)   26' Box Truck

(1)   Full size pickup truck

(4)   Generators

(3)   Inflatable Welcome arches

(48)   A-Frames for directional signage

(36)   18' Tent flags, used for easy location and field identification

Abundant supplies of cups and Gatorade mix from our other event inventory

Banner & sign frames / 1000'+ of fencing / misc. event supplies / traffic cones/ etc.

**Websites**

CSE maintains and operates the websites for each of the IWLCA events. These websites will provide the latest scheduling news, hotel booking and venue information. The sites also serve as the player's portal to provide player data for the coaches.

CSE constantly keep the sites up to date.

**4. Partnership**

In addition to providing a turn-key tournament experience for the IWLCA, CSE has created a financial model that will allow the IWLCA to share in the profit of the IWLCA events.  CSE will split the "net" profit on a 50/50 basis with the IWLCA.

The "net" profit is defined as gross revenues less hard costs, outlined in event settlement

CSE retains all merchandising rights

Revenue streams include;

Team Entry Fees / Grant Funding / Hotel Room Rebates & Commissions / Sponsorship & Vendor fees

**CSE has negotiated an exclusive deal with the Richmond CVB to provide a $3 per room night subsidy (up to $20,000) for the Champions and Capital Cup**

The IWLCA will have input on budget items and have complete access to the books before, during and after the event.

- ❖ CSE and the IWLCA will work cooperatively on a budget that will outline anticipated expenses.
- ❖ All known hard costs and management fees will be outlined.
- ❖ Projected revenue streams will be identified.
- ❖ CSE will solicit "in-kind" arrangements to further reduce costs.


**5. Facilities**

CSE is in constant communication with sports commissions across the country in search of new venues to host IWLCA events. As of January 2017, CSE has secured date holds and facilities rights for all current IWLCA events* through the year 2020. Venues currently under control,

**N.E. Cup:** UMass, *Amherst, MA    * (UMass only books their facility one year out)*

**Champions Cup:** River City, Clover Hill, Ukrop, *Midlothian, VA*

**Mid-West Cup:** Sports Score Park, *Love Park, IL*

**Capital Cup:** River City, Clover Hill*, Midlothian, VA*

**Presidents Cup:**  ESPN/Lake Myrtle/ The Omni Championsgate.

Besides Orlando, other potential sites for the 2019, 2020 & 2021 IWLCA Presidents Cup:
1.) Polo Grounds – Sarasota-Bradenton, FL
2.) Polo Grounds – Palm Beach, FL (CSE has negotiated a **$210,000** grant from the Palm Beach County Sports Commission and the Florida Sports Commission for the 2019, 2020 & 2021 President's Cup to offset anticipated facility costs. This grant money, in addition to the CSE owned assets, will all but eliminated the hard costs typically associated with this event.

In addition, when any new facility, that meet IWLCA specifications, come on line, CSE will present the options to the IWLCA Board.

Equally important, CSE will continue to negotiate with the local sports and tourism commissions to help offset the high rental fees associated with the facilities. In this highly competitive landscape of hotels and sports facilities, we must negotiate 2-3 years out to secure the dates the IWLCA wants. This is a critical ongoing process.







**River City**

**Sportsplex**

**Midlothian, VA**

**Cloverhill**

**Sports Complex**

**Midlothian, VA**





**ESPN**

**Sports Complex**

**Lake Myrtle**

**Sports Complex**







# MidWest Cup

## Mercy Sportscore Two

### Loves Park, IL



# New England Cup

## Umass-Amherst

## Amherst, MA





**6. Registration**

<u>Team Registration</u>

CSE has a relationship with a third-party vendor for an efficient online team and player registration for all lacrosse events. The team registration process begins with the coach creating a password, entering basic team information (team name, team origin, ranking, etc.) and paying a deposit. Once registered, the team is assigned a team PIN that will be used for balance payment and the individual player registration process.  To complete their payment, coaches use the team PIN to access their teams account and complete their payment. To enter a roster and prompt their players to register, coaches use the password created during registration to log in and enter their roster(s). From there, coaches can prompt players to register via an email that contains the team PIN. This prevents a player or anyone from registering themselves on a wrong team. Players must know their team PIN in order to register themselves.

