IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

INTERCOLLEGIATE WOMEN'S          )
LACROSSE COACHES ASSOCIATION,    )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     1:20cv425
                                 )
CORRIGAN SPORTS ENTERPRISES,     )
INC. and RICHARD LEE CORRIGAN    )
JR., in his individual and       )
official capacities,             )
                                 )
          Defendants.            )

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on the motion of Plaintiff Intercollegiate Women's Lacrosse Coaches Association ("IWLCA") for temporary restraining order ("TRO") pursuant to Federal Rule of Civil Procedure 65(b). (Doc. 18.)  After notice to all parties, this court held a hearing on the motion on July 6, 2020.  Having considered all matters of record and the arguments of counsel, the court finds as follows at this preliminary stage:

1. IWLCA is a North Carolina non-profit corporation. (Doc. 15 ¶ 1.)  Members of the IWLCA are coaches of NCAA college women's lacrosse programs across the country. (Id.)  IWLCA hosts tournaments for high school club lacrosse teams. (Id.)  Defendant Corrigan Sports Enterprises, Inc. ("CSE") is a Maryland corporation that hosts, manages, and runs sports tournaments. (Id. ¶¶ 2, 13.)  Defendant Richard Lee Corrigan,

Jr., the president of CSE, is a citizen and resident of Maryland. (Id. ¶ 3.)

2. IWLCA traditionally hosts six lacrosse tournaments for women's high school club lacrosse teams: the Champions Cup, New England Cup, Midwest Cup, Capital Cup, Presidents Cup, and the Debut Tournament. (Id. ¶ 1a-1e.) College coaches (members of the IWLCA) attend these tournaments to scout potential players for their schools' lacrosse teams. (Id. ¶ 1.) IWLCA retains an event management firm to run the tournaments. (Id. ¶ 7.) IWLCA first created the "Champions Cup" in 2006 and hired a management firm, USTC, to run the tournament thereafter. (Id. ¶ 7a.) IWLCA created more tournaments over the following years. (Id. ¶ 7b-7f.)

3. IWLCA first hired CSE to run one of its tournaments in 2009 and continued to hire CSE to run its tournaments. (Id. ¶ 7c-7f.) In hiring a management firm, IWLCA would issue a Request for Proposals ("RFP"), receive proposals from various event management companies, select a company from the proposals, and formulate a contract with that company to manage their tournaments. (Id. ¶ 7.) For example, after IWLCA selected CSE to host and manage the tournaments in 2013, 2014, and 2015, the parties signed a contract. (Doc. 14-1 at 15-20.) The parties signed an addendum extending the terms of the contract to tournaments held in 2016. (Id. at 22-23.)

2

4. In 2017, IWLCA issued an RFP seeking proposals from management companies to host IWLCA's tournaments in 2018, 2019, and 2020. (Doc. 15 ¶ 8; Doc. 15-1.) CSE submitted a proposal (Doc. 15-2), which IWLCA accepted, pursuant to the terms laid out in the RFP. (Doc. 15 ¶ 10.) The parties did not enter into a separate formal contract as they had in past years; IWLCA regarded the RFP and CSE proposal, as accepted, to be the agreement that governed the parties for tournaments in 2017-20.

5. IWLCA's RFP states that IWLCA "will retain the right to determine and approve all aspects related to the competition venue operations during the tournament." (Doc. 15-1 at 7.) Furthermore, the RFP states, under the heading "Payment of Funds," that "IWLCA shall receive a financial report within 90 days after the conclusion of the tournament. All money payable to the IWLCA shall be paid within 120 days . . . pursuant to the transfer instructions provided by the IWLCA." (Id. at 8.) CSE's proposal, under the heading "Partnership," states that "CSE has created a financial model that will allow the IWLCA to share in the profit of the IWLCA events. CSE will split the 'net' profit on a 50/50 basis with the IWLCA." (Doc. 15-2 at 7.)

6. The Board of Directors of IWLCA voted in April 2020 to cancel all IWLCA tournaments in 2020 because of the worldwide COVID-19 pandemic that reached the United States. (Id. ¶ 42.)

