IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THE INTERCOLLEGIATE WOMEN'S  )
LACROSSE COACHES ASSOCIATION,  )
                               )
            Plaintiff,         )
                               )
        v.                     )      1:20-cv-00425
                               )
CORRIGAN SPORTS ENTERPRISES,   )
INC. and RICHARD LEE CORRIGAN, )
JR. in his individual and      )
corporate capacities,          )
                               )
            Defendants.        )


## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This is a dispute over the unwinding of a relationship between the parties related to sponsorship of high school lacrosse tournaments nationwide following the impact of the novel coronavirus in 2020. Before the court is the motion of Plaintiff Intercollegiate Women's Lacrosse Coaches Association ("IWLCA") to dismiss all counterclaims against it pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 68.) Defendants Corrigan Sports Enterprises, Inc. ("CSE") and Richard Lee Corrigan, Jr. filed a response in opposition (Doc. 70), and IWLCA filed a reply (Doc. 71). For the reasons set forth below, the motion will be granted in part and denied in part.

## I.  BACKGROUND

### A.  Factual Background

The facts as outlined in CSE's counterclaims, which are taken as true for the purposes of the present motion, show the following:

CSE is an event hosting company that is experienced in organizing, promoting, and operating sporting events across the country, including lacrosse tournament events.  (Doc. 66 countercls. ¶¶ 18-22.)  Corrigan is CSE's founder and president.  (Id. ¶ 18.)  IWLCA is a professional association whose membership is comprised of college lacrosse coaches within the National Collegiate Athletic Association ("NCAA") and the National Association of Intercollegiate Athletics ("NAIA").  (Id. ¶ 24.)

In or around July 2009, CSE entered into discussions with Gothard Lane, the then-Executive Director of IWLCA, regarding a potential partnership to hold high school women's lacrosse tournaments.[1]  (Id. ¶¶ 25-26.)  As part of these discussions, CSE and Lane agreed that IWLCA would sponsor the tournaments while CSE would organize, promote, plan, and operate them.  (Id.)

---

[1] IWLCA's recitation of the facts does not reflect these initial discussions.  Rather, the amended complaint indicates that IWLCA began hosting high school women's lacrosse tournaments in 2006 and initially worked with a different event management company.  (See Doc. 15 ¶¶ 7.a.-b.)  The amended complaint further alleges that IWLCA began working with CSE in December 2009 after CSE responded to IWLCA's request for proposals, without any reference to discussions or negotiations allegedly conducted in July 2009.  (Id. ¶ 7.c.)  Regardless, for the purposes of the present motion, the court accepts the facts as alleged by Defendants as true unless they are contradicted by documents on which Defendants rely.

Following these discussions and initial negotiations, CSE presented IWLCA with a proposal for CSE to organize and host the Presidents Cup in Naples, Florida in 2010 and 2011 — with an option for 2012 — and the Capital Cup outside of Washington, D.C. in 2011, 2012, and 2013. (Id. ¶ 28.) In exchange, IWLCA would sponsor and promote the tournaments to its member coaches. (Id. ¶ 30.) IWLCA accepted the proposal, and the organizations agreed to split the net profits of the tournaments 50-50. (Id. ¶¶ 29-30.)

In November 2013, CSE and IWLCA executed a contract ("the 2013 contract") to formalize the terms for the organization, promotion, and hosting of several high school women's lacrosse tournaments, including the Champions Cup from 2013 to 2015; the Capital Cup from 2013 to 2016; the Western Cup from 2013 to 2015; and the Presidents Cup from 2013 to 2015. (Id. ¶ 32.) Per the contract, CSE's responsibilities included, among other items, organizing, processing, and executing the registration of all teams; advertising and marketing the tournaments using the IWLCA logo; creating and maintaining a website for the tournaments; and hosting and administering the tournaments, including securing event locations and equipment, staffing officials, researching insurance, facilitating sponsorships and vendors, collecting fees, paying tournament expenses, and accounting for all revenues and expenses for each tournament. (Id. ¶ 33.) In exchange, IWLCA agreed to promote the tournaments to college coaches, to facilitate

3

the establishment of sponsorships for and vendors at the tournaments, to timely communicate with CSE, and to grant CSE the exclusive right to organize and host the tournaments. (Id. ¶ 34.) The contract further indicated that where circumstances may require the cancellation of any tournament, "IWLCA and CSE shall decide together to cancel a Tournament." (Id. ¶ 35.)

In April 2014, CSE and IWLCA executed an addendum to the 2013 contract ("the 2014 addendum") that extended the terms of the 2013 contract to the 2016 Champions, Capital, Western, and Presidents Cups and added the 2014 through 2016 New England Cups to the agreement. (Id. ¶ 36.) In April 2017, the parties executed a second addendum ("the 2017 addendum") that extended the terms of the 2013 contract to the New England, Champions, Midwest, Capital, and Presidents Cups for 2017 and 2018. (Id. ¶ 37.)