<u>Player Registration</u>

Once a coach has entered a player onto his/her roster, the player is notified by email containing the team PIN. To register, a player will create an account or sign back in, and then enter their team code given to them by their coach. The players will then be prompted to fill out bio information which includes every detail a college coach would need – high school, position, height, weight, GPA, accolades, etc. Players can continue to update their information up until the night of the event. This information is automatically imported into Coaches Packet - the electronic recruiting system used by college coaches.


**7.  Facility Set-up**

CSE will strive to maximize that field configurations of the various venues. We take steps to enhance the experience of the attending teams and families.

- ✓ Shade tents and coolers at every bench
- ✓ Coach shuttles between fields
- ✓ Shade tents and water coolers for college coaches in private sideline areas
- ✓ Field I.D. flags & Plenty of directional signage
- ✓ Festive vendor village with plenty of shopping options
- ✓ Fully stocked Gatorade Stations *(complimentary protein bars, energy bars and hydration drinks)*
- ✓ Free parking at all events & parking attendants at larger events
- ✓ Areas for team tents and additional Porta-Johns at each venue
- ✓ Food Options on site
- ✓ Multiple strategically placed first-aid stations with certified athletic trainers

## 8. College Coaches Benefits

CSE has created an environment at the IWLCA events that meet the needs of the college coaches and attending club teams. Each venues offers unique challenges. We strive to create a comfortable, efficient environment for the coaches to conduct the business of recruiting. From the Coaches Hospitality Tent (many air conditioned) to the "hassle-free" restricted sideline coach's area, we try to meet your needs.

CSE provides: *(varies from venue to venue)*

- ✓ Coach's Hospitality Tent or Building (most are air conditioned)
- ✓ Catered meals and snacks
- ✓ Water Bottles for each coach
- ✓ Box Lunches delivered to the fields
- ✓ Charging stations for electronics
- ✓ On field shade tents for coaches with water coolers
- ✓ Ample sideline chairs
- ✓ Shuttles between fields
- ✓ Discounted Hotel Rooms and online booking

## 9. Recruiting Data

CSE has partnered with *Front Rush* to make recruiting information readily and easily available for college coaches. The player bio information that is entered during the registration process is automatically imported into Coaches Packet. Coaches Packet is an electronic recruiting tool for college coaches to use free-of-charge. Once the event has been imported into their system, Front Rush will provide the IWLCA member coaches with a code that coaches use to access the information electronically. This information is constantly updated as changes are made to ensure college coaches have the most up-to-date and most accurate information. Coaches can find individuals by name, field, team, etc. There are a multitude of ways college coaches can find individuals participating in the event. Once they have located the player, they will find the following fields in their recruiting profile:

- Full name
- Phone number
- Email address
- Mailing address
- Parent 1 name and contact information
- Parent 2 name and contact information
- High school
- High school coach and contact information
- Height
- Weight
- Date of birth and age
- Position
- College commitment
- All Test scores and GPA

## 10. Sponsorship

In keeping with CSE's ongoing sponsorship sales efforts, our sales staff will continue to solicit key endemic companies, as well as, others that will add to the total event experience. CSE currently has the following **under contract** for 2017 and beyond:

Gatorade- *all events for three years*

Junk Brands- *Champions & Mid-West for two years*

STX- *Capital Cup*

Brine/ New Balance- *NE & President's Cup*

Nike- *Annual Convention*

Approach Clothing

Gladiator Mouth guards

Spunkwear

SportsBella

Wear's Woody Clothing

Coast to Coast Clothing

KB Designs

## 11. Associations

CSE no affiliations with any female club team/organizations



## <u>Request for Proposals</u>

# 2021-2024 IWLCA Recruiting Events

Host Specifications & Requirements

## Introduction

The Intercollegiate Women's Lacrosse Coaches Association ("IWLCA" and/or "Association") is pleased to provide host companies/organizations ("HOST") the opportunity to submit a proposal to manage IWLCA Recruiting Events between 2021-2024; including, but not limited to, the IWLCA Capital Cup, IWLCA Champions Cup, IWLCA Debut, IWLCA Midwestern Cup, IWLCA New England Cup, and IWLCA Presidents Cup. Bids are being accepted to run all, a few, and individual events.