3

IWLCA immediately notified CSE of its decision, and then released a public statement to notify the lacrosse community and 2020 tournament registrants of the cancellations. (Id. ¶¶ 43, 47-48; Doc. 15-13.) Because CSE directly managed the registration and communications with teams, coaches, and players who were participating in the tournaments, IWLCA had no direct line of communication with the registrants to inform them of the tournaments' cancellations. (Id. ¶ 50.) Contrary to the direction of IWLCA, however, Defendants informed registrants that the 2020 tournaments would be held as scheduled and that IWLCA had merely decided to "step away" from its "official involvement" with the tournaments. (Id. ¶¶ 50, 51b.) In a press release, CSE displayed and used the logos and names used in past years with IWLCA's tournaments. (Id. ¶ 51.) CSE began referring to the tournaments with "CSE" in front of the tournament names. For example, Defendants referred to tournaments as the "CSE Champions Cup" and "CSE Midwest Cup." (Id. ¶ 51d.)

7. According to Lee Corrigan, CSE has scheduled the New England and Midwest Cups to be held on July 25-26 of 2020. (Doc. 27-1 ¶ 41.) The Champions Cup is to be held on August 7-9; the Capital Cup on August 13-16, and the Presidents Cup on November 20-22. (Id.) Although Corrigan does not say whether CSE will be hosting the Debut tournament, IWLCA notes that the Debut

4

tournament has been held in conjunction with the Presidents Cup since 2017. (Doc 19 at 6.)

8. In correspondence with women's lacrosse club teams in North Carolina after IWLCA directed the cancellation of the tournaments, CSE sent e-mails containing the tournaments' logos and names, but with CSE as the sponsor. (Doc. 33-1.)

9. IWLCA directed CSE to issue refunds to the registrants of the canceled tournaments, but CSE refused to do so. (Doc. 15 ¶¶ 54-56.) CSE states that it intends to hold the tournaments as it is able this year and has informed registered teams that the tournaments "will look and feel the exact same as they always have." (Doc. 19-1 at 16.) CSE has rescheduled one tournament -- the Champions Cup -- to be held on August 7-9, 2020, which falls under the NCAA-designated "dead period," in which coaches are prohibited from watching prospective student athletes in person. (Doc. 15 ¶ 52.) Defendants nevertheless have stated that the tournaments will have "even more college coach involvement" than past tournaments, even though coaches will not be able to attend the Champions Cup in person. (Id.)

10. On March 30, 2020, and April 13, 2020, CSE filed for trademark protection of the tournament logos; these logos do not contain the IWLCA's name or logo, but necessarily use the names of the tournaments for which IWLCA claims ownership.

5

(Doc. 27 at 3; Doc. 28-1.)[1]

11.     On June 12, 2020, IWLCA filed trademark applications for the word marks for the names of the tournaments and the mark of IWLCA itself, based on its first use of these marks in commerce.  (Docs. 15-6, 15-7, 15-8, 15-9, 15-10, 15-11, 15-12.)  All trademark applications submitted by both IWLCA and CSE remain pending with the U.S. Patent and Trademark Office.

12.     IWLCA filed the present lawsuit in state court on May 6, 2020, seeking declaratory, monetary, and injunctive relief arising out of Defendants' actions.  (Doc. 7.) Defendants removed the case to federal court on May 13.  (Doc. 1.)  Defendants filed a motion to dismiss for lack of personal jurisdiction on May 28, 2020.  (Doc. 13.)  On June 18, IWLCA filed an amended complaint (Doc. 15) and a response to Defendants' motion to dismiss (Doc. 16).  On June 24, IWLCA filed the present motion for temporary restraining order (Doc. 18) and a motion for preliminary injunction (Doc. 20). Defendants filed a response to the motion for TRO.  (Doc. 27.) The court held a hearing on the TRO on July 6, 2020.

13.     In its amended complaint, IWLCA brings ten causes

---

[1] Defendants disclaim any interest in the mark of IWLCA's name, and Defendants' alleged infringing marks of the tournament names do not contain IWLCA's name or logo.  (Doc. 27 at 14.)

of action against Defendants: (1) conversion of IWLCA's funds; (2) breach of fiduciary duty; (3) constructive fraud; (4) constructive trust; (5) violations of the Lanham Act, 15 U.S.C. § 1051 et seq.; (6) unfair or deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1 et seq.; (7) unjust enrichment; (8) breach of contract; (9) breach of the covenant of good faith and fair dealing; and (10) punitive damages. (Doc. 15 ¶¶ 62-142.) IWLCA seeks a TRO based on its claims for (1) trademark infringement, (2) conversion, and (3) constructive trust. (Doc. 19 at 2, 22, 24.) It seeks, inter alia, injunctive relief ordering Defendants to: cease use or display of IWLCA's trademarks; recall all infringing advertising materials; destroy or deliver all inventory, promotional material, or advertising that uses IWLCA's marks; cease use of any funds collected from 2020 tournament registrants and issue full refunds as directed by IWLCA; and take corrective measures to remedy confusion among consumers regarding the 2020 tournaments. (Doc. 18 at 5-7.)