In 2017, IWLCA issued a Request for Proposals ("RFP") for the 2018, 2019, and 2020 tournaments, to which CSE responded. (Id. ¶ 41-42.) IWLCA accepted CSE's proposal, but the parties did not execute a new contract or addendum for these tournaments. (Id. ¶¶ 42, 53.)

In 2018, Lane stepped down as Executive Director of IWLCA. (Id. ¶ 44.) That same year, Samantha Ekstrand, IWLCA's counsel and leading business executive, informed CSE that IWLCA wanted to negotiate a new long-term contract and make significant changes. (Id. ¶¶ 10, 45.) In response, CSE prepared a draft proposal and

sent it to Ekstrand. (Id. ¶ 45.) However, Ekstrand denied the proposal, allegedly without input or review of the IWLCA Board, and the parties did not execute a new contractual agreement. (Id.)

In December 2018, IWLCA began to more closely monitor the expenses associated with the tournaments and hired an outside firm to inspect CSE's accounting records. (Id. ¶¶ 46-48.) Although the outside firm found no irregularities, Ekstrand allegedly informed the IWLCA Board that CSE was taking advantage of IWLCA and that certain fees were improper. (Id. ¶¶ 48-52.)

The 2019 tournaments were conducted without a written agreement between the parties but performed "in accordance with the terms of the 2013 Contract and subsequent amendments and the course of performance and terms under which they had operated for several years." (See id. ¶ 54.)

Shortly after the 2019 tournaments, in August 2019, CSE opened registration for the 2020 tournaments.[2] (Id. ¶¶ 55-56.) As part of the registration process, registrants were required to submit a clearly identified, non-refundable deposit. (Id. ¶ 58.)

On April 18, 2020, IWLCA publicly announced, without any input from CSE, that it had decided to cancel the 2020 tournaments and that it had "directed" CSE to issue refunds to all registered teams. (Id. ¶¶ 60, 62.) By that time, over 1,100 teams had

_____

[2] Excepted were the Presidents Cup and the Debut Tournament, for which registration opened in March 2020. (Id. ¶ 56.)

registered or were waitlisted for the tournaments and CSE had incurred significant expenses in planning the tournaments. (See id. ¶¶ 59, 64.)

Rather than cancelling the tournaments, CSE announced that IWLCA had decided to withdraw its sponsorship and official involvement in the tournaments, but that CSE would continue to host the tournaments to the extent possible in light of COVID-19 restrictions. (Id. ¶ 66.) CSE further gave registrants who could not participate in the tournament for which they had registered the option of transferring their registration to another 2020 tournament, requesting a deferment of their registration to a 2021 tournament, or requesting a partial refund, less their non-refundable deposit. (Id. ¶¶ 69-70.)

In the months following the April 2020 announcements, IWLCA allegedly began to actively lobby its member coaches not to attend CSE's tournaments or collaborate with CSE in any way. (Id. ¶¶ 72-83.) IWLCA also allegedly began interfering with CSE's relations with sponsors, local municipalities, and tourism boards. (Id. ¶¶ 84-86, 94.) Finally, IWLCA allegedly contacted players, teams, and coaches to discourage them from attending CSE tournaments and made false statements indicating that "CSE runs low quality tournaments," "CSE's president, Lee Corrigan, is dishonest," "participants w[ould] not receive the experience at CSE tournaments" that they were promised, and "there w[ould] not be

many, if any, college coaches/recruiters in attendance." (Id. ¶¶ 87-91.)

Between July and November 2020, CSE hosted five high school women's lacrosse tournaments with COVID-19 protocols in place. (Id. ¶¶ 98-99.) Ultimately, though, the number of teams in attendance was significantly lower than prior years. (See id. ¶ 98.)

## B. Procedural History

On May 6, 2020, IWLCA filed this action in a North Carolina state court seeking declaratory, monetary, and injunctive relief. (Doc. 1-1.) Defendants timely removed the lawsuit to this court (Doc. 1) and moved to dismiss for lack of jurisdiction (Doc. 14). IWLCA subsequently filed an amended complaint (Doc. 15), and the motion to dismiss for lack of jurisdiction was denied (Doc. 42).

Defendants also filed a motion to dismiss pursuant to Rule 12(b)(6) (Doc. 23), which this court granted in part and denied in part on December 4, 2020 (Doc. 63). Defendants then filed their answer, affirmative defenses, and counterclaims in response to IWLCA's amended complaint. (Doc. 66.) Defendants allege five counterclaims against IWLCA: (1) breach of contract; (2) tortious interference with contract; (3) tortious interference with prospective economic advantage; (4) unfair competition; and (5) violations of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 et seq. (Id.

countercls. ¶¶ 102-52.) IWLCA now moves to dismiss all counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 68.) Defendants oppose the motion, which is fully briefed and ready for resolution. (See Docs. 69, 70, 71.)