The information contained in this document provides the minimum proposal specifications for hosting the events. If your organization is interested in submitting a proposal for either the entire scope of events deemed "all events," for the "national events only" (encompassing the Capital, Champions and Presidents Cups), for the "regional events only" (encompassing Midwestern and New England Cups), for "new recruiting events only," or for any combination above, the IWLCA requests a letter of intent to be received no later than Wednesday, April 15, 2020. The completed and signed proposal form must be received via hard copy or email in the IWLCA office in Northborough, Massachusetts by close of business (5:00 pm) on Wednesday, May 13, 2020.

All proposals shall be reviewed and analyzed by IWLCA staff and select members of the Board of Directors who will make up the *Recruiting Events Selection Committee (RESC)*. As each proposal is evaluated, further clarification/input regarding the prospective host companies may be sought and, if needed, a video conference or in-person meeting may be requested. The RESC will make a recommendation to the IWLCA Board of Directors during its next in-person meeting, currently scheduled for June of 2020. Final approval is vested in the IWLCA Board of Directors, and your organization will be notified of the decision in a timely manner.

Coordinating the hosting of high caliber regional and national recruiting events requires thorough planning, seamless coordination between those involved, and complete cooperation from all entities. The IWLCA is keenly aware of the hard work, planning, and preparation necessary to be successful as a host and will do everything within its ability to make sure the events are successful for all involved.

It is critical that you reference all topics in the invitation to bid documents when preparing your proposal. How you plan to manage your areas of responsibility, how the event will be operated, personnel assignments, identifying those who will work directly with the IWLCA staff, foreseen expenses of running a successful event, and revenue sharing sources will all be very important to the proposal evaluation by the IWLCA staff and Executive Committee.

We are fully aware of the time and effort required to prepare a proposal and we are grateful for your consideration, time, and commitment. Should you have any questions or concerns during this process, please do not hesitate to call our office at (617) 212-2006.

*The IWLCA is the official membership-led non-profit association representing the nation's intercollegiate women's lacrosse coaches within Division I, II & III of the NCAA and the NAIA. The IWLCA is a 501c Non-Profit educational organization.*

**TERM**

The term of this RFP is for a period of four (4) years.

**RECRUITING EVENTS**

The IWLCA will determine the age eligibility, registration selection, and format of the recruiting events with input from the HOST. These events will be for females and players who identify as females.

The IWLCA recruiting events must be hosted and conducted as stand-alone events and not incorporated in, or advertised as, a division or sub-division of another event or tournament.

***The recruiting events must be able to accommodate the following:***
- Regional Events (ex. IWLCA Midwestern Cup, IWLCA New England Cup) – 80 teams
- National Events (ex. IWLCA Capital Cup, IWLCA Champions Cup, IWLCA Presidents Cup) – 200+ teams
- IWLCA Debut – 60 teams
- New Events – To be determined by the HOST and approved by the IWLCA

**BID TIMELINE:**

***PHASE NO. 1: REQUESTS FOR BIDS – MARCH 30, 2020***
The information contained in this document provides the minimum bid specifications for hosting future IWLCA recruiting events, as well as essential information that will provide assistance in the development of a creative, comprehensive and competitive bid proposal.

***PHASE NO. 2: LETTER OF INTENT – APRIL 15, 2020***
All questions can be addressed to Liz Robertshaw, IWLCA Executive Director, earobertshaw@iwlca.org.

***PHASE NO. 3: QUESTIONS AND ANSWERS – APRIL 15 – MAY 11, 2020***
All questions can be addressed to Liz Robertshaw, Executive Director of the IWLCA.

***PHASE NO. 4: BID SUBMISSION – MAY 13, 2020***
Completed bid proposals will be due by 5:00PM ET, Wednesday, May 13, 2020.
*A completed bid includes providing the information in Bid Specifications and Requirements, Host Information, Facility and Event Requirements.*

***PHASE NO. 5: COMMENT PERIOD - MAY 15 – JUNE 30, 2020***
The IWLCA will review and analyze completed proposals and may seek further clarification from one or more of the proposed hosts in connection with their respective proposals. In person meetings, videoconferences, and/or presentations may be requested by the IWLCA.