Based on these findings, the court concludes as follows:

1. The court has personal jurisdiction over the Defendants because the Defendants directed emails containing the allegedly infringing marks into North Carolina. IWLCA must make a prima facie showing that the court has personal jurisdiction over Defendants. Universal Leather, LLC v. Koro AR, S.A., 773 F.3d

7

553, 558 (4th Cir. 2014). The court construes "all relevant pleading allegations in the light most favorable" to IWLCA and "draw[s] the most favorable inferences for the existence of jurisdiction." Id. (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). To determine whether personal jurisdiction is proper, the court engages in a two-step inquiry. First, North Carolina's long-arm statute must provide a statutory basis for asserting personal jurisdiction, and second, the exercise of personal jurisdiction must comport with the Due Process Clause of the Fourteenth Amendment. Christian Sci. Bd. of Dirs. of the First Church of Christ, Sci. v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). The North Carolina long-arm statute is construed "to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." Id. Thus, the two-part test "collapse[s] into a single inquiry" whether the non-resident defendant has sufficient minimum contacts with the forum state such that exercising jurisdiction over the defendant "does not offend traditional notions of fair play and substantial justice." AARP v. Am. Family Prepaid Legal Corp., Inc., 604 F. Supp. 2d 785, 798 (M.D.N.C. 2009) (quoting Christian Sci., 259 F.3d at 215).

2. There are two types of personal jurisdiction: general and specific. General jurisdiction exists when a defendant has "systematic and continuous contacts" within the forum state.

8

Id. However, if the contacts with the forum fall below the requirements for the court to exercise general jurisdiction, courts may exercise specific jurisdiction when "the cause of action 'aris[es] out of or relate[s] to' the defendant's contacts with the forum state." Id. (alterations in original) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413-14 (1984)). To decide whether specific personal jurisdiction exists, the court must determine "(1) the extent to which the defendant purposefully availed [himself] of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 301-02 (4th Cir. 2012). Each prong must be satisfied for personal jurisdiction to exist. Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278-79 (4th Cir. 2009).

3. IWLCA has made a prima facie showing that Defendants purposefully availed themselves of the privileges of conducting business in North Carolina. Defendants solicited business from North Carolina women's lacrosse teams and received registration fees from those teams so the teams could participate in the tournaments at issue. (Doc 16-1 ¶¶ 8-9; Doc. 16-2 ¶¶ 8-9.) Furthermore, after IWLCA announced the cancellation of the 2020

9

tournaments, Corrigan authored an email to registered lacrosse teams, including teams in North Carolina, in which he clarified that CSE would still be hosting the tournaments this year. (Doc. 33-1.) At the hearing on IWLCA's motion for TRO, IWLCA alleged that this letter was sent to 46 teams in North Carolina. Critically, this email contained the alleged infringing marks at issue in this case. (Id.)

4. In a tort action such as a trademark infringement claim, a court may exercise jurisdiction "over a non-resident defendant who is a primary participant[] in an alleged wrongdoing intentionally directed at a resident in the forum state." AARP, 604 F. Supp. at 799 (alteration in original) (internal quotation marks omitted). Under analogous circumstances, this court has found that exercise of personal jurisdiction over a corporate officer was proper when the officer "actively participate[d]" in the tort. Id. Here, Defendant Lee Corrigan, as President of CSE, authored and directed a letter sent via email to various coaches who reside in North Carolina regarding CSE's decision to hold the 2020 tournaments despite IWLCA's decision to "step away from its 'official involvement' with [the] tournaments." (Doc. 33-1.) This email also contained the word marks at issue in IWLCA's trademark infringement claims. Thus, the evidence before the court indicates that IWLCA's trademark claims arise from and relate to Corrigan's "direction of allegedly tortious

activity into North Carolina for commercial gain with the knowledge that harm was likely to occur." <u>AARP</u>, 604 F. Supp. 2d at 801. Such evidence is sufficient for the first and second prongs of the specific personal jurisdiction analysis. Furthermore, the court finds that exercise of personal jurisdiction here would be constitutionally reasonable, as having Defendants defend this action in North Carolina "does not offend traditional notions of fair play and substantial justice." <u>Id.</u> In addition to the conduct set out above, for some time preceding and up to the filing of this action, Defendants also dealt directly with IWLCA through its representatives located in Durham, North Carolina. (Doc. 33-2.) Thus, the court may exercise specific personal jurisdiction over both CSE and Corrigan.