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), a complaint — or as is the case here, a counterclaim — must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Hall v. Go To Team, Inc., No. 1:15-CV-295, 2016 WL 9440867, at *1 (M.D.N.C. Mar. 31, 2016). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the complainant's favor. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997); Hall, 2016 WL 9440867, at *1. "Rule 12(b)(6)

8

protects against meritless litigation by requiring sufficient factual allegation 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cnty. Bd. Of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (alteration in original) (quoting Twombly, 550 U.S. at 555). A counterclaim is judged by the same standard and "must 'state[] a plausible claim for relief' that permit[s] the court to infer more than the mere possibility of misconduct based upon 'its judicial experience and common sense.'" Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010) (alterations in original) (quoting Iqbal, 556 U.S. at 679); Hall, 2016 WL 9440867, at *1. Thus, mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In ruling on a motion to dismiss, courts may consider documents attached to either the counterclaims or the motion to dismiss without converting the motion into one for summary judgment so long as the documents are integral to the counterclaims and authentic. Philips v. Pitt Cnty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009); Hall, 2016 WL 9440867, at *1.

**B. Breach of Contract**

Defendants first bring a counterclaim for breach of contract against IWLCA. (Doc. 66 countercls. ¶¶ 102–17.) Under North

9

Carolina law, the essential elements for a breach of contract claim are the existence of a valid contract and a breach of its terms. Eli Rsch., Inc. v. United Commc'ns Grp., LLC, 312 F. Supp. 2d 748, 755 (M.D.N.C. 2004) (citing Poor v. Hill, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000)). A valid contract requires an agreement based on a meeting of the minds and sufficient consideration. See Creech ex rel. Creech v. Melnik, 556 S.E.2d 587, 591 (N.C. Ct. App. 2001). As such, in order to state a claim for breach of contract, Defendants must first show that the parties had an enforceable agreement.

Defendants argue that the 2013 contract governed the execution of the 2020 tournaments and that IWLCA breached its terms. (Doc. 66 countercls. ¶¶ 110-11.) In response, IWLCA argues that Defendants are estopped by their contrary representations to this court from asserting that the 2013 contract governed the 2020 tournaments. (Doc. 69 at 6-7.) It further argues that, even if Defendants are not estopped, the 2013 contract did not govern the parties' relationship because it expired prior to the 2020 tournaments and was not otherwise extended to the 2020 tournaments. (Id.) Defendants respond that their prior representations are not inconsistent with their current claim and that although the parties did not extend the 2013 contract to the 2020 tournaments by any written agreement, the parties established a contract implied in

10

fact through their continued adherence to the terms of the 2013 contract in relation to the 2020 tournaments.  (Doc. 70 at 5-7.)

"[J]udicial estoppel or the doctrine of preclusion against inconsistent positions" protects the integrity of the courts by precluding parties from adopting inconsistent positions in the course of a judicial proceeding.  Guinness PLC v. Ward, 955 F.2d 875, 899 (4th Cir. 1992); see also Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982) ("In certain circumstances a party may properly be precluded as a matter of law from adopting a legal position in conflict with one earlier taken in the same or related litigation."); Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1177 (D.S.C. 1974) ("A party cannot have its cake and eat it too.").  Although "[c]ourts have had difficulty in formulating a specific test for determining when judicial estoppel should be applied," and though neither party here has brought it to the court's attention, the Fourth Circuit has identified three elements that must be met before application of this doctrine. See Lowery v. Stovall, 92 F.3d 219, 223-24 (4th Cir. 1996).  First, "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation."  Id. at 224.  Second, "the prior inconsistent position must have been accepted by the court," and third, "the party sought to be estopped must have intentionally misled the court to gain unfair advantage."  Id. (internal quotation marks omitted).

"Because of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution."  Id.

Here, Defendants previously sought to distance themselves from the consent to jurisdiction provision of the 2013 contract by asserting, in support of their motion to dismiss for lack of jurisdiction, that the 2013 contract "expired after the conclusion of the 2018 tournaments" and that "this action does not concern the 2013 [c]ontract."  (Doc. 14 at 12.)  Accordingly, Defendants argued, the court could not exercise jurisdiction over them based upon the consent contained in that agreement.  (Id.)  IWLCA contends that these statements bar Defendants from now asserting that the 2013 contract governed the 2020 tournaments.[3]  (Doc. 69 at 6-8.)

Defendants' present position certainly conflicts with their earlier statements regarding the relevance of the 2013 contract. However, the court never accepted Defendants' prior position.  (See Doc. 42 (finding the court has jurisdiction over Defendants without reference to claims regarding the 2013 contract).)  Further, IWLCA has shown no facts that would suggest that Defendants have

---

[3] Although IWLCA suggests that these inconsistent statements were established by Corrigan's sworn declaration (see Doc. 69 at 6 (citing Doc. 14-1 ¶ 13)), his declaration merely recites the parties' contracting history (see Doc. 14-1 ¶¶ 13-15).  While Defendants' earlier filings relied upon his declaration for factual support (see Doc. 14 at 12-13), the declaration itself never characterizes the 2013 contract as expired or otherwise inapplicable (see Doc. 14-1).

intentionally misled the court to gain an unfair advantage. So even though speaking out of both sides of one's mouth raises natural credibility problems and may give rise to the use of a judicial admission for evidentiary purposes, see Fraternal Ord. of Police Lodge No. 89 v. Prince George's Cnty., MD, 608 F.3d 183, 190 (4th Cir. 2010), it is regrettably not a prohibited practice for lawyers and is not alone a basis for imposing judicial estoppel. As such, the application of judicial estoppel is not appropriate here, and the court must consider whether Defendants have successfully alleged a contract implied in fact and a breach of that agreement.