***PHASE NO. 6: HOST DETERMINED – JUNE 30, 2020***
The IWLCA will review all materials and accept the proposal(s) to host the 2021-24 IWLCA Recruiting Events. Such decisions are not considered final until they are approved by the IWLCA Board of Directors. The results of this bid process will be communicated to the bidders in a timely manner

**BID SUBMISSION**

The bid documents referenced herein shall become the property of the IWLCA upon submission thereof. The IWLCA shall not be liable or responsible for any costs, expenses or other liabilities associated with the preparation and/or submission of the bid documents referenced herein.

**FINANCIAL ARRANGEMENTS**

Your proposal must include a proposed budget and financial report that reflects all revenue sources, event and staff expenses, commitments by the bid respondent, and a revenue sharing agreement with the IWLCA.

**BID SPECIFICATIONS AND REQUIREMENTS**

1. Entry Fee
   a. Team entry fee will be determined by the IWLCA with input from the HOST.
   b. In 2021 the entry fee is expected to be:
      i. $2000.00 for guaranteed 4 games per team event
      ii. $1500.00 for guaranteed 3 games per team event
      iii. HOST proposed entry fee for new events
   c. The fee for an individual athlete to participate on a house team during an IWLCA tournament shall not exceed $100.00
   d. All other fees proposed by HOST with regard to or related to the tournament must be approved by the IWLCA in advance.

2. *Proposed* IWLCA Event Dates & Locations
   a. **Champions Cup** (Virginia/Mid-Atlantic/Tri-State) – to be held Friday, Saturday & Sunday:
      i. A consistent weekend in early to mid-June should be established with regards to the NCAA Division I Recruiting Calendar

   b. **New England Cup** (New England) – to be held Friday, Saturday & Sunday:
      i. A consistent weekend in mid to late June should be established with regards to the NCAA Division I Recruiting Calendar

   c. **Midwestern Cup** (Midwest) – Friday, Saturday & Sunday:
      i. A consistent weekend in early to mid-July should be established with regards to the NCAA Division I Recruiting Calendar

   d. **Capital Cup** (Virginia/Mid-Atlantic/Tri-State) – Thursday, Friday, Saturday & Sunday:
      i. A consistent weekend in mid to late July should be established with regards to the NCAA Division I Recruiting Calendar

   e. **Presidents Cup** (Florida, held in conjunction with IWLCA Convention) – Friday, Saturday & Sunday:

<ol type="i" start="1">
<li>This event will take place during the weekend before Thanksgiving with regards to the NCAA Division I Recruiting Calendar</li>
</ol>

<ol type="a" start="6">
<li><strong>The Debut (s) (</strong>Currently Florida, open to alternative locations) – Friday, Saturday & Sunday:
<ol type="i">
<li>This event will take place during the weekend before Thanksgiving with regards to the NCAA Division I Recruiting Calendar</li>
</ol>
</li>
<li><strong>New Events</strong> – For any event not currently under the IWLCA umbrella, either established or new to creation, please include details about when, where, and the type of event you propose running for the IWLCA. Include why adding such an event would be beneficial to the IWLCA. Please be mindful of the <u>NCAA Division I Women's Lacrosse Recruiting calendar,</u> which limits the attendance of our Division I coaches to certain times of the year.</li>
</ol>

<ol start="3">
<li>Event Competition & Support Facility Requirements
<ol type="a">
<li>Thursday of the event (if applicable) – Fields available to all teams: 7:00am – 10:00pm</li>
<li>Friday of the event – Fields available to all teams: 7:00am – 10:00pm</li>
<li>Saturday of the event – Fields available to all teams: 7:00am – 10:00pm</li>
<li>Sunday of the event – Fields available to all teams: 7:00am – 8:00pm</li>
</ol>
</li>
</ol>

<span style="color:purple"><strong><u>HOST INFORMATION</u></strong></span>

- Experience: describe your event management history and provide references.

- Staff: list your full-time staff and explain their roles and responsibilities in your organization and how each would assist with these recruiting events.

- Equipment: what type of equipment (tents, tables, chairs etc.) does your group/company **OWN** that could be used while running these recruiting events? List specific quantities. Estimate what equipment you would need to rent and what those costs would be.