5. Federal Rule of Civil Procedure 65(b) governs the availability of a TRO to preserve the status quo ante until a hearing on a motion for preliminary injunction can be held. <u>Hoechst Diafoil Co. v. Nan Ya Plastics Corp.</u>, 174 F.3d 411, 422 (4th Cir. 1999).

6. The requirements for obtaining temporary and preliminary injunctive relief are the same. <u>See</u> <u>Rogers v. Stanback</u>, No. 1:13CV209, 2013 WL 6729864, at *1 (M.D.N.C. Dec. 19, 2013) (citing <u>U.S. Dep't of Labor v. Wolf Run Mining Co.</u>, 452 F.3d 275, 281 n.1 (4th Cir. 2006)). A TRO, like a preliminary

11

injunction, is "an extraordinary remedy . . . which is to be applied only in [the] limited circumstances which clearly demand it." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks omitted) (citation omitted).  In order to obtain a TRO, a movant must establish: (1) that it is likely to succeed on the merits of the dispute; (2) that it is "likely to suffer irreparable harm" in the absence of a TRO; (3) that "the balance of equities" tips in its favor; and (4) that injunctive relief is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346-47 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010).  IWLCA must satisfy all four requirements to receive relief.  Real Truth, 575 F.3d at 346.

7. IWLCA first must make a "clear showing" that it is likely to succeed on the merits of its claims.  Id. at 345-46.  IWLCA offers three legal claims to support its request for a TRO, each of which will be addressed in turn.

8. The first legal claim IWLCA offers to support its requested injunction is trademark infringement.  To make out a trademark infringement claim, IWLCA must first demonstrate that it owns valid and protectable trademarks.  Where, as here, the parties agree that the marks at issue are unregistered (Doc. 19 at 4; Doc. 27 at 6.), Section 43(a) of the Lanham Act, codified

12

at 15 U.S.C. § 1125(a), provides federal protection for unregistered trademarks. MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 341 (4th Cir. 2001). IWLCA bears the burden of proving the validity of its marks. Id. at 340. This requires the court to determine whether the marks are "(1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." U.S. Search, LLC v. U.S. Search.com Inc., 300 F.3d 517, 523 (4th Cir. 2002). Suggestive marks -- in addition to arbitrary and fanciful marks -- are considered inherently distinctive and receive the greatest amount of protection. Rebel Debutante LLC v. Forsythe Cosm. Grp., Ltd., 799 F. Supp. 2d 558, 568 (M.D.N.C. 2011). In comparison, a descriptive mark may receive protection, but only if it has acquired a secondary meaning in the minds of the public. Id. at 568-69. "Secondary meaning is the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990); see also Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211 (2000) (noting that secondary meaning "occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself" (alteration in original) (internal quotation marks omitted)). The burden of

13

demonstrating secondary meaning, which typically "entails a rigorous evidentiary standard," lies with the party asserting that a secondary meaning exists.  U.S. Search, 300 F.3d at 525. The Fourth Circuit has suggested six factors to consider to determine whether a mark has acquired a secondary meaning: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 395 (4th Cir. 2009).  However, direct evidence, such as testimony from players and coaches regarding their state of mind, is not strictly necessary; circumstantial evidence such as length of use, amount and type of advertising and promotion used to bring attention to the designation as a mark, recognition of the marks by the media and customers, and the use (or non-use) of the mark by third parties may all be utilized in demonstrating that the marks have a secondary meaning.  2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 15:30 (5th ed. 2017).[2]  In

---

[2] Even Internet searches may be probative of secondary meaning.  See Lisa Larrimore Ouellette, The Google Shortcut to Trademark Law, 102 Calif. L. Rev. 351 (2014); cf. mophie, Inc. v. Shah, Case No.: SA CV 13-01321-DMG, 2014 WL 10988347, at *19 at n.14 (C.D. Cal. Nov. 12, 2014) (citing Ouellette's article and clarifying that an Internet search "is certainly not a definitive determination of secondary meaning," but it may be probative of the issue).