A contract implied in fact "arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract." Snyder v. Freeman, 266 S.E.2d 593, 602 (N.C. 1980) (quoting 17 C.J.S. Contracts § 4b (1963)). Such a contract may be found where "a contract lapses but the parties continued to act as if they are performing under a contract," and neither party "clearly and manifestly indicates, through words or . . . conduct, that it no longer wishes to continue to be bound" by the terms of the lapsed agreement. See Celanese Acetate, LLC v. Lexcor, Ltd., 632 F. Supp.

2d 544, 550 (W.D.N.C. 2009). In evaluating a contract implied in fact on a 12(b)(6) motion, "[w]hether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." Synder, 266 S.E.2d at 602.

Here, Defendants argue that the parties' continued adherence to the terms of the 2013 contract in planning the 2020 tournaments sufficiently establishes a contract implied in fact. (Doc. 70 at 6-7.) IWLCA argues in response that its decision not to execute an addendum that extended the 2013 contract to the 2020 tournaments establishes its intent not to be bound by the terms of that contract. (Doc. 71 at 2.)

Reviewing the pleadings in light of the 2013 contract, the court finds that Defendants have plausibly alleged that the 2020 tournaments were governed by the 2013 contract. It is undisputed that the parties did not execute a consolidated contractual agreement for the 2018, 2019, and 2020 tournaments. (See Doc. 15 ¶ 11; Doc. 66 countercls. ¶¶ 41-43, 54.) Defendants' pleadings allege that both parties adhered to the terms of the 2013 contract in planning and executing the 2018 and 2019 tournaments. (Doc. 66 countercls. ¶¶ 43, 54.) Further, there is some evidence that the parties — at least initially — adhered to the terms of the 2013 contract in planning the 2020 tournaments. (See, e.g., id. ¶ 57.) Although IWLCA contends that the failure to execute an addendum to the 2013 contract for the 2018-20 tournaments shows an intent not

to be bound, the parties' continued partnership in planning women's high school lacrosse tournaments in line with the terms of that contract from 2018 to the start of 2020 – as alleged by Defendants – plausibly alleges a contract implied in fact such that the 2020 tournaments could be governed by the terms of the 2013 contract. Ultimately, whether the parties intended as much depends on the development of the record and at this stage raises a question of fact. See Synder, 266 S.E.2d at 602. At the present stage, the pleadings are sufficient to allege a contract implied in fact based on the material terms of the 2013 contract.

Because Defendants have plausibly alleged a contract implied in fact, it must next be determined whether they have sufficiently alleged a breach of that agreement. Defendants claim that IWLCA has breached the agreement by unilaterally announcing the cancellation of the 2020 tournaments; by actively discouraging registered teams, players, and coaches from attending the 2020 tournaments; and by failing to promote the 2020 tournaments to its member coaches. (Doc. 66 countercls. ¶¶ 112-14.) Defendants support these allegations with specific facts. For example, Defendants allege that IWLCA unilaterally decided and announced the cancellation of the 2020 tournaments in April 2020 at the outset of the coronavirus pandemic. (Id. ¶ 60.) They further point to specific efforts made by IWLCA to discourage its coaches from affiliating with CSE (see id. ¶¶ 73-83) and the significant

15

drop in attendance for the 2020 tournaments compared to years prior (see id. ¶ 98).[4]  Meanwhile, the 2013 contract requires that IWLCA "[p]romote the Tournaments to college coaches with the goal of increasing attendance and participation," and specifically states that should a "condition exist that poses substantial risk to the safety and well being of Tournament participants and attendees, the IWLCA and CSE shall decide together to cancel a Tournament." (Doc. 66-2 at 4.)  The allegations made by Defendants are sufficient, at the present stage, to plead a plausible breach of the parties' agreement.  Accordingly, IWLCA's motion to dismiss Defendants' counterclaim for breach of contract will be denied.

### C.  Tortious Interference with Contract

Defendants next bring a claim of tortious interference with contract.  Defendants contend that IWLCA tortiously interfered with contracts between Defendants and players, teams, and coaches registered for the 2020 tournaments.[5]  (Doc. 66 countercls. ¶¶ 119-

---

[4] To the extent that IWLCA argues that Defendants ignore the "obvious alternative explanation" for decreased attendance and participation in the 2020 tournaments – namely, the COVID-19 pandemic – it raises a fact question that the court is constrained not to consider at the motion to the dismiss stage. Erickson, 551 U.S. at 94 (2007) (a court "must accept as true all of the factual allegations" in the counterclaim when considering a Rule 12(b)(6) motion).  For this reason, the court does not address this argument here.