- Please provide **TWO** proposed financial structures: a Partnership model and a Management Fee model. Please describe in as much detail as possible all anticipated sources of revenue and expenses, as well as what your company would offer in the course of doing business (that would not be listed as an expense). Please include any fees and what those would cover.

- Facility/Facilities: what facility/facilities do you propose as the site for the recruiting events? List the site's features including the projected number of teams that the facility could accommodate during the event? *Note- no more than two (2) sites may be utilized for any one (1) recruiting event.*

- Registration: What system/tool do you propose for team and individual registration process? Please describe how and when your event registration system would work.

- Facility Set-up:  What is your suggested set-up for fields/vendor area/welcome area/college coach area/club registration area? Please include anticipated number of tents, chairs, tables, transportation, etc. Visual sketches or maps are welcome.

- College Coach Benefits: What is your plan for the provisions and support available for College Coaches during these events? Recruiting is an important job responsibility for College Coaches. We view these tournaments as providing the best opportunity and support for IWLCA members to do this part of their job well.

- Recruiting: How will you secure correct student-athlete recruiting information? How will you distribute student-athlete recruiting information to college coaches?

- Sponsorship: What relationships do you have with potential sponsors and vendors? Give an estimated price range of the additional revenue you could contribute from these parties? What is your company's commission structure for securing additional revenue?

- HOST will appoint an Event Manager, Venue Liaison & Hotel Liaison, all of who will work with the IWLCA Executive Director and IWLCA Recruiting Events Committee.

- Affiliations: Are you or your group/company affiliated with any club team/organizations?  Are you or your group/company affiliated with any lacrosse companies?  If so who?


**FACILITY and EVENT REQUIREMENTS**

- For National Events - A minimum of 22 full size (60yds x 105yds to 70yds x 120yds) athletic fields, preferably field turf, within walking distance of each other. If more than one facility is required, that facility should be within a short driving distance with shuttle service provided by the HOST when requested by IWLCA. If the fields do not have lights, then a minimum of 26 fields will be required.

- For Regional Events - A minimum of 8 full size (60yds x 105yds to 70yds x 120yds) athletic fields, preferably field turf, within walking distance of each other. If the fields do not have lights, then a minimum of 12 fields will be required.

- For New Event Proposal – If you are proposing a new event please include the detail of the amount of full size (60yds x 105yds to 70yds x 120yds) athletic fields needed to run the event.

- The facility must supply permanent or temporary scoring systems for each field. If the facility does not supply this, the HOST will be responsible for the expense and supply.

- Additional Field Need: The HOST will provide a field with two (2) shot clocks, digital scoreboard accessibility, public address system accessibility, and water/ice for use by teams competing in an IWLCA-sponsored exhibition events.

- The HOST will provide adequate on site or adjacent free parking in the amount that equates to a minimum of 12 cars per team registered. If the need for offsite parking arises, HOST will provide shuttle service to site.

- The HOST to provide one (1) certified athletic trainer (ATC) for every four fields.

- The HOST will provide water and ice for each field for the duration of the event

- The HOST will provide adequate staff, including one (1) Field Manager per field that is responsible for score keeping and communication with Tournament Manager and Athletic Trainers as needed, and one (1) Field Area Supervisor for every four (4) fields that is responsible for maintaining proper field set-up including water and ice needs, keeping designated coaches' areas clear of any non-coaching persons and coordinating the needs of any Field Manager with the Tournament Manager.

- The HOST will provide adequate hospitality areas with food and refreshments for the IWLCA coaches & game officials during the event. For a full day event (8am-9pm) three meals will be provided, along with snacks. For a half day event one/two meals will be provided, along with snacks. The HOST will work with the IWLCA to determine the appropriate number and type of meals and snacks needed per event.

- The HOST will provide two (2) certified officials for each contest.

- The HOST will provide a communication system (walkie-talkies) sufficient in number so that each Field Manager, Field Area Supervisor, Athletic Trainer and Event Manager may be in continuous contact.


**HOST REPRESENTATIVES**

The HOST shall appoint individuals to assume the following duties and responsibilities (understanding that the IWLCA may ask for modifications in the duties assigned to the HOST at its sole discretion).