14

determining whether a mark has secondary meaning, the court directs its attention to the relevant class of consumers at issue –- here, presumably the teams, coaches, players, and families associated with high school and college women's lacrosse. 2 <u>McCarthy on Trademarks</u> § 15:46.

9. IWLCA argues that its marks for Champions Cup, Capital Cup, Presidents Cup, Midwest Cup, and New England Cup are suggestive, contending that these marks "conjure images of the associated tournaments, services, activities, and competitions, without directly describing them." (Doc. 19 at 7-8.) IWLCA contends that the mark Debut is arbitrary "because it is a common word applied in an unfamiliar way." (<u>Id.</u> at 8.) Defendants argue that the marks are invalid because they are descriptive and lack a secondary meaning. (Doc. 27 at 8-9.) Defendants point out that several other sports leagues use the term "Champions Cup" as tournament names, indicating that the marks at issue are descriptive rather than suggestive. (<u>Id.</u>) Defendants also argue that IWLCA has not presented any evidence of secondary meaning in the record.

10. The line between descriptive and suggestive marks is frequently a fine one. On the current record, the court cannot say that IWLCA has demonstrated a likelihood of success that its marks are valid and protectable. IWLCA's contention that the marks are protected is contained largely in one

15

paragraph with a conclusory statement. (Doc. 19 at 7-8.) The categorization of a mark is a question of fact. E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 192 (3d Cir. 2008). It is not that IWLCA cannot not make this showing; rather, it is that IWLCA has simply not provided sufficient evidence at this stage demonstrating either that its marks are suggestive (and are therefore inherently valid) or have a secondary meaning (thus entitling descriptive marks to protection). U.S. Search, 300 F.3d at 525-26. At this preliminary stage and faced with difficult legal and factual questions on an undeveloped record, the court should not yet enjoin any activity. See 5 McCarthy on Trademarks § 30:45 ("A trial judge hearing a request for preliminary injunction is not required to decide difficult legal and factual issues which could only be determined at a full trial. Indeed, the judge should not be expected to make a determination of a serious factual dispute based on an incomplete showing in affidavits submitted at the preliminary injunction hearing."). IWLCA may well show a likelihood of success on the merits in its motion for preliminary injunction with the benefit of a more well-developed evidentiary record through discovery. See, e.g., Di Biase v. SPX Corp., No. 3:14-cv-00656-RJC-DSC, 2015 WL 5714547, at *4 (W.D.N.C. Sept. 29, 2015), aff'd, 872 F.3d 224 (4th Cir. 2017).

16

11.    Because IWLCA has yet to show at this early stage a likelihood of success that its marks are valid and protectable, it is unnecessary for the court to consider the remaining elements of IWLCA's trademark infringement claim.[3] See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 930 (4th Cir. 1995) (finding that a trademark infringement claim requires a showing that plaintiff "has a valid, protectible trademark, and that the defendant's use . . . is likely to cause confusion among consumers.")  Likewise, it is unnecessary for the court to consider the remaining Winter preliminary injunction factors in connection with IWLCA's trademark infringement claim, as the failure to satisfy one of the Winter factors is fatal to a movant's claim.  United States v. North Carolina, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016).

12.    A conversion claim is a tort that North Carolina courts have defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Peed v. Burleson's Inc., 94 S.E.2d 351, 353 (N.C. 1956).  The Supreme Court of North

---

[3] It bears noting that IWLCA has presented some evidence that Defendants' actions have caused confusion amongst consumers.  (Doc. 16-1 ¶ 12; Doc. 16-2 ¶ 12; Doc. 19-1.)  Moreover, unauthorized use of a mark is an "undeniable threat" to the trademark owner's reputation.  Ark. Best Corp., v. Carolina Freight Corp., 60 F. Supp. 2d 517, 520 (W.D.N.C. 1999).

Carolina has defined the tort as having two elements: (1) "ownership in the plaintiff" and (2) "wrongful possession or conversion by the defendant." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., 723 S.E.2d 744, 747 (N.C. 2012). Thus, IWLCA must show that it owned the funds Defendants collected from registrants of the 2020 lacrosse tournaments. See id.

13.    IWLCA argues that the 2017 RFP and CSE's proposal together comprise a binding contract between the two parties, and that the contract gives IWLCA exclusive control over all registration fees and registrant information. (Doc. 19 at 22.) Defendants argue that the RFP and CSE's proposal did not form a contract and that, in any event, the two documents do not grant IWLCA exclusive control over the funds as IWLCA claims. (Doc. 27 at 17-18.) As a result, CSE argues that its ownership of the registry funds is not wrongful.