[5] While Defendants argue in their response that this claim extends to CSE's contracts with other third parties, including IWLCA member coaches, sponsors, and local municipalities (see Doc. 70 at 11-12), the counterclaim as alleged is limited to CSE's contracts with registered teams, players, and coaches (see Doc. 66 countercls. ¶¶ 119-28

26.)  IWLCA argues that this claim should be dismissed because Defendants failed to adequately plead the cause of action in several respects; specifically, that Defendants failed to adequately allege that IWLCA induced any specific third party to breach its contract, that any specific third party actually breached its contract, that Defendants actually maintained contracts with the third parties, or that any third party would have performed under its contract but for IWLCA's conduct. (Doc. 69 at 10.)  Defendants respond that IWLCA has mischaracterized their pleadings. (See Doc. 70 at 10-11.)

To state a claim for tortious interference with contract, a complainant must show the following: (1) the existence of a valid contract between the complainant and a third person which confers upon the complainant a contractual right against a third person; (2) the opposing party knew of the contract; (3) the opposing party intentionally induced the third person not to perform the contract; (4) the opposing party acted without justification in doing so; (5) and actual damage resulted to the complainant. Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 784 S.E.2d 457, 462 (N.C. 2016).  A complainant need not allege that the party's actions caused an actual breach of the agreement, but

(discussing only registration contracts with 2020 tournament participants and referring only to statements allegedly made by IWLCA to "registered teams, players, and coaches")).

that the party wrongfully interfered with the complainant's rights under the contract.  See Lexington Homes, Inc. v. W.E. Tyson Builders, Inc., 331 S.E.2d 318, 322 (N.C. Ct. App. 1985), accord Eng. Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc., 172 F.3d 862 (4th Cir. 1999).

Here, Defendants allege that IWLCA was aware that CSE entered into registration contracts with teams, players, and coaches for the 2020 tournaments (Doc. 66 countercls. ¶¶ 119-21) and that IWLCA interfered with these contracts by "contact[ing] . . . players, teams, and coaches and discourag[ing] them from partnering with CSE and/or attending CSE tournaments" and encouraging registrants to withdraw from the 2020 tournaments (id. ¶¶ 87, 122).  In so doing, IWLCA allegedly made false and disparaging statements regarding the quality of CSE's tournaments and the expected attendance of college coaches and recruiters at those tournaments. (Id. ¶¶ 88, 91, 122-24.)  As a result of these statements — which were allegedly made with "no justification" and were attributable to IWLCA's "personal animus" against CSE and Corrigan — "certain of the statement recipients" broke their contracts with CSE by failing to attend the 2020 tournaments, which ultimately had historically low participation rates compared to prior years.[6]

---

[6] As discussed supra, although IWLCA argues that Defendants ignore the "obvious alternative explanation" for low attendance rates – namely, the COVID-19 pandemic — the court must accept Defendants' factual allegations as true at the present stage.

18

(See id. ¶¶ 98, 125-27; Doc. 70 at 13.)

Although IWLCA contends that Defendants have failed to allege sufficient facts to plausibly state this claim, Defendants have in fact made certain specific factual allegations in support of their claim. In particular, Defendants have alleged that IWLCA representatives wrongfully contacted parties registered for the 2020 tournaments and made specific false statements to them in order to induce them not to attend the 2020 tournaments in violation of their registration agreements. Defendants further allege that at least some recipients ultimately did not attend as a result and that Defendants suffered damages due to the decreased participation numbers and resulting decreased revenues. While Defendants do not specifically identify the IWLCA representatives or registered parties involved, a high level of specificity is not required to state this claim. See, e.g., Mkt. Am., Inc. v. Rossi, No. 1:97CV00891, 1999 WL 1939247, at *15 (M.D.N.C. Apr. 15, 1999) (dismissing claim for tortious interference with contract, but taking no issue with generalized assertions regarding "numerous" distributors), modified, 104 F. Supp. 2d 606 (M.D.N.C. 2000), aff'd, 238 F.3d 413 (4th Cir. 2000). "At this stage of the proceeding, [a complainant] is not burdened with the task of proving its claim; [a complainant] need only allege facts which make its claim plausible." BioSignia, Inc. v. Life Line Screening of Am., Ltd., No. 1:12CV1129, 2014 WL 2968139, at *7 (M.D.N.C.

July 1, 2014). While far from robust, Defendants' allegations are sufficient to survive dismissal. Defendants' ultimate task of providing specific evidence in support of these claims will await further demonstration.

To the extent IWLCA argues that Defendants' claim should be dismissed because Defendants did not allege that any specific registrant actually breached its agreement, this argument fails. It is not necessary for a party to plead an actual breach of an agreement to state a claim for tortious interference with contract; all that must be pleaded is wrongful interference. <u>Lexington Homes</u>, 331 S.E.2d at 322. Defendants have sufficiently alleged such interference here, such that dismissal is inappropriate. For this same reason, IWLCA's argument that Defendants have failed to plead "but for" causation fails. (<u>See</u> Doc. 66 countercls. ¶ 125 ("The false statements made by IWLCA . . . induced certain of the statement recipients to break their contracts with CSE.").) In light of IWLCA's prior involvement in the tournaments as a sponsor and its relationship with its member coaches, these allegations are plausible. Defendants have also adequately alleged damages as a result of IWLCA's alleged wrongful interference such that the claim survives.