The responsibilities of these individuals are as follows:

1. **Event Manager.** The event manager shall work with the IWLCA to ensure that event management responsibilities are fulfilled. Responsibilities include but are not limited to:

- Work with facility to assure needs are met for running successful event
- Team Registration Website: Setup and maintain website for the registration of teams attending the event
- Manage registration and waiting list organization based on input from IWLCA
- Collection of participant/team information including complete rosters with player contact information and coach contact information

- Work with digital evaluation company chosen by IWLCA to assure player profiles are seamlessly integrated with platform for coach evaluation
- Work with video company chosen by the IWLCA to ensure access to fields and ability to capture live game footage is available
- Staff the event check-in areas for participating teams, college coaches, officials, and vendors
- Hire the field managers and field area supervisors
- Hire the athletic trainers
- Hire an assignor to secure and manage an adequate number of game officials
- Develop the event competition schedule based on criteria given from IWLCA
- Game management, including a comprehensive weather policy

2. **Competition Venue Liaison.** The competition/practice venue(s) shall appoint a knowledgeable member of its staff to serve in this position. Responsibilities include but are not limited to:

- Supervision of competition venue
- Setup of event check in areas for participating teams, college coaches, officials, and vendors
- Setup and maintenance of college coaches only observation areas
- Setup of a headquarters/information area
- Setup and maintain college coach and game officials' hospitality areas
- Vendor booth organization
- Concessions
- External venue décor
- Security
- Supervision of waste management, both trash and restrooms
- Parking plan and supervision
- Posting and recording of competition results
- Two (2) goals per field
- Six (6) game balls per field
- Table(s), chair(s), walkie talkie and batteries for Field Managers
- Tent(s) for competing teams, field area managers and Athletic Trainers (One per every Four (4) Fields)

3. **Lodging Liaison.** This individual should be a convention and visitors' bureau staff member or a professional hotel account manager. Responsibilities include the administration of the hotel blocks, assistance with securing overflow hotel properties, managing hotel information desk volunteers.

## HOTEL REQUIREMENTS

**Americans with Disabilities Act**
All hotels used for the IWLCA Recruiting Events shall be responsible for complying with the public accommodation requirements of the Americans with Disabilities Act (ADA).

**PERMITS and APPROVALS**

The municipality in which the competition venue(s) are located shall, through the HOST, provide all permits as well as review and approval services at no cost to the IWLCA.

**COMPETITION VENUE GUIDELINES**

**Operational Control.** The IWLCA will retain the right to determine and approve all aspects related to the competition venue operations during the event.

**Exclusivity.** The IWLCA shall have the exclusive right to the entire competition venue.

**Venue Space Condition.** The competition venue will be provided fully cleaned with all venue areas in good working condition at no cost to the IWLCA.

**Safety & Security.** The competition venue will provide the host and IWLCA with a copy of its weather policy plan, security plan and any other policies pertinent to running a successful and safe event.

**COMPETITION VENUE INSURANCE**

The responsibility of confirming and or purchasing the following insurance policies and maintaining these certificates is born by the Host. The IWLCA reserves the right to ask for these verifications of insurance coverage.

**1. Certificate of Insurance.** The competition venue, at its own expense and not subject to reimbursement, shall carry and maintain its own insurance during the entire term of the Agreement, with the following insurance programs provided by insurers rated A.M. Best, A-VII or better. A certificate of insurance evidencing such program must be submitted to the IWLCA no later than six months prior to the tournament, and at any other time requested by the IWLCA. Such policies must contain express conditions that:

1. The IWLCA is given 30 days advance written notice of any modification or termination of any insurance program.

2. The competition venue's insurance providers agree to waive any rights of subrogation they may have against the IWLCA. Failure on the part of the competition venue to procure or maintain required insurance shall constitute a material breach of contract upon which the IWLCA may immediately terminate the Agreement.