14.    Assuming the RFP and CSE's proposal formed a contract, IWLCA's remedy would then be contractual (which is not the substance of equitable relief), and not in tort. Moreover, the sections of the RFP and CSE's proposal that IWLCA relies on do not clearly show that IWLCA holds exclusive control over registration fees. For example, the RFP states that the IWLCA "will retain the right to determine and approve all aspects related to the competition venue operations *during the*

18

*tournament*." (Doc. 15-1 at 7 (emphasis added).) Furthermore, the RFP states, under the heading "Payment of Funds," that "IWLCA shall receive a financial report within 90 days *after the conclusion of the tournament*. All money payable to the IWLCA shall be paid within 120 days . . . pursuant to the transfer instructions provided by the IWLCA." (Id. at 8 (emphasis added).) CSE's proposal, under the heading "Partnership," states that "CSE has created a financial model that will allow the IWLCA to share in the profit of the IWLCA events. CSE will split the 'net' profit on a 50/50 basis with the IWLCA." (Doc. 15-2 at 7.) These statements, even if considered terms of a binding contract, do not clearly grant complete ownership of the registration fees to IWLCA. IWLCA has thus failed to demonstrate a likelihood of success on its conversion claim, given the record currently before the court, and the court is constrained to deny IWLCA's motion for TRO based on its conversion claim. North Carolina, 192 F. Supp. 3d at 629. This is not to say that IWLCA has no remedy for potential breach of the relationship with CSE.

15. A constructive trust "is a duty . . . imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against

19

the claim of the beneficiary of the constructive trust." Bissette v. Harrod, 738 S.E.2d 792, 800 (N.C. Ct. App. 2013) (quoting Cury v. Mitchell, 688 S.E.2d 825, 827 (N.C. Ct. App. 2010)), disc. review denied, 747 S.E.2d 251 (N.C. 2013). A constructive trust requires a showing of "some fraud, breach of duty or other wrongdoing by the holder of the property." Id. (quoting Cury, 688 S.E.2d at 800). IWLCA argues that the facts supporting its trademark infringement and conversion claims support a finding that it would be "unconscientious or inequitable" for Defendants to retain the registration funds. Variety Wholesalers, 723 S.E.2d at 752.

16. Because the court finds that IWLCA has not yet demonstrated a likelihood of success on its trademark and conversion claims, it is premature at this stage for IWLCA's constructive trust claim to form the grounds for the entry of a TRO.

17. In sum, in the absence of a demonstrated likelihood of success on the merits of the three claims on which IWLCA seeks a TRO, its motion will be denied at this stage.

18. Having said that, the record raises grave concerns as to the propriety of Defendants' conduct. This case strongly suggests that CSE is seeking to unfairly trade on its relationship with IWLCA, who is and has been the sponsor of these tournaments. IWLCA retained CSE to implement IWLCA's plan

20

to set up tournaments it has historically sponsored, and
Defendants have rejected its sponsor's directions and appear to
be hijacking the tournaments in CSE's name.  That IWLCA has not
yet demonstrated its rights in the purported marks at this early
stage does not necessarily foreshadow an inability to do so on
a more complete record.  The tournaments are also imminent (as
early as this weekend), and at this late stage it is difficult
for the court to sort out the highly contested issue of validity
of the marks.  If the marks are valid, there is evidence of
infringement and confusion notwithstanding CSE's use of its name
as sponsor.  <u>Rebel Debutante</u>, 799 F. Supp. 2d at 573 (finding
that pairing name with another's trademark cannot alone avoid,
and may very well increase, potential confusion).  Ultimately,
the principal issue in this case is which party has the right
to the marks in order to conduct tournaments in the future.  The
court therefore directs the Magistrate Judge to set an expedited
discovery schedule that will permit the court to hold a hearing
on the pending motion for preliminary injunction as soon as
practicable.  IWLCA's pending motion to expedite limited
discovery (Doc. 30) will therefore be referred to the Magistrate
Judge.

IT IS THEREFORE ORDERED that IWLCA's motion for temporary
injunctive relief (Doc. 18) is DENIED WITHOUT PREJUDICE.

_____/s/___Thomas D. Schroeder_____
                                        United States District Judge

July 23, 2020