Finally, IWLCA's argument that Defendants did not maintain the registration contracts, but rather that IWLCA did, fails. Defendants specifically allege that CSE, not IWLCA, entered into

the contracts with registrants. (Doc. 66 countercls. ¶ 120.) Although CSE did so in line with its agreement with IWLCA (id.), this alone does not support IWLCA's contention that CSE did not maintain these contracts. As such, IWLCA's suggestion that its actions were privileged as it was an insider to the relevant contracts fails. (See Doc. 69 at 14.) Taken collectively, Defendants' allegations are sufficient to state a claim for tortious interference with contract to survive dismissal. To be sure, IWLCA sees the legal relationship differently, but resolution of these competing claims must await the development of the factual record.

For all these reasons, IWLCA's motion to dismiss Defendants' tortious interference of contract claim will be denied.

**D. Tortious Interference with Prospective Economic Advantage**

Defendants next bring a claim for tortious interference with prospective economic advantage. Defendants allege that IWLCA interfered with CSE's plans to hold high school women's lacrosse tournaments in 2021 by encouraging teams, players, and coaches not to attend these events and by making false statements regarding the safety and effectiveness of the tournaments for college recruitment. (Doc. 66 countercls. ¶¶ 131-35.) IWLCA argues that this claim must be dismissed because Defendants' allegations fail in multiple respects; namely, that Defendants failed (1) to

identify a particular prospective contract with a particular third party with which IWLCA allegedly interfered, (2) to allege that IWLCA was aware of any prospective contract, (3) to allege that any such inference was intentional, and (4) to allege that any particular contract was not consummated. (Doc. 69 at 15.) IWLCA further argues that the claim must be dismissed because it is based only on Defendants' expectation of continuing business relationships. (Id. at 16-17.) In response, Defendants contest IWLCA's characterization of their pleadings as vague and further contend that they had more than a mere expectancy of contracting with teams, players, and coaches for the 2021 tournaments. (See Doc. 70 at 16-20.)

A claim for tortious interference with prospective economic advantage arises when a party interferes with a business relationship "by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, . . . if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." Spartan Equip. Co. v. Air Placement Equip. Co., 140 S.E.2d 3, 11 (N.C. 1965) (citations omitted). A complainant's "mere expectation of a continuing business relationship is insufficient to establish such a claim." Beverage Sys., 784 S.E.2d at 463. Rather, a complainant must allege that "a contract would have resulted but for defendant's malicious

22

intervention." Id. Conclusory indications that a contract would have been formed but for a party's conduct, without more, are not sufficient to state a claim for relief. See William Ives Consulting, Inc. v. Guardian It Sys., LLC, No. 3:19-CV-00336-GCM, 2020 WL 6495542, at *4 (W.D.N.C. Nov. 4, 2020).

Courts have acknowledged that North Carolina law "is not crystal clear" on the level of specificity required to state a claim for tortious interference with prospective economic advantage. See The Bldg. Ctr., Inc. v. Carter Lumber, Inc., No. 16 CVS 4186, 2016 WL 6142993, at *7 (N.C. Super. Oct. 21, 2016) (business court) (comparing Owens v. Pepsi Cola Bottling Co., 412 S.E.2d 636, 644-45 (N.C. 1992) with Dalton v. Camp, 548 S.E.2d 704, 710 (N.C. 2001)). Several courts have concluded that pleadings which do not identify specific customers or specific prospective contracts are insufficient to survive dismissal. See id. at *8; Sec. Camera Warehouse, Inc. v. Bowman, No. 16 CVS 5385, 2017 WL 1718806, at *8 (N.C. Super. May 1, 2017) (business court); see also DaimlerChrysler Corp. v. Kirkhart, 561 S.E.2d 276, 286 (N.C. Ct. App. 2002); Tucker Auto-Mation of N.C., LLC v. Russell Rutledge & Rutledge Com., LLC, No. 1:15-CV-893, 2017 WL 2930926, at *3 (M.D.N.C. July 10, 2017).

Here, the court need not determine whether Defendants have adequately pleaded sufficient facts for many of the particulars of this claim, which is at best dubious because Defendants fail to

identify any particular contract or any particular team, player, or coach that was so dissuaded. The claim fails for another reason - namely, that it is based on the "mere expectation of a continuing business relationship." See Beverage Sys., 784 S.E.2d at 463. Defendants indicate that "teams, players, and coaches that historically attend[ed] CSE's recruiting tournaments" have failed to register for the 2021 tournaments "as they ha[d] for several years prior." (Doc. 66 countercls. ¶¶ 132, 137; see also id. ¶ 90 ("CSE has [] not heard from numerous club teams, coaches, and players who historically attended CSE tournaments and had positive relationships with CSE.").) Beyond the historic attendance of these unspecified teams, players, and coaches, Defendants provide no basis for their conclusion that contracts for the 2021 tournaments would have resulted but for IWLCA's conduct. Defendants' expectation of a continuing business relationship with these third parties alone is not sufficient to state a claim for tortious interference with prospective economic advantage. As such, IWLCA's motion to dismiss this claim will be granted.