**2. Liability Insurance.** The competition venues' insurance will be the primary coverage. When providing the required limits of insurance using a combination of primary and umbrella and/or excess policies, the competition and practice venue will confirm on the certificate of insurance that the umbrella and/or excess policies follow form to the primary insurance and will drop down in the event of exhaustion of the primary insurance. Such liability insurance will name the IWLCA and each of its officers, directors, agents, employees, sponsors and licensees as additional insureds. Such insurance must include the following:

Comprehensive Commercial General Liability insurance, on an occurrence form, with a combined single limit for Bodily Injury and Property Damage, including Products Liability (including completed-operations coverage), coverage for contractual liability, independent contractors, broad form property damage, personal and advertising injury, and no exclusion for beverage alcohol liability, and no exclusion for liability arising from food-borne illness, in an amount of at least Two Million Dollars ($2,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate.

3. **Workers' Compensation Insurance.** The competition venue shall carry a program of workers' compensation insurance in an amount and form which meets all applicable statutory requirements, and which specifically covers all employees who provide services by or on behalf of the competition venue and all risks to such persons under the competition venue agreement.

4. **Competition Venue Destruction Insurance.** In the event the competition venue cannot be used for any reason, with the exception of the sole, active fault or negligence of the IWLCA, thus creating a situation or circumstance where the tournament may not proceed on the dates specified, the competition venue agrees to exercise its best effort to relocate the event, with the final authorization of the new location subject to IWLCA approval.

5. **Business Interruption Insurance/ Event Cancellation Insurance.** Host will be required to acquire event insurance in order to cover all registration fees and expenses incurred prior to the tournament in case the tournament is cancelled due to inclement weather, national emergency, or other circumstances.

## MEDIA RIGHTS

The IWLCA possesses the exclusive media rights for its events.

## MARKETING & PROMOTION

The marketing and promotion of all IWLCA recruiting events will be the responsibility of the HOST with input and approval of the IWLCA. This includes, but is not limited to; logos, taglines, hashtags used, emails sent to participating clubs, players, and families, and social media promotions.

## VOLUNTEERS

The Host is responsible for the creation, implementation and execution of any extensive volunteer program, including a comprehensive recruiting and a shift assignment program.

1. Volunteers must be 16 years of age or older. For liability purposes, waiver forms will be provided by the IWLCA for each volunteer and must be collected by the HOST prior to the first day of the event.

**TAX EXEMPTION**

The IWLCA is a 501c (3) tax exempt organization and the bid respondents shall include any tax exemption from sales or admission taxes from the state or local governments. If tax exemption is not applicable, then all applicable tax rates shall be disclosed and any increases in tax rates from the time of the bid submission shall be absorbed by the bid respondent or rebated back to the IWLCA.


**PAYMENT OF FUNDS**

IWLCA shall receive a comprehensive financial report and all money payable to the IWLCA less hotel rebate revenue, within 60 days after the conclusion of the event. Final payment including hotel rebate revenue will be paid within 90 days after the conclusion of the event. Payments may be in the form of a check, wire transfer or other method pursuant to instructions provided by the IWLCA. Any delay in this payment not pre-approved by the IWLCA will result in a penalty of 5% per month of the amount due to the IWLCA to be paid by the HOST.


**FINANCIAL AUDIT**

The IWLCA shall have the right to conduct a full financial audit on the event revenues sources and expenditures on an annual basis. The IWLCA will be responsible for the payment of said audit and the HOST will fully comply with the needs of the audit company in a prompt manner. Delay or lack of cooperation will be considered a material breach of the Agreement.


**ADDITIONAL BID INFORMATION/ QUESTIONS**

For any questions and/or to submit a bid/proposal for this event, please contact:

Liz Robertshaw
Executive Director
Intercollegiate Women's Lacrosse Coaches Association
120 W Main Street
Northborough, MA 01532
O. (617) 203-2140
C. (617) 212-2006
E. earobertshaw@iwlca.org



April 15, 2020

Liz Robertshaw
Executive Director
Intercollegiate Women's Lacrosse Coaches Association
120 W Main Street
Northborough, MA 01532

Dear Liz,

On Behalf of Corrigan Sports Enterprises please know that it is out intent to bid on partnering once again with the IWLCA for the 2021, 2022, 2023 & 2024. We look forward hearing more details about the process and the scope of the work here in the coming days and weeks.

Thank You,

Lee Corrigan

**IWLCA Trademarks**
**(USPTO Applications pending)**

**IWLCA**
**New England Cup**
**Champions Cup**
**Midwestern Cup**
**Capital Cup**
**Presidents Cup**
**Debut**