### E. Violations of the UDTPA and Unfair Competition

Lastly, Defendants bring claims for violations of the UDTPA and common law unfair competition. Defendants base these causes of action on their underlying claims for breach of contract and tortious interference with contract and prospective economic advantage. (Doc. 66 countercls. ¶¶ 142-43, 149.) In response,

24

IWLCA argues that a breach of contract alone cannot support either claim. (Doc. 69 at 19-22.) Further, it argues that Defendants have failed to make any specific allegations that would support these claims. (Id. at 22-23.)

The standard for violations of the UDTPA and common law unfair competition are not "appreciably different." BellSouth Corp. v. White Directory Publrs., Inc., 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999) (citing Carolina Aniline & Extract Co., Inc. v. Ray, 20 S.E.2d 59, 61-62 (N.C. 1942)). The tort of common law unfair competition is recognized in North Carolina "as an offense committed in the context of competition between business rivals." Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 697 (M.D.N.C. 2011) (quoting Henderson v. U.S. Fid. & Guar. Co., 488 S.E.2d 234, 239 (N.C. 1997)). "The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." Henderson, 488 S.E.2d at 240. UDTPA violations require a plaintiff to show that (1) the defendant committed an unfair or deceptive act or practice (2) that was in or affecting commerce and (3) proximately caused injury. Stack v. Abbott Lab'ys, Inc., 979 F. Supp. 2d 658, 666–67 (M.D.N.C. 2013) (citing Dalton, 548 S.E.2d at 711). "An act or practice is unfair 'if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and is

25

deceptive 'if it has the capacity or tendency to deceive.'" Id. (quoting Ace Chem. Corp. v. DSI Transp., Inc., 446 S.E.2d 100, 106 (N.C. Ct. App. 1994)). "The determination of whether an act or practice is an unfair or deceptive practice that violates [the UDTPA] is a question of law for the court." Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000).

Defendants explicitly base these causes of action on their underlying breach of contract and tortious interference claims. (Doc. 66 countercls. ¶¶ 142-43, 149.) Although Defendants' tortious interference with prospective economic advantage claim has been dismissed, Defendants have sufficiently alleged claims for breach of contract and tortious interference with contract. The court must therefore consider the sufficiency of each to support an unfair competition claim.

Tortious interference with contract claims may support unfair competition claims. See Roane-Barker v. Se. Hosp. Supply Corp., 392 S.E.2d 663, 670 (N.C. Ct. App. 1990) ("Because defendant's acts did amount to tortious interference with contract . . . the court did not err in finding an unfair or deceptive trade practice."); see also McDonald v. Scarboro, 370 S.E.2d 680, 685 (N.C. Ct. App. 1988) (finding tortious interference with contract can support a breach of the UDTPA); Edmondson v. Am. Motorcycle

Ass'n, Inc., 7 F. App'x 136, 152-53 (4th Cir. 2001) (same);[7] Clark
Material Handling Co. v. Toyota Material Handling U.S.A., Inc.,
No. 3:12-CV-00510-MOC, 2015 WL 3514339, at *14 (W.D.N.C. June 4,
2015) (same).  Here, Defendants have alleged that IWLCA interfered
with CSE's contracts with tournament attendees and that in doing
so, IWLCA made false and disparaging statements about the 2020
tournaments.  Further, Defendants allege that IWLCA's actions
caused certain individuals not to attend the tournaments, breaking
their contracts and causing harm to CSE in the form of lost
revenues and decreased tournament participation.  At this early
stage, these allegations are sufficient to state a plausible claim
for unfair competition predicated on IWLCA's tortious interference
with contract.

To the extent Defendants base their unfair competition claims
on IWLCA's breach of contract, a higher standard must be met as
North Carolina courts "differentiate between contract and
deceptive trade practice claims, and relegate claims regarding the
existence of an agreement, the terms contained in an agreement,
and the interpretation of an agreement to the arena of contract
law." Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp.
303, 306-07 (M.D.N.C. 1988).  A "mere breach of contract, even if

---

[7] Unpublished opinions of the Fourth Circuit are not precedential but
can be cited for their persuasive, but not controlling, authority. See
Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

intentional," is not sufficient to sustain a claim under the UDTPA. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998). Instead, a showing of "substantial aggravating circumstances" is required. Id. "The type of conduct that has been found sufficient to constitute a substantial aggravating factor has generally involved forged documents, lies, and fraudulent inducements." Stack, 979 F. Supp. 2d at 668 (collecting cases); see also LFM Real Est. Ventures, LLC v. SunTrust Bank, No. 5:11CV135-RLV, 2012 WL 6114242, at *9 (W.D.N.C. Dec. 7, 2012) ("The courts have found that aggravating factors may include intentional misrepresentation for the purpose of deceiving or injuring another or actions that rise to the level of fraud."). However, statements that amount to "mere puffing, guesses, or assertions of opinions" as opposed to "representations of material facts" are not sufficient. See Watson v. Fleetwood Motor Homes of Ind., Inc., No. 1:06CV275, 2007 WL 2156351, at *4 (W.D.N.C. July 24, 2007); see also Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 389 (N.C. 1988) ("[A] statement of an opinion . . . could not constitute fraud."). Further, "[w]here the only acts alleged are themselves a breach of the contract between the parties, they will not support a UDTPA claim." Stack, 979 F. Supp. 2d at 668.

Accordingly, for Defendants' breach of contract claim to support these claims, the breach must be accompanied by "substantial aggravating circumstances." Defendants contend that

certain of IWLCA's actions – specifically discouraging teams, players, and coaches from attending the 2020 tournaments, disparaging CSE and Corrigan to coaches and attendees, and spreading misinformation about the tournaments while using the COVID-19 pandemic as pretext for severing their partnership – constitute such circumstances. (See Doc. 70 at 21-22.) However, these activities are themselves alleged to be breaches of the parties' contract and therefore cannot support a separate UDTPA claim. (See Doc. 66 countercls. ¶¶ 113-15 (explaining that IWLCA breached the parties' contract by "failing to promote" and "actively discouraging" teams, players, and coaches from attending the 2020 tournaments).) Further, at least some of the alleged behavior, such as IWLCA's statements regarding the quality of CSE's tournaments and the trustworthiness of Corrigan, do not appear to be misrepresentations of fact but rather statements of opinion regarding a competing organization. As such, these allegations are insufficient to show "aggravating circumstances" that elevate the breach of contract claim to one of unfair competition. Watson, 2007 WL 2156351, at *4; see also Myers & Chapman, 374 S.E.2d at 389. Accordingly, to the extent Defendants base their unfair competition claims on IWLCA's breach of contract, IWLCA's motion to dismiss those claims will be granted and those claims will be dismissed.

## F.    Request to Amend

Defendants argue that to the extent the court finds dismissal of certain counterclaims appropriate, they should be permitted to amend their counterclaims.  (Doc. 70 at 22.)   IWLCA opposes this request principally because no proposed amended pleading has been offered.  (Doc. 71 at 12.)

Under Federal Rule of Civil Procedure 15(a)(2), once 21 days elapses from service of a motion to dismiss, a plaintiff may amend a pleading only with the opposing party's consent or leave of court.  Leave should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2).  Leave to amend will be denied only if (1) the amendment would prejudice the opposing party, (2) there is bad faith on the part of the moving party, or (3) the amendment would be futile.  Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).

While leave may be freely granted, Federal Rule of Civil Procedure 7(b)(1) requires that a "request for a court order must be made by a motion" which states the grounds for seeking the order and the relief sought.  Further, this district's local rules require that leave to amend be requested in a separate motion and be accompanied by a proposed amended pleading.  See M.D.N.C. L.R. 7.3(a), 15.1.  The purpose of these requirements "is to avoid having cases thrust into limbo on such generalized requests that may later prove unsupported."  Sullivan v. Lab'y Corp. of Am.

Holdings, No. 1:17CV193, 2018 WL 1586471, at *13 (M.D.N.C. Mar. 28, 2018).  Accordingly, a request for leave to amend that is brought as an alternative to dismissal and requested at the end of a party's brief opposing a motion to dismiss is not a proper motion, does not comply with the local rules, and may be denied on those grounds alone.  Id. (citing Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 630–31 (4th Cir. 2008) and Intellectual Ventures I LLC v. Bank of Am., Corp., No. 3:13-CV-358-RJC-DSC, 2014 WL 868713, at *4 (W.D.N.C. Mar. 5, 2014)); U.S. ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 703 (4th Cir. 2014).

Here, Defendants have not filed a motion to amend, nor have they attached proposed amended pleadings.  Without a proposed amended pleading, the court cannot consider the effect or efficacy of any hypothetical amendment to Defendants' pleading.  As such, Defendants' alternative request to amend their counterclaims will be denied without prejudice.  To permit otherwise would risk delaying litigation for potentially speculative reasons.

**III. CONCLUSION**

For the reasons stated,

IT IS THEREFORE ORDERED that IWLCA's motion to dismiss (Doc. 68) is GRANTED IN PART and DENIED IN PART as follows:

1.  The motion to dismiss Defendants' counterclaim for tortious interference with prospective economic advantage is GRANTED and the claim is DISMISSED;

2.    The motion to dismiss Defendants' counterclaims for breach of contract and tortious interference with contract is DENIED; and

3.    The motion to dismiss Defendants' counterclaims for common law unfair competition and violations of the UDTPA is DENIED to the extent the claims are based on Defendants' claim for tortious interference with contract, but is otherwise GRANTED.

IT IS FURTHER ORDERED that Defendants' request to amend their counterclaims (Doc. 70 at 22-23) is DENIED WITHOUT PREJUDICE.


                                    /s/    Thomas D. Schroeder
                              United States District Judge

July 1, 2021