IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| THE INTERCOLLEGIATE WOMEN'S LACROSSE COACHES ASSOCIATION (IWLCA), | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:20-CV-425 |
| | ) |
| CORRIGAN SPORTS ENTERPRISES, INC., AND RICHARD LEE CORRIGAN, JR., in his individual and official capacities, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This is a dispute over the unwinding of a relationship between the parties related to sponsorship of high school lacrosse tournaments nationwide following the impact of the worldwide coronavirus pandemic in 2020. In June 2020, Plaintiff Intercollegiate Women's Lacrosse Coaches Association, Inc. ("IWLCA") sued its former business partner, Defendant Corrigan Sports Enterprises, Inc. ("CSE"), and its President, Defendant Richard Lee Corrigan, Jr. ("Corrigan") (collectively "Defendants"), asserting various claims under the Lanham Act and state law. (Doc. 15 ¶¶ 62-142.) Defendants have filed several counterclaims alleging breach of contract and various state law tort claims (Doc. 66 countercls. ¶¶ 102-152). Now before the court

are the parties' cross-motions for summary judgment on several remaining claims (Docs. 110, 112), Defendants' motions to strike filings related to IWCLA's motion for summary judgment (Docs. 142, 151), various motions to seal (Docs. 115, 118, 134), and a joint motion for leave to file briefs in support of the motions to seal (Doc. 131).

For the reasons set forth below, IWLCA's motion for summary judgment (Doc. 112) is granted in part and denied in part; Defendants' motion for summary judgment (Doc. 110) is denied; IWLCA's motion to seal (Doc. 115) is granted in part and denied in part; IWLCA's motion to seal (Doc. 134) is denied; Defendants' motion to seal (Doc. 118) is denied; the parties' joint motion for leave to file briefs in support of the motions to seal (Doc. 131) is granted; and Defendants' motions to strike (Doc. 142; Doc. 151) are granted in part in that the court will disregard the declarations and uncited exhibits at issue and denied with respect to the attorney's fee request.

## I. BACKGROUND

### A. Factual Background

The court sets out the facts in the light most favorable to the non-moving parties in the cross-motions for summary judgment. See Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011) ("When cross-motions for summary judgment are before a court, the court examines each motion separately,

2

employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure.").

IWLCA is a non-profit corporation whose membership comprises women's college lacrosse coaches within the National Collegiate Athletic Association ("NCAA") and National Association of Intercollegiate Athletics ("NAIA"). (Doc. 15 ¶ 1; Doc. 66 countercls. ¶ 24.) Since 2006, IWLCA has sponsored, in various places and at various times of year, tournaments for women's high school club lacrosse teams. (Doc. 15 ¶¶ 1, 7.) Most of IWLCA's tournaments cater to female student-athletes who are eligible, or soon to be eligible, for recruiting by NCAA and NAIA lacrosse programs and who want the opportunity to showcase their skills before IWLCA's member coaches. (Id.) Pertinent here, IWLCA has sponsored — and continues to sponsor — six tournaments, each of which is associated with a specific alleged trademark: the Champions Cup, the New England Cup, the Midwest Cup, the Capital Cup, the Presidents Cup, and Debut (collectively, "The Recruiting Tournament Series"). (See Doc. 15 ¶ 7; Doc. 66 countercls. ¶ 98.) Each year, hundreds of club lacrosse teams comprising thousands of student athletes from across the country attend these tournaments, largely because of the exposure to IWLCA's member coaches. For at least the last ten years or so, IWLCA has selected a third-party company to manage, or "host," the Recruiting Tournament Series. (Doc. 15 ¶ 7.)

3

Defendant CSE is an event management company that, among other things, promotes and operates sporting events, including lacrosse tournaments, across the country. (Doc. 66 countercls. ¶¶ 19-21.) As of 2017, CSE boasted twenty-eight full-time employees and owned most of the equipment necessary to host large sporting events, including lacrosse tournaments. (Doc. 15-2 at 3.)

### 1. Historical Relationship

The parties' relationship dates back to 2009, when IWLCA's then-Executive Director, Gothard Lane first contacted CSE about hosting the Recruiting Tournament Series in partnership with IWLCA. (Doc. 27-2 ¶ 6.) Shortly thereafter, CSE submitted to IWLCA a "revenue and expense-sharing partnership proposal" whereby CSE would organize and host the Presidents Cup in 2010 and 2011 (with an option for 2012) and the Capital Cup in 2011, 2012, and 2013. (See id. ¶ 8.) In May 2010, IWLCA formally accepted the proposal, and the parties later executed the agreement as planned. (See id. at 9.) In 2012, CSE hosted the 2012 Presidents Cup.

In late 2013, IWLCA and CSE agreed to expand the scope of their partnership. To that end, in November 2013, CSE and IWLCA executed a contract ("the 2013 contract") which, among other things, memorialized the terms for "the organization, promotion, and hosting" of several of the Recruiting Tournament Series tournaments, including, as relevant here, the Champions Cup from 2013 to 2015; the Capital Cup from 2013 to 2016; the Western Cup

4

from 2013 to 2015; and the Presidents Cup from 2013 to 2015. (Doc. 66-2.)

Under the 2013 contract, CSE's responsibilities included: organizing, processing, and executing the registration of all teams; advertising and marketing the tournaments using the IWLCA logo; creating and maintaining a website for the tournaments; and hosting and administering the tournaments, including securing event locations and equipment, staffing officials, researching insurance, facilitating sponsorships and vendors, collecting fees, paying tournament expenses, and accounting for all revenues and expenses for each tournament. (See Doc. 66-2 at 2.) IWLCA, for its part, agreed to promote the tournaments to college coaches, to facilitate the establishment of sponsorships for and vendors at the tournaments, to timely communicate with CSE, and to grant CSE the exclusive right to organize and host the tournaments. (See id. at 3-4.) The contract provided in its recitals that "this Agreement reserves to the IWLCA the right . . . to make all final decisions regarding the Tournaments." (Id. at 1.) Under a heading titled "Cancellation of a Tournament" the contract further provided in part:

> Should inclement weather, an Act of God, or war, or some other condition exist that poses substantial risk to the safety and well being of Tournament participants and attendees, the IWLCA and CSE shall decide together to cancel a Tournament. . . .

(Id. at 4.)

In April 2014, CSE and IWLCA executed an addendum to the 2013 contract ("the 2014 addendum") that extended the terms of the 2013 contract in two ways: first, it provided that CSE would also host the 2016 Champions Cup, Capital Cup, Western Cup, and Presidents Cup; and second, it stated that CSE would now also host the New England Cup in 2014, 2015, and 2016. (Doc. 66-3.) All other terms of the 2013 contract were also extended through 2016. (Doc. 66-3.)

Three years later, in April 2017, the parties executed a second addendum ("the 2017 addendum") that extended the terms of the 2013 contract once more: under its terms, CSE would now host the New England Cup, Champions Cup, Midwest Cup, Capital Cup, and Presidents Cup for 2017 and 2018. (Doc. 66-4.) All other terms of the 2013 contract were again extended through 2018. (Id.)

Around the same time, however, IWLCA was growing dissatisfied with certain aspects of CSE's performance in managing the tournaments. (See Doc. 111-5 at 65-67.) As a consequence, on February 6, 2017, IWLCA published a "Request for Proposals" ("RFP") seeking bids from event management companies, including CSE, to host the 2018-2020 Recruiting Tournament Series. (See Doc. 15-1.) Soon thereafter, CSE submitted a "response" to the RFP, outlining its bid. (See Doc. 15-2.) Several months later, the IWLCA Board of Directors decided to accept CSE's proposal, thereby agreeing to partner with CSE again for the 2018-2020 Recruiting

6

Tournament Series. (Doc. 111-2 ¶ 5.) Notably, however, IWLCA and CSE did not formalize this agreement with a contract, nor did they formally extend the 2013 contract with any further addendum. (See Doc. 111-2 ¶ 6-7; Doc. 15 ¶ 11; Doc. 66 countercls. ¶¶ 41-43, 54.) They continued to do business together, and CSE hosted the Recruiting Tournament Series in both 2018 and 2019. (Doc. 15 ¶ 13; Doc. 66 ¶ 13.)[1]

At all relevant times throughout their business relationship, the parties' pecking order was clearly established: IWLCA controlled and sponsored the tournaments, while CSE managed the details. For example, a 2012 announcement from CSE, ostensibly in response to concerns about who was in charge, announced — with the stated goal of clarifying confusion and providing "reassur[ance]" — "that "ALL (4) 'Official' IWLCA Tournaments in 2013 will be managed and produced by Corrigan Sports Enterprises (CSE), under the express written consent and direction of the IWLCA." (Doc. 116-29 at 2 (emphasis added).) CSE's statement also explained that "Corrigan Sports [was] honored to manage all four of the IWLCA's official tournaments." (Id. at 3 (emphasis added).) This hierarchy remained clearly established all the way through 2020 when CSE published a promotional document stating, immediately

---

[1] IWLCA characterizes CSE's historical performance as problematic. (See Doc. 111-5 (discussing logistical issues that plagued the 2019 tournaments and characterizing CSE's management performance as "particularly poor").)

next to IWLCA's logo, that "CSE has been granted all five of the IWLCA sanctioned events," the "biggest, and best HS Girls club recruiting tournaments in the Nation drawing over 300 college coaches per event." (Doc. 116-28 at 2.) In short, the tournaments were IWLCA's, and CSE was retained to handle the logistics.

## 2. The 2020 Season

In August 2019, registration for most 2020 tournaments opened. (Doc. 66 countercls. ¶ 56; Doc. 74 ¶ 56.)[2] As usual, hundreds of teams across the nation registered, and each paid a deposit to ensure its spot in the tournaments. (See Doc. 66 countercls. ¶ 58-59.) As in the past, CSE collected all registration fees and deposits. (Doc. 15 ¶ 44; Doc. 66 ¶ 44.) As of early 2020, the 2020 IWLCA tournaments were scheduled to be held as follows: (1) the Champions Cup on June 19-21, 2020, in Midlothian, Virginia; (2) the New England Cup on June 26-28, 2020, in Amherst, Massachusetts; (3) the Midwest Cup on July 11-12, 2020, in Aurora, Illinois; (4) the Capital Cup on July 16-19, 2020, in North East, Maryland; and (5) the President Cup and "the Debut Tournament" on November 20-22, in Wellington, Florida. (See Doc. 15 ¶ 7; Doc. 66 ¶ 1.)

Then the world literally came to a halt. On March 11, 2020, the World Health Organization classified the COVID-19 outbreak as

---

[2] Registration for the Presidents Cup and the Debut Tournament did not open until March 2020. (Doc. 66 countercls. ¶ 56.)

a global pandemic.  See William Wan, WHO Declares a Pandemic of
Coronavirus       Disease       Covid-19,       Wash.       Post,
https://www.washingtonpost.com/health/2020/03/11/who-declares-
pandemic-coronavirus-disease-covid-19/ (last visited July 26,
2023).  Two days later, on March 13, 2020, President Trump declared
the  COVID-19  pandemic  a  national  emergency.    Presidential
Proclamation No. 9994, 85 Fed. Reg. 15337–15338 (2020).  Dozens of
states thereafter followed suit, including Virginia (host of the
Champions Cup), Massachusetts (host of the New England Cup), and
Illinois (host of the Midwest Cup), all of whom quickly imposed
strict limits on social gatherings and other activities.  See
Commonwealth of Virginia, Office of the Governor, Exec. Order No.
53,   Temporary   Restrictions   on   Restaurants,   Recreational,
Entertainment, Gatherings, Non-essential Retail Businesses, and
Closure  of  K-12  Schools  Due  to  Novel  Coronavirus  (COVID-19)
(Mar. 23, 2020); Commonwealth of Massachusetts, Office of Governor
Charlie Baker, COVID-19 Order No. 13, Assuring Continued Operation
of  Essential  Services  in  the  Commonwealth,  Closing  Certain
Workplaces, and Prohibiting Gatherings of More Than 10 People
(Mar. 23, 2020); State of Illinois, Office of Governor JB Pritzker,
Exec. Order 2020-10, Executive Order in Response to COVID-19 (Mar.
20, 2020).

     With the Champions Cup less than two months away, IWLCA and
CSE were contemplating cancelling the 2020 Recruiting Tournament

Series entirely. (See, e.g., Doc. 83-3 at 25-27.) The parties discussed extensively whether cancellation insurance — which CSE had not yet purchased for any upcoming tournament — would cover any losses incurred if the tournaments were cancelled on account of the pandemic. (See, e.g., Doc. 111-1 at 31-36; Doc. 111-2 ¶ 9.) They also discussed whether they could reschedule the tournaments for later in the year. (Doc. 130-4 at 2-3.)

About the same time the parties were having these discussions, CSE began investigating whether and how to file an application with the U.S. Patent and Trademark Office ("USPTO") to trademark as its own the tournament names associated with the Recruiting Tournament Series. (See Doc. 111-5 at 88; Doc. 116-7 at 20-29.) CSE had first attempted to register the marks in 2017, but for one reason or another failed to complete the process. (See Doc. 116-7 at 20-26 (Corrigan explaining that "somehow the ball was dropped").) In late March 2020, however, CSE renewed its effort to register the marks. (Doc. 116-7 at 26-28.) Eventually, with the help of "Trademark Plus" (an organization that facilitates the trademark application process), CSE applied to register as its marks PRESIDENTS CUP, CAPITAL CUP, CHAMPIONS CUP, and NEW ENGLAND CUP. (Doc. 116-7 at 26-28.)

In any event, by early April, the parties had reached an impasse in deciding whether to move forward with the 2020 Recruiting Tournament Series. IWLCA, for its part, expressed

10

"serious concerns regarding the viability of hosting the 2020 tournaments," particularly in light of the recently enacted prohibitions on certain large gatherings and on interstate and intrastate traveling. (Doc. 111-5 at 72.) On April 13, 2020, the IWLCA Board voted to cancel the 2020 tournaments. (Doc. 15 ¶ 42.) CSE, meanwhile, remained adamant that the tournaments should proceed as planned (or at the very least proceed with a short delay). (See Doc. 66 ¶ 66.) By this time, IWLCA had also confronted CSE about its claimed failure to properly reimburse it for certain expenses incurred in prior tournaments. (Doc. 116-7 at 28.)

To resolve these issues, both IWLCA and CSE agreed to participate in a formal mediation. (Doc. 111-5 at 71-74.) The mediation was held on April 14, 2020. (Id.) By all accounts, it did not go well. After what was apparently only a brief discussion, Corrigan (through the mediator) proposed the following to IWLCA:

> Maybe the entire scope of our arrangement should be completely blown up. And we will just go our separate ways right now. We are happy to refund all the 2020 teams for all the 2020 events. We will then restart events without the IWLCA label on them. And then put out events on sale (the NE Cup, the MW Cup, the President's Cup, the Capital Cup and the Champion's Cup).
>
> We have all the venues and tourism agreements in our name. Remember we do NOT have a contract with them and have been operating in good faith since 2012.

11

(Doc. 116-15 at 2.)  The next day, April 15, 2020, IWLCA, through

counsel, responded:

> [T]he IWLCA accepts the basis of the last paragraph that
> Lee shared via email/memo at the end of day one of
> mediation about "go[ing] our separate ways."  I
> incorporated his points here, except for the retention
> and use of the tournament names.  It should be noted
> that the IWLCA used the names Champions Cup and Capital
> Cup in tournaments before beginning to work with CSE.

(Doc. 116-17 at 2.)

At some unspecified point, IWLCA notified Defendants of its

cancellation decision.  (Doc. 15 ¶ 43.)  On April 18, 2020, IWLCA

publicly announced its decision to cancel the 2020 Recruiting

Tournament Series.  (Doc. 15 ¶¶ 42, 43, 47; Doc. 66 ¶ 47.)  IWLCA

directed CSE to fully refund all registration fees and deposits,

less any documented unrecoverable costs incurred prior to the

cancellation decision, that CSE had collected.  (Doc. 15 ¶ 44;

Doc. 66 ¶ 44.)  Later that day, IWLCA notified its membership of

the cancellation decision and released a public statement to inform

the lacrosse community and registrants.  (Doc. 15-13.)  The

statement explained:

> [U]nder the current circumstances, we cannot confidently
> say that it will be feasible or responsible to host youth
> tournaments for 3,000-14,000 people this summer, or even
> this fall.  Should the youth sporting landscape open up
> and allow for other types of events for prospective
> student-athletes to play safely and our coaches to
> recruit safely, the IWLCA will explore those
> opportunities.

(Doc. 15-13 at 1.)  The statement also explained that "[t]he IWCLA

has directed its tournament event management company, Corrigan Sports Enterprises, to cancel these events and issue refunds to all registered teams." (<u>Id.</u>)

That same day, however, CSE issued a press release of its own, asserting in relevant part that, in fact, the tournaments would go forward:

> Contrary to the IWLCA's announcement earlier today, Corrigan Sports Enterprises plans to host the scheduled 2020 New England Cup, Junk Brands Midwest Cup, STX Capital Cup, Junk Brands Champions Cup and Brine Presidents Cup Presented by New Balance. We regret that the IWLCA Board of Directors has decided to step away from its "official involvement" with the tournaments this year.

(Doc. 15-14 at 10.) The announcement, which was both emailed to tournament registrants and posted to CSE's website, prominently displayed IWLCA's alleged trademarks, modified by removing "IWLCA" from each tournament's name and logo:



(Doc. 15-14 at 5-9.)

Later that day, CSE posted an announcement to Twitter stating, "DESPITE THE RUMOURS, GIRLS LAX TOURNAMENTS ARE STILL ON!" (<u>See</u>

https://twitter.com/CSELax/status/1251594736470831111 (last visited July 31, 2023); (Doc. 15 ¶ 51(c) n.11).) Here again, the announcement prominently displayed IWLCA's alleged trademarks, modified by removing "IWLCA" from each tournament's name and logo. (Id.)

On April 20, 2020, CSE again announced that the tournaments were still scheduled but renamed each event to include CSE's name. (Doc. 15-14 at 4.) For example, the "IWLCA Presidents Cup" became the "CSE Presidents Cup," and so on. (Id.) The announcement also stated that the tournaments "will look and feel the exact same as they always have." (Id.) More fully, the announcement provided the following:

> We understand that the conflicting messages that were sent out over the weekend caused a lot of confusion and panic. We also know that the COVID-19 pandemic has created a lot of unknowns as to if and when it will be safe to be back on the lacrosse fields. Whether on the current scheduled dates or the backup dates listed below, Corrigan Sports Enterprises plans to still host the scheduled CSE 2020 New England Cup, CSE 2020 Midwest Cup, and CSE 2020 Capital Cup, CSE 2020 Champions Cup, and CSE 2020 Presidents Cup and Debut. The tournaments will look and feel the exact same way as they always have.

(Id.) Although CSE refused to cancel the Recruiting Tournament Series, it soon decided to postpone individual tournaments. On April 23, 2020, CSE announced that the "CSE" Champions Cup, originally scheduled for June 19-21, 2020, was cancelled and rescheduled for August 7-9, 2020. (Doc. 15-14 at 11.) These August

14

dates fell within an NCAA "dead period" during which coaches were prohibited from watching prospective student athletes compete in person. (Doc. 15 ¶ 52; Doc. 66 ¶ 52.) On April 30, 2020, CSE announced that the "CSE" New England Cup, originally scheduled to take place in Amherst, Massachusetts on June 26-28, 2020, was cancelled and rescheduled for July 24-26, 2020, even though Massachusetts had barred all events like it. (Doc. 15 ¶ 53; Doc. 66 ¶ 53.)

B.  **Procedural Background**

On May 6, 2020, IWLCA filed this lawsuit in North Carolina state court, seeking declaratory, monetary, and injunctive relief. (Doc. 1-1.) Upon removal to this court (Doc. 1), Defendants unsuccessfully sought dismissal for lack of personal jurisdiction. (Docs. 13, 42 ¶ 1). Soon thereafter, IWLCA amended it complaint (Doc. 15) asserting nine causes of action against CSE and against Corrigan in his personal capacity: (I) conversion; (II) breach of fiduciary duty; (III) constructive fraud; (IV) constructive trust; (V) violations of the Lanham Act, 15 U.S.C. §§ 1051, et seq.; (VI) violations of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 et. seq.; (VII) unjust enrichment; (VIII) breach of contract; and (IX) breach of the covenant of good faith and fair dealing. (Doc. 15 ¶¶ 62-138.) IWLCA also made an independent claim for punitive damages pursuant to its other claims. (Id. ¶¶ 139-42.)

15

IWCLA then moved to temporarily enjoin Defendants from conducting any further tournaments (Doc. 18), which the court denied without prejudice (Doc. 43). Shortly thereafter, however, the parties presented, and the court approved, a consent injunction prohibiting Defendants, who did not admit liability, from any future use of the alleged trademarks at issue. (Doc. 54.)

The amended complaint was thereafter narrowed following Defendants' motion to dismiss. (Doc. 63.) See Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enterprises, Inc. ("IWLCA I"), 505 F. Supp. 3d 570, 578 (M.D.N.C. 2020). The court dismissed count I (conversion), count II (breach of fiduciary duty), count III (constructive fraud), and count IX (breach of the covenant of good faith and fair dealing), and denied the motion as to count IV (constructive trust), count VI (violations of the UDTPA), count VII (unjust enrichment), and count VIII (breach of contract). Id. at 593-94. As to count V (violations of the Lanham Act), the court denied the motion as it related to IWLCA's trademark infringement claim, but dismissed the trademark dilution claim. Id. The court also dismissed IWLCA's freestanding claim for punitive damages in light of IWLCA's prayer for the same in its relief. Id. Finally, as to the claims made against Corrigan in his personal capacity, the court declined to dismiss count V (the Lanham Act trademark infringement claim) and count VI (UDTPA claims) but granted the motion as to all other claims. Id.

16

Defendants thereafter filed an answer, and CSE alleged several counterclaims: (1) breach of contract; (2) tortious interference with contract; (3) tortious interference with prospective economic advantage; (4) common law unfair competition; and (5) violations of the UDTPA. (Doc. 66 countercls. ¶¶ 102-52.) Upon IWCLA's motion, the court dismissed CSE's counterclaim for tortious interference with prospective economic advantage and narrowed its counterclaims for common law unfair competition and violations of the UDTPA (limiting them to IWLCA's alleged tortious interference with contract), but otherwise denied the motion. See Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enterprises, Inc. ("IWCLA II"), 546 F. Supp. 3d 440, 445, 456-57 (M.D.N.C. 2021).

Following discovery, the parties brought the present motions. First, the parties filed cross-motions for summary judgment on IWLCA's claim for trademark infringement in violation of the Lanham Act (count V) and IWLCA's claim for unfair competition and unfair trade practices under the UDTPA (count VI). (See Doc. 111; Doc. 112.)[3] Second, Defendants move for summary judgment on each of IWLCA's remaining claims: IWCLA's claim for constructive trust (count IV); IWCLA's claim for unjust enrichment (count VII); and

---

[3] Only IWLCA moved for summary judgment as to its Lanham Act and UDTPA claims against Corrigan in his personal capacity. (See Doc. 112 at 1.) Defendants responded in opposition. (See Doc. 130 at 28.)

17

IWLCA's claim for breach of contract (count VIII). (See Doc. 111 at 6, 21, 26 n.4.) IWCLA responded in opposition (Doc. 133 at 34-38), and Defendants replied (Doc. 141 at 12-16). Third, IWLCA moves for summary judgment on each of Defendants' remaining counterclaims: CSE's counterclaim for breach of contract (counterclaim I); CSE's counterclaim for tortious interference with contract (counterclaim II); and CSE's counterclaims for common law unfair competition and for unfair trade practices under the UDTPA (counterclaims IV and V). (See Doc. 112 at 1.) Defendants, in response, concede that IWLCA is entitled to summary judgment on the counterclaims for tortious interference with contract, common law unfair competition, and violations of the UDTPA (counterclaims II, IV, and V) (Doc. 130 at 7 n.2), but otherwise maintain their opposition to IWLCA's motion for summary judgment on their counterclaim for breach of contract (counterclaim I) (id. at 29). IWLCA replied. (Doc. 149 at 10-14.)

Pursuant to Local Rule 5.4(c), IWLCA also filed two separate motions to seal certain of CSE's confidential business documents attached to its motion for summary judgment and its memorandum in opposition to CSE's motion for summary judgment. (See Doc. 115; Doc. 134.) CSE moved to seal certain of IWLCA's documents. (Doc. 118.) The parties jointly moved for leave to file briefs in support of these motions to seal (Doc. 131), and CSE filed a

proposed response supporting IWLCA's motions to seal, claiming that the documents attached to IWLCA's motions contained CSE's "proprietary, sensitive, financial and/or otherwise confidential business information." (See Doc. 132; Doc. 138.)

Finally, Defendants moved to strike certain declarations and other exhibits filed by IWLCA with its summary judgment briefing. (Docs. 142, 151.) IWLCA responded in opposition. (Doc. 154.)

Each of these motions will be addressed in turn.

## II. ANALYSIS

### A. Motions to Strike

The court first considers Defendants' motions to strike. (Docs. 142, 151.)

#### 1. Failure to Disclose Witnesses

Invoking Federal Rules of Civil Procedure 26 and 37, Defendants move to strike certain declarations and other exhibits that IWLCA submitted with its motion for summary judgment. First, they move to strike ten witness declarations — attached to IWLCA's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 133) — because, according to Defendants, none of these witnesses was "identified in any disclosures [as] required by Rule 26," and IWLCA's failure to do so was neither substantially justified nor harmless. (Doc. 143 at 3; see Doc. 142 ¶¶ 1-3.)[4]

_____

[4] Specifically, Defendants move to strike the following declarations:

19

Each of the declarants is or was a director or coach of a club lacrosse team registered for the 2020 Recruiting Tournament Series. (See Docs. 133-7 to Doc. 133-16.)

Second, and similarly, Defendants move to strike[5] certain declarations attached to IWLCA's amended reply in support of its motion for summary judgment, which Defendants again contend were not previously identified as required by Rule 26 and whose omission was neither substantially justified nor harmless. (Doc. 152.)[6] Here, too, each of the witnesses in question is or was a director or coach of a club lacrosse team registered for the 2020 Recruiting Tournament Series. (See Doc. 144-1 to Doc. 144-5.)

Defendants style these two motions as "motions to strike." However, Rule 37(c)(1) authorizes the sanction of "not allow[ing]" a party to "use" evidence supplied by an undisclosed witness. See White v. City of Greensboro, 532 F. Supp. 3d 277, 299 (M.D.N.C. 2021) (analyzing remedy under Rule 37(c)(1) on a motion to

---

Doc. 133-7 (Charles Shoulberg), Doc. 133-8 (Michele DeJulius), Doc. 133-9 (Tracey Sullivan), Doc. 133-10 (Kelly Kubach), Doc. 133-11 (Beverly Altig), Doc. 133-12 (Julie Jerrell), Doc. 133-13 (McKinley Sbordone), Doc. 133-14 (Patricia Daley), Doc. 133-15 (Samantha Bartron), Doc. 133-16 (Timothy Godby).

[5] Because IWLCA filed its reply brief and attached declarations (Doc. 144, amended at Doc. 149) after Defendants filed their initial motion to strike (Doc. 142), Defendants filed a separate motion to strike (Doc. 151). The analysis for each motion is nevertheless the same, so the court considers them together.

[6] Specifically, Defendants move to strike the following declarations: Doc. 144-1 (Jeffrey Joseph Abboud); Doc. 144-2 (Kristen Mullady); Doc. 144-3 (Caitlin Jackson); Doc. 144-4 (Wendy Stone); and Doc. 144-5 ("Clarissa Clarke). (See Doc. 151 ¶ 2.)

20

exclude); Wall Recycling, LLC v. 3TEK Global, LLC, 588 F. Supp. 3d 647, 658 n.10 (M.D.N.C. 2022) ("Technically, the court does not strike declarations, as motions to strike are directed to pleadings." (citing Fed. R. Civ. P. 12(f))).  Accordingly, the court's remedy, if granted, would be to disregard the declarations at issue when ruling on the parties' cross-motions for summary judgment.

IWLCA responds that it timely disclosed all of the witnesses at issue.  (Doc. 154 at 8-10.)  It also argues that, even if its disclosures were not timely, any delay or defect was harmless and substantially justified.  (See id. at 10-17.)

Rule 26(a) requires a party to voluntarily disclose to other parties "the name and, if known, the address and telephone number of each individual likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses . . . ."  Fed. R. Civ. P. 26(a)(1)(A)(i).  "The parties must provide the specific names of the individuals they might use as witnesses.  It is not sufficient to identify them through the use of a collective description . . . ."  6 James Wm. Moore et al., Moore's Federal Practice § 26.22(4)(a)(i) (2023)); Alston v. DIRECTV, 254 F. Supp. 765, 780 (D.S.C. 2017).  The basic purpose of Rule 26(a) "is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise."  Russell v. Absolute Collection Servs.,

21

Inc., 763 F.3d 385, 396 (4th Cir. 2014). Rule 26 further requires a party to "supplement" any disclosure made under Rule 26(a) "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).

On October 4, 2021, the parties exchanged their Rule 26(a)(1) initial disclosures. (See Doc. 86-3 (IWLCA); Doc. 86-4 (Defendants).) On March 30, 2022, IWLCA filed a supplemental disclosure, providing damages calculations, but did not disclose any additional individuals. (Doc. 86-5.) As relevant here, IWLCA initially disclosed fourteen individuals and noted the following that it "may use to support its claims or defenses":

> Any individual identified by the Defendants whether the disclosure is made in Defendants' initial disclosures, discovery responses, materials filed with the Court, in materials produced pursuant to a subpoena issued in this action, in deposition testimony, or otherwise in the course of the proceedings in this action.

(Doc. 86-3 at 6 (boldface omitted; emphasis added).) Defendants, for their part, identified the following individuals as among those it "may use to support its claims or defenses":

> Various players, coaches, teams, and parents involved in CSE lacrosse tournaments in 2020 and 2021: These witnesses are expected to have information regarding communications from IWLCA regarding the CSE tournaments, and/or confusion (or the lack thereof) stemming from the use of any trademark by CSE.

(Doc. 86-4 at 4 (boldface omitted; emphasis added).)

IWLCA argues that its disclosure was timely because each of the individual witnesses at issue is a "coach[] . . . involved in CSE lacrosse tournaments," and IWLCA timely disclosed those witnesses when they identified "[a]ny individual identified by the Defendants." (See Doc. 154 at 8-10.) IWLCA also points out that, because CSE was charged with registering teams for the 2020 Recruiting Tournament Series in the first place, they "already had the identity and contact information" of each individual declarant. (Id. at 10)[7]

As an initial matter, Defendants' own disclosure of "various players, coaches, teams, and parents" was itself inadequate under Rule 26(a). Rule 26(a) does not countenance generic disclosures: a "party must" provide "the name, and if the known the address and telephone number of each individual likely to have discoverable information . . . that the disclosing party may use to support its claim or defenses . . . ." Fed. R. Civ. P. 26(a)(1)(A)(i) (emphases added); see Rogers v. Bank of Am., N.A., Civ. No. 13-1333, 2014 WL 4681031, at *6 (D. Kan. Sept. 19, 2014) (concluding that "Defendants' mere identification of individuals not by name but by a generic label that could apply to a number of its employees

---

[7] Despite the opportunity to do so, Defendants did not file a reply brief to respond to this argument.

. . . is not sufficient to satisfy its initial disclosure obligations under Rule 26(a)(1)(A)(i)"); Toney v. Hakala, No. 4:10-CV-2056, 2012 WL 1554911 at *1-2 (E.D. Mo. Apr. 30, 2012) (Rule 26(a) disclosures identifying merely "employees," "medical staff," and "records custodians," were insufficient because they did not provide plaintiff with the information required by the Rule, thereby preventing him from conducting effective discovery).

While Defendants' disclosures were inadequate and should have been supplemented with specific names once they were determined, IWLCA relied on Defendants' defective disclosure at its peril. Because IWLCA never supplemented its disclosure, the court is constrained to conclude that it violated Rule 26(a) and (e)'s disclosure requirements by failing to timely disclose the declarants at issue. The question is whether IWLCA should have known of the identities of the players, coaches, teams, and parents who would support its case, and if it did not know of them at the time of its initial disclosures, whether it should have known of them during discovery so as to comply with its duty to supplement its disclosures under Rule 26(e); or, whether Defendants controlled access to, or already knew, this information. That is, the issue is whether this failure was harmless or substantially justified.

### 2. Sanctions Under Rule 37

"If a party fails to [timely] provide information or identify

24

a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The court has "broad discretion" to determine whether an untimely disclosure is substantially justified or harmless. Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596-97 (4th Cir. 2003). Five factors guide the exercise of that discretion: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Id. at 597. The first four factors of this test "relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." Bresler v. Wilmington Tr. Co., 855 F.3d 178, 190 (4th Cir. 2017). The non-disclosing party bears the burden of establishing these factors. Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir. 2014).

As for the first factor, IWLCA surprised Defendants with its declarations. IWLCA argues that "Defendants already had the identity and contact information of every coach, club director,

25

and student-athlete registered to participate in the IWLCA's 2020 Recruiting Tournaments." (Doc. 154 at 10.) But this misunderstands the nature of "surprise" in this context, which comes not from learning the declarants' identities, but from learning that the opposing party intends to use those declarants in support of its version of the facts. See Brooks v. Kerry, 37 F. Supp. 3d 187, 205 (D.D.C. 2014) (rejecting argument that defendant's familiarity with declarant negated surprise, and explaining that surprise comes from learning that opposing party is using declarant to support its case), abrogated on other grounds by Johnson v. Perez, 823 F.3d 701, 710 (D.C. Cir. 2016). IWLCA's other argument — that the late-breaking declarations corroborate what is established in other deposition testimony and otherwise support IWLCA's arguments on the merits — fares no better. (Doc. 154 at 12.) That a newly-discovered declarant's testimony responds to, or otherwise corroborates, other known evidence does not make its late-blooming appearance unsurprising; were it otherwise, virtually any "relevant" evidence would be "unsurprising" under Southern States's first factor.

The second factor — the ability of the non-disclosing party to cure the surprise — also favors Defendants. By producing these declarations from undisclosed witnesses in its response to Defendants' motion for summary judgment and its reply to its own motion, IWLCA ensured that Defendants had little, if any, ability

26

to impeach the declarants.  See Baemmert v. Credit One Bank, N.A., 271 F. Supp. 3d 1043, 1051 (W.D. Wis. 2017) (declining to consider declaration submitted at summary judgment from a previously undisclosed witness because its "untimely disclosure deprived [the plaintiff] of the opportunity to impeach this evidence before summary judgment").  To cure the surprise at this stage, the court would have to reopen discovery to allow for depositions and order a second round of summary judgment briefing, "thereby delaying resolution of this case and increasing the cost of litigation to both parties and wasting this court's judicial resources." Pontones v. San Jose Rest. Inc., No. 5:18-CV-219, 2020 WL 6438395, at *2 (E.D.N.C. Nov. 2, 2020); see Revak v. Miller, No. 7:18-CV-206, 2021 WL 2188674, at *5 (E.D.N.C. May 28, 2021) (striking affidavits of three witnesses whose disclosure came after discovery had closed and defendants had moved for summary judgment, explaining that plaintiff could not now "depose [them] to assess their credibility or uncover any gaps or weaknesses in their affidavits").

The third Southern States factor — whether "allowing the evidence would disrupt the trial" — does not weigh against IWLCA. However, "courts need not find that every Southern States factor weighs against the non-disclosing party if exclusion is otherwise warranted."  Martin v. Norfolk S. Ry. Co., No. 1:16-CV-1191, 2018 WL 6840128, at *4 n.4 (M.D.N.C. Dec. 31, 2018) (citing Hoyle v.

27

Freightliner, LLC, 650 F.3d 321, 330 & n.6 (4th Cir. 2011)), aff'd, 787 F. App'x 162 (4th Cir. 2019).

As for the fourth factor, IWLCA concedes that the "declarations are important." (Doc. 154 at 15.) IWLCA's trademark infringement claims turn, in large measure, on whether the putative trademarks are valid and on whether the Defendants' use of "identical or similar mark[s] is likely to cause confusion among consumers." U.S. Search, LLC v. U.S. Search.com Inc., 300 F.3d 517, 523 (4th Cir. 2002). Each of the declarations involves testimony highly probative of both issues. The more important the evidence, the less a plaintiff is justified for failure to disclose it and the more the opposing party would be prejudiced if the evidence were allowed. Finch v. BASF Catalysts LLC, No. 1:16-CV-1077, 2018 WL 2770140, at *3 (M.D.N.C. June 8, 2018).

The fifth factor is the non-disclosing party's explanation for its failure to disclose the evidence. IWLCA argues that it did not disclose the declarants' identities earlier because Defendants, who conducted the 2020 tournament season, possessed their names and contact information "at all times" and "refused to produce" that information "despite [IWLCA's] multiple demands" for it. (Doc. 154 at 17.) Specifically, IWLCA contends that "Defendants failed to disclose the identities of th[e] clubs, coaches, and directors (and how Defendants handled the deposits and fees paid by each) until the night before discovery closed on

28

September 30, 2022," even though IWLCA had repeatedly asked for this information throughout discovery. (Id. at 6, 17-18.) As a result, IWLCA says, its belated disclosures — which came in January 2023 — were "substantially justified" for purposes of Rule 37. (Id. at 16.)

For at least two reasons, IWLCA's explanation is wanting. First, IWLCA's own status within the club lacrosse industry belies its suggestion that, as a result of Defendants' obstinance, it had no way of knowing the identities of the 2020 Recruiting Tournament Series registrants until September 2022. Perhaps fairly, IWLCA could not have known every registrant without CSE's records. But to a person, each of the declarants testified that he or she had been attending IWLCA's Recruiting Tournament Series for years — and for some, as long as ten years. (See, e.g., Doc. 133-7 ¶ 5 ("I have been involved with IWLCA's tournaments since their inception."); Doc. 133-8 ¶ 5 ("I have been involved with IWLCA's tournaments since at least 2010."); Doc. 133-9 ¶ 5 ("I have been involved with IWLCA's tournaments since at least 2016."); Doc. 133-11 ¶ 5 ("I have been involved with IWLCA's tournaments for at least 10 years."); Doc. 144-3 ¶ 5 ("I have been involved with IWLCA's tournaments since at least their inception.").) Even if IWLCA did not host the 2020 tournaments, it strains credulity to suggest that IWLCA, which has been hosting these tournaments with Defendants for over a decade, had no means by which to learn of

29

the identities of registrants for the 2020 Recruiting Tournament Series who could testify as to any confusion they may have experienced as a result of Defendants' actions.

Second, the timing of IWLCA's disclosures more than three months _after_ IWLCA received the information at the close of discovery (on September 30, 2022) raises doubts as to how justified IWLCA's delay was. Each of the declarations in IWLCA's response in opposition to Defendants' motion for summary judgment (Doc. 133-7 to Doc. 133-16) is dated January 8, 2023 — the day before the response was due. If such coordination was possible, it is unclear that the delay was justified. Accordingly, IWLCA has not demonstrated that its proffered excuse rises to the level of substantial justification necessary to prevent exclusion pursuant to Rule 37. Thus, the fifth _Southern States_ factor weighs in favor of Defendants.

Much of IWLCA's response brief discusses why two declarations in particular — docket entry 144-1 (Declaration of Jeffrey Joseph Abboud) and docket entry 144-2 (Declaration of Kristen Mullady) — should not be struck. (_See_ Doc. 154 at 11-13, 15-16.) Defendants could not have been "surprised" by these declarations, IWLCA argues, because Defendants "opened th[e] door" by citing in their brief emails Abboud and Mullady sent to CSE in the wake of IWLCA's decision to cancel the 2020 Recruiting Tournament Series. (_Id._ at 12.) Moreover, IWLCA contends, these declarations merely "refute

30

Defendants' false claim . . . that Abboud and Mullady were never confused by Defendants' use of the IWLCA's tournament marks." (Id. at 11.)  Most critically, IWLCA waited until its reply to append these declarations.  (Docs. 144-1, 144-2.)  By this point, Defendants had already articulated its arguments on actual confusion based on what IWLCA represented in its opening memorandum as its affirmative evidence.  Further, the Abboud and Mullady emails were known by IWLCA years ago, thus giving rise to the inference that IWLCA knew what testimony these witnesses could provide before the close of discovery.  (Compare Doc. 19-1 at 62-63, 81 with Docs. 144-1 at 12-13, 144-2 at 19.)  Thus, any argument that IWLCA's failure to disclose these witnesses was substantially justified is weak.

Considering all five factors, the court concludes that they weigh in Defendants' favor at this stage.  See Southern States, 318 F.3d at 597.  While Defendants' motion is styled as a motion to strike, the sanction provided under Rule 37 is disallowance from "use."  Fed. R. Civ. P. 37(c)(1).  Accordingly, the court grants Defendants' motions (Docs. 142, 151) insofar as the court will not consider the declarations (Doc. 133-7 to Doc. 133-16; Doc. 144-1 to Doc. 144-5) in its determination of the parties' cross-motions for summary judgment.[8]

---

[8] IWLCA has listed all fifteen declarants on its pre-trial witness list.

### 3. IWLCA's Disclosure of Superfluous Exhibits

Defendants move pursuant to Local Rule 7.3(e) and (f) to strike fourteen exhibits attached to IWLCA's motion for summary judgment they contend IWLCA failed "to cite, reference, or otherwise discuss" in any of its summary judgment briefing. (Docs. 142 ¶ 5-6; 143 at 12 (listing Docs. 114-5, 114-6, 114-8, 114-10, 114-19, 114-21, 114-22, 114-23, 114-24, 114-25, 114-26, 114-27, 114-30, 114-31).) IWLCA did not respond to this argument.

Under this court's Local Rules, documents may be filed only "when they are not yet part of the record and a party relies on those documents to support or oppose a motion." Seaman v. Duke Univ., No. 1:15CV462, 2018 WL 10446957, at *1 (M.D.N.C. June 6, 2018) (striking uncited exhibits at class certification stage). Local Rule 7.2 also requires factual assertions in the briefs to be accompanied by a citation to evidence. L.R. 7.2(a)(2). "Read together, the Local Rules [thus] make it clear that there is no reason to file exhibits not cited in the briefs." Seaman, 2018 WL 10446957, at *1. As above, the appropriate remedy is to disregard these exhibits. Wall Recycling, 588 F. Supp. 3d at 658 n.10.

First, IWLCA failed to respond to this argument, which would authorize the court to grant the motion as unopposed. (Doc. 154);

---

(Doc. 160-1.) Defendants moved in *limine* to preclude IWLCA from calling them at trial and to exclude the declarations as inadmissible hearsay. (Doc. 163 at 8-12.) The court thus leaves for later determination whether any declarant should be permitted to testify at trial in light of the equitable factors noted.

see Mahdi v. Stirling, 20 F.4th 846, 905 (4th Cir. 2021); Hadley v. City of Mebane, No. 1:18CV366, 2020 WL 1539724, at *19 (M.D.N.C. Mar. 31, 2020).  For no good reason, the court did the work IWLCA should have done.  Cray Comms., Inc. v. Novatel Comput. Sys., Inc., 33 F.3d 390, 396 (4th Cir. 1994) ("[The district court] would have been well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate."); cf. Seaman, 2018 WL 10446957, at *1 ("To the extent the Court did not consider an exhibit in connection with deciding a motion, it is not a judicial record and the public has no protectable interest in access to the exhibit.").  For docket entries 114-8, 114-19, 114-22 through 114-24, 114-26, and 114-31, direct application of this court's Local Rules justifies striking the exhibits.  Docket entries 114-5 and 114-6 are not cited by IWLCA, but the contents are nevertheless discussed without citation (including, with respect to docket entries 114-6, by Defendants (Doc. 111 at 9)) and are relevant to the dispute.  Contrary to Defendants' contention, docket entries 114-21, 114-25, 114-27, and 114-30 are all cited by IWLCA and bear some probative value.  (Doc. 133 at 11; Doc. 149 at 4, 7, 14.) The motion regarding uncited exhibits in docket entries 114-8, 114-19, 114-22 through 114-24, 114-26, and 114-31 will be granted,[9]

---

[9] The motion with respect to the corresponding sealed and unredacted versions of these documents (Docs. 116-8, 116-19, 116-22 through 116-24, 116-26, and 116-31) will also be granted.

and the motion regarding Docs. 114-5, 114-6, 114-21, 114-25, 114-27, and 114-30 will be denied.

### 4. Defendants' Request for Attorney's Fees

Finally, Defendants move pursuant to Federal Rule of Civil Procedure 37 for reasonable expenses, including attorney's fees, caused by IWLCA's Rule 26 violation. (See Doc. 152 at 12-13.) Such a sanction is appropriate here, Defendants urge, because they "were required to file not one, but two separate motions to strike declaration testimony from fifteen different witnesses — none of whom were [sic] properly disclosed." (Id. at 13 (emphasis removed).) In response, IWLCA argues that Fourth Circuit precedent supports awarding fees "when a party fails to disclose evidence helpful to an opposing party," a situation the court does not face here. (Doc. 154 at 18-19 (citing Southern States, 318 F.3d at 595 n.2).)

IWLCA has the better of the argument. True, the court may impose other appropriate sanctions — including attorney's fees and reasonable expenses — "in addition to or instead of" exclusion of the evidence. Fed. R. Civ. P. 37(c)(1). However, the declaration testimony at issue here, all agree, is decidedly unhelpful to the opposing party — that is, Defendants. Moreover, exclusion of the insufficiently disclosed witness declarations is sufficient in these circumstances to cure IWLCA's failure at this stage. Accordingly, the court, in its discretion, will deny Defendants'

34

request for reasonable expenses, including attorney's fees.

**B.    Motion for Summary Judgment**

    **1.    Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Devs., Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pa. Nat'l Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994)).

While the movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate the existence of a genuine dispute of material fact. Bouchat v. Balt. Ravens

Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). A mere scintilla of evidence is insufficient to circumvent summary judgment. Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" (internal quotation marks omitted)). Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248–49. Trial is unnecessary only if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one-party files a motion. See Desmond, 630 F.3d at 354. Accordingly, the court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, 475 F.3d 633, 638 (4th

Cir. 2007) (internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).

### 2. Cross-Motions for Summary Judgment

Before the court are cross-motions for summary judgment on IWLCA's claims against CSE for trademark infringement under the Lanham Act and UDTPA. (See Doc. 111 at 6, 7 n.1; Doc. 112 at 1.) IWLCA argues, among other things, that Defendants infringed on its valid trademarks when, in 2020, they "used" them "for all of the IWLCA Recruiting Tournaments without modification" and knew that doing so "would create confusion in the relevant market." (Doc. 113 at 20-21.) Defendants,[10] in turn, argue that they are entitled to summary judgment because IWLCA's putative marks are neither valid nor enforceable; and, even assuming they are, no reasonable jury could find that Defendants' use of the marks created a likelihood of confusion. (Doc. 111 at 8-21.)

### a. IWLCA's Claim for Trademark Infringement Under the Lanham Act

The basic principle underlying federal and state trademark

_____

[10] For ease of reference, the court refers to "Defendants" because IWLCA moved for summary judgment on its claims against Corrigan in his personal capacity (see Doc. 112 ¶ 3) even though Defendants did not cross move on the same (see Doc. 133 at 33-34; Doc. 130 at 28-29).

37

law is "that distinctive marks — words, names, symbols, and the like — can help distinguish a particular artisan's goods [or services] from those of others" and that the "[o]ne who first uses a distinct mark in commerce thus acquires rights to that mark." B&B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138, 142 (2015). Trademark protections, which have ancient origins and derive primarily from the common law, "benefit consumers and producers alike." Jack Daniel's Props., Inc. v. VIP Prods. LLC, 599 U.S. 140, 146 (2023). A trademark "helps consumers identify goods and services that they wish to purchase, as well as those they want to avoid." Matal v. Tam, 582 U.S. 218, 224 (2017). At the same time, trademarks "ensure that the producer itself — and not some 'imitating competitor' — will reap the financial rewards associated with the product's good reputation." Jack Daniel's, 599 U.S. at 146 (quoting Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 164 (1995)).

At common law, trademark ownership was acquired by actual use of a mark in a given market, rather than by creation or registration of the mark. See United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97–98 (1918); Emergency One, Inc. v. Am. Fire Eagle Engine Co., 332 F.3d 264, 267–68 (4th Cir. 2003). The owner of a mark has an exclusive right to its use, which includes the right to prevent others from using the same or a confusingly similar mark. See Emergency One, 332 F.3d at 267 (citing

38

*Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1106 (6th Cir. 1991)). When more than one user claims the exclusive right to use an unregistered trademark, priority is determined by "the first actual use of [the] mark in a genuine commercial transaction." *Id.* at 267–68 (quoting *Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998)).

Federal law does not itself "create trademarks," but "Congress has long played a role in protecting them." *B & B Hardware*, 575 U.S. at 142. In 1946, Congress enacted the Lanham Act, the "foundation of current federal trademark law." *Matal*, 582 U.S. at 224. The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. The "first part of that definition" identifies "the kind of things covered," while the "second part . . . describes every trademark's primary function: to identify the origin or ownership of the article to which it is affixed." *Jack Daniel's*, 599 U.S. at 145-46 (internal quotation marks omitted).

The Lanham Act creates two primary mechanisms to help protect trademarks. *See B & B Hardware*, 575 U.S. at 142. First, the act sets up a voluntary registration system by which any mark owner

39

may apply to the United States Patent and Trademark Office ("USPTO") to have its mark placed on the federal register. See 15 U.S.C. §§ 1051, 1052. Registration carries with it certain benefits: namely, it constitutes "prima facie evidence" of a mark's validity and "serves as constructive notice of the registrant's claim of ownership, which forecloses some defenses in infringement actions." Iancu v. Brunetti, 139 S. Ct. 2294, 2297-98 (2019) (internal quotation marks omitted). But because registration does not itself create trademarks, it is not mandatory, and the "owner of an unregistered mark may still use [the mark] in commerce and enforce it against infringers." Id. at 2297.

Second, the act creates a federal cause of action for trademark infringement. See 15 U.S.C. §§ 1114(1)(A) (registered marks), 1125(a)(1)(A) (unregistered marks). The nature of the cause of action differs, however, depending on whether the mark at issue is registered or unregistered. If the mark is registered, then the owner is entitled to bring suit under Section 32 of the Lanham Act (15 U.S.C. § 1114) and is entitled to a presumption that the mark is valid. See Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000).[11] But if the mark is unregistered,

_____

[11] More specifically, a certificate of registration from the USPTO constitutes prima facie evidence of (1) the validity of the mark and its registration, (2) the registrant's ownership of the mark, and (3) the registrant's "exclusive right" to use the mark on or in connection with the goods and services specified in the certificate of registration.

40

then the plaintiff must proceed under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). <u>Matal</u>, 582 U.S. at 225 (noting that "even if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act"); <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768 (1992) (noting that "Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks" (internal quotation marks and citation omitted)).

To establish a violation of Section 43 of the Lanham Act, a plaintiff must demonstrate that (1) it has a valid, protectable trademark, and (2) and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers. <u>See</u> <u>U.S. Search</u>, 300 F.3d at 523; <u>Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.</u>, 43 F.3d 922, 930 (4th Cir. 1995). The court will discuss each element in turn.

### (1) **Valid and Protectable Trademark**

IWLCA proceeds under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which covers unregistered trademarks. (Doc. 133 at 7 ("IWLCA's claim is for violation of Section 43(a) . . . .") A prevailing plaintiff under Section 43(a) "must first and most

---

See <u>U.S. Search</u>, 300 F.3d at 524 (citing <u>Am. Online, Inc. v. AT&T Corp.</u>, 243 F.3d 812, 816 (4th Cir. 2001)).

41

fundamentally prove that it has a valid and protectable mark." U.S. Search, 300 F.3d at 523 (internal quotation marks omitted).[12] To ascertain whether a mark is valid and protected, the court must determine whether it is (1) generic, (2) descriptive, (3) suggestive or (4) arbitrary or fanciful. Id.; Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9-11 (2d Cir. 1976) (Friendly, J.). These four gradations of trademark distinctiveness appear in ascending order of strength (from generic to arbitrary or fanciful). See OBX-Stock, Inc. v. Bicast, Inc., 558 F.3d 334, 340 (4th Cir. 2009) (explaining strength in terms of the gradually increasing protection afforded to the type of mark or designation at issue).

First, "[i]f a term is generic (the common descriptive name for a thing), it is ineligible for trademark protection." Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990). Generic terms, in the patois of trademark law, are considered not "distinctive"; and if "a designation is not distinctive, it is not a mark." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:2 (5th ed. 2023) (internal quotation marks omitted). The reason for this is simple enough: "One purveyor's use in commerce of a trademark consisting of the word that identifies what is sold under that mark cannot reasonably deprive

---

[12] Defendants do not dispute, for purposes of the present motion, IWLCA's ownership of the marks. (See Doc. 111 at 8 n.3, Doc. 113 at 3.)

competing manufacturers of the product of the right to call an article by its name." Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 41 (2d Cir. 2016) (internal quotation marks and alterations omitted). So, for example, "LITE BEER for light beer, CONVENIENT STORE for convenience stores, and POLO shirts for polo shirts cannot serve as trademarks." OBX-Stock, 558 F.3d at 340.

Second, "descriptive" marks "merely describe a function, use, characteristic, size, or intended purpose of the product." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996); see OBX-Stock, 558 F.3d at 340 (providing the YELLOW PAGES telephone directory and 5 MINUTE glue as examples of descriptive marks). If a term is descriptive, it "may be eligible for protection, but only if it has acquired a 'secondary meaning' in the minds of the public." U.S. Search, 300 F.3d at 523; see OBX Stock, 558 F.3d at 340. A mark obtains secondary meaning when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Sara Lee Corp., 81 F.3d at 464. "For example, the descriptive phrase 'quick stop' used to describe convenience stores would only acquire secondary meaning if a substantial portion of the consuming public were to associate the term with a particular business." Perini Corp., 915 F.2d at 125. "Coca-Cola is probably the paradigm of a descriptive mark that has acquired a secondary meaning." Sara Lee Corp., 81 F.3d at 464.

43

Under the common law, descriptive marks were largely synonymous with generic marks and therefore were also unprotectable for the same reason. See Abercrombie & Fitch Co., 537 F.2d at 9 (citing Del. & Hudson Canal Co. v. Clark, 80 U.S. (13 Wall.) 311, 323 (1872)). Eventually though, and "no doubt out of concern for businesses that invested time and money in building a brand identity under descriptive marks," Congress carved out some protection for descriptive marks commanding secondary meaning. Guthrie Healthcare, 826 F.3d at 41; see Two Pesos, 505 U.S. at 769 ("Section 2 of the Lanham Act provides that a descriptive mark that otherwise could not be registered under the Act may be registered if it 'has become distinctive of the applicant's goods in commerce.'" (quoting 15 U.S.C. §§ 1052(e), (f))).

Finally, if a term is fanciful, arbitrary, or suggestive, "the association between the mark and its source is presumed and the mark is eligible for trademark protection." Perini Corp., 915 F.2d at 124–25. Fanciful marks, like KODAK or EXXON, are "in essence, made-up words expressly coined for serving as a trademark." Sara Lee Corp., 81 F.3d at 464; OBX-Stock, 558 F.3d at 340. Arbitrary marks, meanwhile, "are based on existing words used in ways unconnected with their common meaning, such as APPLE computer or SHELL gasoline." OBX-Stock, 558 F.3d at 340. Lastly, suggestive marks, "as the word implies, suggest rather than

44

describe goods or services." <u>U.S. Search</u>, 300 F.3d at 523. Examples of suggestive marks include GLASS DOCTOR window repair or L'EGGS pantyhose. <u>See</u> <u>Synergistic Int'l, LLC v. Korman</u>, 470 F.3d 162, 172 (4th Cir. 2006); <u>Sara Lee Corp.</u>, 81 F.3d at 464–65. In contrast to generic and descriptive designations, these "three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." <u>Two Pesos</u>, 505 U.S. at 768.

A trademark holder who registers his trademark with the USPTO is entitled to a rebuttable presumption that the trademark is valid.[13] More precisely, the trademark registration "shall be prima facie evidence of the validity of the registered mark." 15 U.S.C. §§ 1115(a), 1057(b). This presumption shifts the burden of production on the issue of validity. <u>See</u> <u>OBX-Stock</u>, 558 F.3d at 342; <u>Retail Servs., Inc. v. Freebies Publ'g</u>, 364 F.3d 535, 542 (4th Cir. 2004), <u>abrogated on other grounds by</u> <u>Verisign, Inc. v. XYZ.COM LLC</u>, 891 F.3d 481, 488–89 (4th Cir. 2018). "If sufficient evidence of genericness is produced to rebut the presumption, the presumption is 'neutralize[d]' and essentially drops from the case, although the evidence giving rise to the presumption

---

[13] When a trademark has become "incontestable" under 15 U.S.C. § 1065 (i.e. that it has been continuously used in commerce for more than five years since its initial USPTO registration), registration is conclusive evidence of validity. 15 U.S.C. § 1115(b). However, IWLCA's registration indisputably does not qualify for this presumption.

45

remains." Retail Servs., 364 F.3d at 543 (emphasis removed).

Whether a trademark is rebuttably presumed valid due to descriptiveness or suggestiveness depends on the nature of USPTO's registration. See Synergistic Int'l, 470 F.3d at 172. When the USPTO believes that a trademark is merely descriptive, the applying registrant must provide evidence of secondary meaning before the USPTO will grant registration. Id. These registrations are sometimes called "2(f) registrations," named after the section of the act that authorizes registration for descriptive marks with secondary meaning. See, e.g., 2 McCarthy, supra, ¶ 11:53. "[B]y requiring applicants with descriptive marks to prove that such marks have secondary meaning before the PTO registers a mark, the PTO 'necessarily decides whether a mark is descriptive or suggestive in its decision whether to register the mark.'" Zinner v. Olenych, 108 F. Supp. 3d 369, 383 (E.D. Va. 2015) (quoting Lone Star, 43 F.3d at 934). The descriptive-versus-suggestive difference is significant in cases, such as this, where the timing of the registration is of particular import with respect to applying the presumption of validity.

Here, during the pendency of this litigation, the USPTO issued to IWLCA certificates of registration for CAPITAL CUP, PRESIDENTS CUP, MIDWEST CUP, and NEW ENGLAND CUP — thereby "registering" the marks on the Principal Register. (See Doc. 113 at 6; Doc. 114-1; Doc. 114-2; Doc. 114-3; Doc. 114-4.) The USPTO required evidence

46

of secondary meaning only for MIDWEST CUP and NEW ENGLAND CUP, but not for CAPITAL CUP and PRESIDENTS CUP. (See id.) IWLCA first argues that all of these registrations create a legal presumption that the marks are valid. (See Doc. 113 at 7; Doc. 133 at 7-8.) But IWLCA further specifies that its marks for CAPITAL CUP and PRESIDENTS CUP are entitled to a presumption of validity dating back to the date of its application, while appearing to concede that the 2(f) registrations for MIDWEST CUP and NEW ENGLAND CUP serve as persuasive evidence only. (Doc. 133 at 8-9). Defendants contend that because all four registrations were granted after IWLCA filed this lawsuit, the court should not apply the presumption of validity to any of them, at least in part because they argue that the presumption of validity only applies to suits brought under 15 U.S.C. § 1114. (Doc. 111 at 7-8).

No party has presented authority that squarely answers the question of whether the presumption of validity applies to a registrant whose registration issues only after the suit commences. See United Supreme Council v. United Supreme Council of Ancient Accepted Scottish Rite, 329 F. Supp. 3d 283, 292-93 (E.D. Va. 2018) (holding that a trademark-holder who at no point registered the trademark did not have standing to sue under Section 1114, but not ruling on this issue); Weems Indus., Inc. v. Teknor Apex Co., 540 F. Supp. 3d 839, 850 n.7 (N.D. Ia. 2021) ("[N]othing in the Lanham Act prohibits a registration from being submitted as

47

prima facie evidence of validity in any case brought under its provisions."); Sengoku Works, Ltd. V. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996) (granting a presumption of "ownership" to the date of application for a registered mark, but not a presumption of validity). The plain language of 15 U.S.C. § 1115(a) does not suggest that the presumption is limited to cases brought under 15 U.S.C. § 1114, despite Defendants' contention to the contrary. 15 U.S.C. ¶ 1115(a) ("Any registration . . . owned by a party to an action shall be . . . prima facie evidence of the validity of the registered mark." (emphasis added)); see also Weems, 540 F. Supp. 3d at 850 n.7. Accordingly, the court must determine whether and in what form the presumption of validity applies to IWLCA's trademarks.

In making this determination, the court turns to Zinner v. Olenych, 108 F. Supp. 3d 369 (E.D. Va. 2015). In Zinner, the plaintiff obtained a registration for its trademark during the pendency of the litigation and thus after the alleged infringement began. Id. at 377. The USPTO did not require evidence of secondary meaning. Id. Relying on a number of Fourth Circuit precedents, the court held that, "at minimum, [USPTO] registration is prima facie evidence that the [plaintiff's] mark is a valid service mark, _at least from the date of its issuance_." Id. at 382 (emphasis in original). But because the USPTO registration did not require evidence of secondary meaning, the court also held that the

48

plaintiff's registration is prima facie evidence of validity retroactively, at least dating back to when the alleged infringement occurred (approximately 10 months prior). Id. at 375-77, 386. This follows because the nature of the USPTO's registration creates a presumption that the trademark was suggestive and thus inherently distinctive. Id. at 386.

While not controlling, Zinner is instructive. Here, as in Zinner, IWLCA obtained trademark registrations without submitting proof of secondary meaning for CAPITAL CUP and PRESIDENTS CUP. Accordingly, IWLCA is entitled to a presumption that those trademarks are inherently distinctive. As a result, Defendants bear the burden of production that the marks are not valid. By contrast, IWLCA retains the burden of production that the two marks that required evidence of secondary meaning, MIDWEST CUP and NEW ENGLAND CUP, are valid because the USPTO registration only signifies that these are "descriptive" from the date of registration. See 2 McCarthy, supra, § 15:34 ("If the alleged infringement began before the mark was registered, then a § 2(f) registration does not create a presumption of secondary meaning dating back to before the mark was registered."). The court may nevertheless view these registrations as persuasive evidence, as argued by IWLCA, in determining validity through common law. (Doc. 133 at 9). As for CHAMPIONS CUP, for which the USPTO has refused

49

registration,[14] and DEBUT, for which the USPTO has only granted registration on the Supplemental Register, IWLCA retains the burden to prove validity purely through common law. (Doc. 114-5); George & Co. LLC v. Imagination Ent. Ltd., 575 F.3d 383, 391 n.8 (4th Cir. 2009) ("A descriptive term lacking secondary meaning may not appear on the Principal Register, but may appear on the Supplemental Register. . . . [U]nlike principal registration, supplemental registration is not *prima facie* evidence of the validity of the registered mark . . . .").

Thus, Defendants have the burden of producing "sufficient evidence to establish that [CAPITAL CUP and PRESIDENTS CUP are] generic by a preponderance of evidence." Retail Servs., 364 F.3d at 542. "If sufficient evidence of genericness is produced to rebut the presumption, the presumption is 'neutralize[d]' and essentially drops from the case, although the evidence giving rise to the presumption remains." Id. at 543. As a general, but not per se, rule, registration without evidence of secondary meaning creates a genuine dispute of material fact that would withstand a motion for summary judgment by a challenger to a trademark's validity. See id. (citing Am. Online, 243 F.3d at 818). The USPTO's determination is not accorded formal Chevron deference;

---

[14] IWLCA has appealed the USPTO's refusal to the Trademark Trial and Appeal Board (TTAB). (Doc. 114-6 at 2.) TTAB stayed proceedings pending the outcome of this litigation. (Id.)

instead, it will be treated merely as "strong evidence" of validity.  Id. at 543; Zinner, 108 F. Supp. 3d at 383.

With the parties' respective burdens regarding validity in mind, the court turns to whether there is a genuine dispute of material fact for any of IWLCA's marks.  "The crucial question in a case involving secondary meaning is whether the public is moved in any degree to buy an article because of its source." Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997).  In this circuit, a party claiming trademark protection must meet its burden on that "crucial question" by reference to the following six factors (sometimes called the "the Perini factors"): (1) length and exclusivity of use; (2) advertising expenditures; (3) consumer studies linking the product to the product source; (4) sales success; (5) unsolicited media coverage of the product; and (6) attempts to plagiarize.  See Perini, 915 F.2d at 125 (citing Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985)); Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017).

In the Fourth Circuit, if a plaintiff establishes intentional copying of a mark, a presumption of secondary meaning arises.  This rule dates back to M. Kramer Manufacturing Company v. Andrews, 783 F.2d 421, 448 (4th Cir. 1986), in which the court held that "evidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden

51

of persuasion to the defendant on that issue." The reason for the presumption is straightforward: "when a defendant copies the trademark of a competitor, it is likely that he intended to appropriate some commercial advantage or benefit that his competitor derived from the use of the mark." Id. at 449. The court held that "since the defendants have offered no credible evidence rebutting this presumption, the infringement is established." Id. In doing so, the court stated that where "the plaintiff shows that the defendant intentionally copied the plaintiff's trade dress, then the burden is upon the defendant to prove a lack of secondary meaning." Id. at 450 (emphasis added). The court's only citation to this burden shifting statement was to distinguish an Eleventh Circuit case that affirmed the trial court's conclusion that intentional copying did not establish a presumption of secondary meaning. Id. (citing Brooks Shoe Manufacturing Co. v. Suave Shoe Corp., 716 F.2d 854, 859-60 (11th Cir. 1983)).[15]

Four years later, in Osem Food Industries Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 163 (4th Cir. 1990), the court similarly concluded that a presumption of secondary meaning arises where there is sufficient evidence of intentional copying of a

---

[15] At least one other circuit reads the Fourth Circuit precedent to create "a rebuttable presumption of secondary meaning." See Jason Scott Collection, Inc. v. Trendily Furniture, LLC, 68 F.4th 1203, 1215 n.7 (9th Cir. 2023).

competitor's trade dress.  The court observed that the M. Kramer court described this "not merely as a shifting of the burden of proof but as a 'presumption' upon which a judgment 'must issue' in the absence of rebutting proof."  Id. at 163 (citing M. Kramer, 783 F.2d at 448.)  In reversing the district court, therefore, the Osem court added that the defendant should have been given the opportunity to "present[] sufficient evidence to rebut the presumption."  Id. at 165.

Eight years later, in Larsen v. Terk Technologies Corp., 151 F.3d 140, 148-49 (4th Cir. 1998), the Fourth Circuit reaffirmed that evidence of intentional, direct copying of a mark provides the party claiming protection a presumption of secondary meaning. In reviewing Osem, the court noted that it had "stated that such evidence not only shifts the burden of persuasion, but acts as a presumption upon which judgment 'must issue' in the absence of rebutting proof."  Id. at 148.  Agreeing with the trial court that the defendant offered only an argument and no probative evidence, the Fourth Circuit held that the trial court "correctly found that [the defendant] did not rebut the presumption of secondary meaning."  Id. at 149.

In International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco, 329 F.3d 359, 371 (4th Cir. 2003), the court characterized Larsen as follows: "Under Larsen, a trademark plaintiff that proves that the defendant directly and

53

intentionally copied its mark is presumed to have proved that mark's secondary meaning, and the defendant must then disprove that presumption." The court went on to describe the defendant's burden as one of "refuting a presumption" of secondary meaning. Id. In International Bancorp, where the defendant was counterclaiming for infringement, the court affirmed the district court because it found both that (1) the plaintiff companies failed to provide any probative evidence of secondary meaning in rebuttal and (2) the Perini factors favored the defendant. Id. In dissent, Judge Motz wrote that the majority had improperly applied the Larsen presumption by shifting the burden of proof to the alleged infringer to show lack of secondary meaning. Id. at 397. In Larsen, she noted, because the alleged infringer failed to rebut the presumption, the court never faced the question of the effect of offering rebuttal evidence. Id. "However, the ultimate burden of proof," she noted, "always remains on the one asserting a claim." Id. (citing Fed. R. Evid. 301 (providing "In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally."); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (stating that in employment cases the burden-shifting under McDonnell Douglas Corp. v. Green, 411 U.S. 792

54

(1973), only shifts a burden of production, as Rule 301 fixes the burden of proof at all times on the plaintiff)). Turning to International Bancorp, the only way to read Larsen consistent with Supreme Court precedent and Rule 301, she concluded, is to find that the plaintiff companies' "extensive evidence rebutting the presumption of secondary meaning"[16] shifted the burden of proof on this issue back to the counterclaiming defendant under the Perini factors. Int'l Bancorp, 329 F.3d at 397. The majority responded that the dissent's criticism did not "diminish[] the precedential force that Larsen has on this case" because the plaintiff companies failed to present evidence "sufficient to rebut the Larsen presumption, let alone to counter the Perini factors." Id. at 371. In other words, the majority concluded, the same lack of probative rebuttal evidence at play in Larsen compelled the same result in International Bancorp, thus avoiding resolution of the dissent's contentions on burden shifting.

In order to reconcile the Fourth Circuit's pronouncements on the effect of a presumption based on intentional, direct copying with Supreme Court precedent and Rule 301, the court concludes that the presumption shifts the burden to the alleged infringer to produce evidence to rebut it. If the alleged infringer fails to

---

[16] Clearly, the majority and dissent disagreed on whether the plaintiff companies offered probative evidence in response to the Larsen presumption.

do so, the mark holder is entitled to judgment on the issue of secondary meaning. If the alleged infringer proffers probative evidence, the evidence must then weigh in favor of the mark holder, who always bears the burden of proof. This approach not only gives meaning to Larsen and well-established principles on burdens of proof at the summary judgment stage, but is consistent with the Federal Rules of Evidence and Supreme Court precedent.

Turning back to the present case, the record leaves no doubt that CSE intentionally and directly copied IWLCA's marks when advertising its own 2020 women's lacrosse tournaments. Indeed, CSE's tournament announcements after April 18, 2020, speak for themselves:

> Contrary to IWLCA's announcement earlier today, Corrigan Sports Enterprises plans to still host the scheduled 2020 New England Cup, Midwest Cup, Capital Cup, Champions Cup and Presidents Cup. We regret that the IWLCA Board of Directors has decided to step away from its "official involvement" with the tournaments this year.

(Doc. 15-14 at 10 (April 18, 2020, announcement).)

**Junk Brands MIDWEST CUP:** July 25–26, 2020. Grand
Park Sports Campus in Westfield, IN

**NEW ENGLAND CUP:** July 25–26. TBD Venue**

**Junk Brands CHAMPIONS CUP:** August 8–9, 2020. River
City SportsPlex in Midlothian, VA

**STX CAPITAL CUP:** August 14–16, 2020. Kirkwood Soccer
Complex in New Castle, DE.

**Brine PRESIDENTS CUP Presented by New Balance:** Nov
20–22, 2020. West Palm, FL. International Polo Club



(Doc. 15-14 at 14 (June 18, 2020, announcement.)   Corrigan also

confirmed as much in his deposition:

> Q: After April 2020, CSE used the exact words Capital
> Cup in communicating with consumers in the market for
> girls lacrosse tournaments?
>
> A: Yes, we utilized that up until [the consent
> injunction] in early September was signed. Yeah, we did.
>
> Q. And CSE used the exact mark Champions Cup after April
> 18, 2020 in communicating with consumers and offering
> for sale registrations for girls lacrosse tournaments by
> that name, correct?
>
> A. Yes.  Sure.  The same would apply to that. The answer
> would apply to that one, of course, as well as the
> Midwest Cup and the New England Cup.

The only difference being is that the official IWLCA event terminology or logo used was taken off of everything that we did, all marketing materials, all public relations materials, everything online, and we made it very clear to our audience that those events were no longer official IWLCA events.

Q: But you used the exact mark for all those events, Champions Cup, Presidents Cup, Capital Cup, Midwest Cup, New England Cup; you used the exact same marks after April 18, 2020?

A: Yes.

(Doc. 116-7 at 2-3.) In fact, Corrigan was adamant that the marks themselves were critical to each tournament's success, explaining that CSE decided not to change the names largely because "[p]eople know those brands." (Id. at 12-13.)

At this stage, such clear evidence of copying entitles IWLCA to a presumption of secondary meaning. See Int'l Bancorp, 192 F. Supp. 2d at 481 (finding intentional and direct copying from mere circumstantial evidence); Larsen, 151 F.3d at 149 (holding that the district court correctly found that a presumption of secondary meaning arose when "evidence at trial clearly showed that [defendant] intentionally copied [plaintiff's marks]"); Osem, 917 F.2d at 163 (district court erred when, upon finding of "acknowledged copying," it "refused to consider the presumption of secondary meaning"); IT'SUGAR LLC v. I Love Sugar, Inc., No. 4:13-CV-01644, 2013 WL 6077353, at *4-5 (D.S.C. Nov. 19, 2013) (concluding that "striking similar[ity]" of the exterior signage, the use of vendors who were "familiar" with plaintiff's design,

58

and statements from the defendant indicating an intent to copy were all enough evidence to create a presumption that plaintiff's trade dress had obtained secondary meaning.); Campbell Sales Grp., Inc. v. Gramercy Park Design, LLC, No. 110CV55, 2010 WL 3945350, at *6 (M.D.N.C. Oct. 6, 2010) (concluding that evidence of intentional copying here was "sufficient to give rise to the presumption of secondary meaning"); Lance Mfg., LLC v. Voortman Cookies Ltd., 617 F. Supp. 2d 424, 434 (W.D.N.C. 2009) (concluding that "presumption of secondary meaning [applies] in this case" in light of evidence indicating that defendant "intentionally copied" defendant's trade dress); Leviton Mfg. Co. v. Universal Sec. Instruments, Inc., 304 F. Supp. 2d 726, 736 (D. Md. 2004) (concluding that deposition testimony from defendant's President admitting copying efforts was "sufficient to shift the burden of proof on the issue of secondary meaning to [defendant]").[17]

Defendants respond that they never made any use "whatsoever of the IWLCA name [] and communicated . . . to all involved that IWLCA would have no part in CSE's 2020 tournaments." (Doc. 130 at 26.) Defendants further argue that they never used the "exact" mark

---

[17] Defendants argue that "Larsen and Osem Foods are . . . trade dress cases, making them further distinguishable and inapplicable." (Doc. 130 at 26 n.11.) Not only is Larsen a trademark infringement case, the Fourth Circuit in Larsen explicitly extended the logic of Osem Food to trademark infringement cases. Larsen, 151 F.3d at 148-49 ("Osem Food-Kramer Manufacturing applies even to cases, such as that at bar, for trademark infringement.").

Case 1:20-cv-00425-TDS-LPA   Document 179   Filed 09/26/23   Page 59 of 110

because they removed "IWLCA" from tournament logos. (Doc. 130 at 16.) This misses the point. The problem is not that CSE intentionally copied IWLCA's name; the problem is that CSE intentionally copied IWLCA's marks.[18]

Under Larsen, the burden shifts to Defendants to proffer evidence of lack of secondary meaning. See Larsen, 151 F.3d at 148. To meet this burden at the summary judgment stage, Defendants must put forward "some evidence[] that the fact finder [could] conclude[] [is] probative in disproving secondary meaning." Int'l Bancorp, 329 F.3d at 371. If Defendants cannot do so, IWLCA is "due a finding that its mark[s] enjoyed secondary meaning," even if IWLCA "offer[s] no proof of secondary meaning whatsoever." Id. (emphasis removed).

To analyze whether Defendants have rebutted the presumption of secondary meaning, courts generally examine the Perini factors as applied to the putative infringer's evidence. See Int'l Bancorp, 329 F.3d at 371 (noting its "expect[tation]" that a district court would look at rebuttal evidence "through the lens of the traditional Perini categories"); IT'SUGAR LLC, 2013 WL

---

[18] Defendants cite Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc., No. 3:08CV573, 2009 WL 2013599, at *10 (E.D. Va. July 10, 2009), in support of their argument. But this case offers them no support. There, the district court simply found insufficient evidence of intentional copying to shift the burden of persuasion to the defendant. See id. (noting that mere "awareness and interest in a competitor" is "not atypical for a new company" and therefore is insufficient to serve as evidence of "intentional copying" of a mark).

6077353, at *5 (in determining whether defendant has "adequately rebutted" the presumption of secondary meaning, "the Court must address the six [Perini] factors); Campbell Sales Grp., 2010 WL 3945350, at *6 (same).

The court now turns to the secondary meaning factors, mindful that the exercise is an inherently factual one. See U.S. Search, 300 F.3d at 525-26. The factors are "relevant to" but "not dispositive of" secondary meaning. Perini, 915 F.2d at 125. Given the number of marks at issue, and the multiple layers of presumptions that apply to some, but not all, the court will analyze the marks in groups where common facts and principles apply.

(i)    PRESIDENTS CUP and CAPITAL CUP

Defendants face a burden shift from two sources for the validity of PRESIDENTS CUP and CAPITAL CUP: one from the presumption from USPTO registration (suggestiveness) and one from its intentional copying (descriptiveness). Defendants' burden can reasonably be met with the same or similar evidence. As noted above, IWLCA is entitled to a presumption that PRESIDENTS CUP and CAPITAL CUP are suggestive because the USPTO registered these marks without evidence of secondary meaning.

Viewing the record as a whole, the court finds that Defendants have presented no evidence to rebut the presumption of

61

suggestiveness with respect to PRESIDENTS CUP.[19] Even were the court to disregard the USPTO's determination regarding suggestiveness, Defendants have presented no evidence relevant to the Perini factors[20] to rebut the Larsen presumption that the marks are descriptive with secondary meaning. Under either framing, IWLCA is entitled to partial summary judgment that PRESIDENTS CUP is valid.

Regarding CAPITAL CUP, Defendants argue that, as a matter of law, CAPITAL CUP is geographically descriptive and unprotectable. (Doc. 111 at 7 (citing OBX-Stock, Inc., 558 F.3d at 341).) Defendants support this claim with a "concession" by IWLCA that it picked the name Capital Cup for "its proximity to the Maryland-DC area." (Doc. 130 at 13 (citing Doc. 130-1 at 12).) IWLCA counters by claiming that Defendants have proffered no evidence to rebut the presumption of suggestiveness, which by virtue of its inherent distinctiveness, requires no evidence of secondary meaning. (Doc. 133 at 11-12.)

While the USPTO's determination is strong evidence of suggestiveness, "[c]ourts do have the power . . . to overrule the

---

[19] Defendants claim in conclusory fashion that it is "undisputed" that CSE never used PRESIDENTS CUP. (Doc. 111 at 7 n.2.) But this is belied by the record and unsupported by their citation. That Defendants neither pursued this claim in subsequent filings leads the court to reject this contention.

[20] Where the parties present no probative evidence of any Perini factor, the court will refrain from mechanically walking through each and only notes that there is no support for it.

[USPTO's] determination of a mark's strength." OBX-Stock, Inc. v.
Bicast, Inc., No. 2:04CV45, 2006 WL 8442143, at *5 (E.D.N.C. June
12, 2006), aff'd, OBX-Stock, Inc., 558 F.3d 334; Resorts of
Pinehurst, Inc. v. Pinehurst Nat. Corp., 148 F.3d 417, 422 (4th
Cir. 1998) ("[USPTO] registration, however, is not conclusive.").
Not all geographically descriptive marks lack secondary meaning.
Instead, a geographically descriptive mark has secondary meaning
when the "mark no longer causes the public to associate the goods
with the geographical location, but to associate the goods with a
particular product or source of the product." OBX-Stock, Inc.,
558 F.3d at 340. Evidence to support such a finding can come from
"various sources, including 'purchaser testimony, consumer
surveys, listings and dictionaries, trade journals, newspapers,
and other publications.'" OBX-Stock, Inc., 2006 WL 8442143, at *5
(quoting Glover v. Ampak, Inc., 74 F.3d 57, 59 (4th Cir. 1996)).

　　　Certain geographically descriptive marks, like PINEHURST and
KENTUCKY FRIED CHICKEN, have secondary meaning and thus are valid.
OBX-Stock, Inc., 558 F.3d at 340-41. By contrast, the Fourth
Circuit has held that OBX, a shorthand used to refer to the Outer
Banks in North Carolina, is not valid. Id. at 342. In OBX-Stock,
Inc., the court affirmed the district court's finding that the
defendant had rebutted a presumption of suggestiveness resulting
from USPTO registration using evidence of internet searches
associating OBX with the Outer Banks, third-party companies

63

selling clothes featuring "OBX," and marketing products using "OBX" to refer to the Outer Banks, among others.  See OBX-Stock, Inc., 2006 WL 8442143, at *5.  With the burden shifted back to the plaintiff, the Fourth Circuit held that OBX had no secondary meaning because the plaintiff presented "no evidence" that the public associated OBX with the plaintiff.  OBX-Stock, Inc., 558 F.3d at 341.

Even accepting (without holding) Defendants' implied position that the USPTO was wrong to conclude CAPITAL CUP is suggestive, Defendants' showing that would purportedly rebut a presumption of descriptiveness is insufficient to meet its burden at this stage. Unlike the defendant in OBX-Stock, Inc., Defendants present no evidence beyond an "admission" of the reason IWLCA picked the name "Capital Cup." (Doc. 130 at 13 (citing Doc. 130-1 at 12).)  Simply put, this is not probative whatsoever of how the consuming public associates the name and does not answer at all to the Perini factors.  Thus, after careful consideration of the precedent in OBX-Stock, Inc. and the Perini factors, and crediting the strong evidence of USPTO registration, the court finds that IWLCA is entitled to partial summary judgment on the validity of CAPITAL CUP.[21]

---

[21] The court need not determine if CAPITAL CUP is suggestive or descriptive with secondary meaning.  It is both unnecessary to the court's holding and inadequately briefed.

In light of the fact that USPTO required evidence of secondary meaning for MIDWEST CUP and NORTHEAST CUP and registration occurred during the pendency of this lawsuit, Defendants carry the burden to rebut the presumption of secondary meaning due to intentional copying.

Here, as with CAPITAL CUP, Defendants argue that MIDWEST CUP and NEW ENGLAND CUP are geographically descriptive and lack secondary meaning. (Doc. 111 at 14.)  In support, Defendants point to IWLCA deposition testimony that IWLCA created the NEW ENGLAND CUP so that New England teams would "not have to travel down south," and that the NEW ENGLAND CUP and MIDWEST CUP names "denote the region that the smaller regional event would be in."  (Doc. 130 at 13 (citing Doc 130-1 at 6-7, 13).  IWLCA claims that Defendants have not rebutted the presumption of secondary meaning and, in the alternative, that it has proffered sufficient evidence to foreclose any genuine issue of material fact as to secondary meaning, including the persuasive evidence of USPTO registration. (Doc. 113 at 13; Doc. 133 at 9.)

For the same reasons stated above for CAPITAL CUP, Defendants fail to carry their burden of rebutting the presumption of secondary meaning for these two marks.  Applying OBX-Stock, Inc. and the Perini factors, Defendants' evidence is not probative of how the consuming public associates MIDWEST CUP and NEW ENGLAND

65

CUP. See OBX-Stock, Inc., 558 F.3d at 340. Defendants supply no other evidence relevant to the Perini analysis. IWLCA is thus entitled to partial summary judgment on the validity of MIDWEST CUP and NEW ENGLAND CUP.

### (iii)  CHAMPIONS CUP and DEBUT

As with MIDWEST CUP and NEW ENGLAND CUP, Defendants carry only one burden for CHAMPIONS CUP and DEBUT: to rebut the presumption of secondary meaning due to intentional copying.

Defendants argue that CHAMPIONS CUP is "nothing more than [a] commonplace expression." (Doc. 111 at 8). They point to numerous unrelated third-party registrations for marks that include "champions cup" but disclaim exclusive use of those words "apart from the mark as shown." (Doc. 111 at 9; see, e.g., Doc. 27-3 at 6-7 (disclaiming exclusive use of "champions cup" for rugby cup logo).) Defendants also point to USPTO's refusal of IWLCA's CHAMPIONS CUP application on descriptiveness grounds. (See Doc. 111-4.) This evidence is sufficient to shift the burden back to IWLCA to show secondary meaning. For this, the court turns to the Perini factors to determine if there is a genuine dispute of material fact as to secondary meaning.

Regarding the length and exclusivity of use, CHAMPIONS CUP was first used in commerce in June 2007. (Doc. 15-6 at 1.) IWLCA has not presented evidence of exclusive use, however. To the contrary, Defendants have presented numerous examples of USPTO registrations

66

for marks that include "champions cup" but disclaim exclusive use of those words. (Doc. 27-3.) Furthermore, in refusing to register CHAMPIONS CUP, the USPTO pointed to the use of "champions cup" in an array of sports, including softball, volleyball, tennis, and even by other lacrosse organizations. (See Doc. 111-4 at 5). Nevertheless, the length of use, especially in light of the well-defined nature of IWLCA's market — women's club lacrosse tournaments, may outweigh non-exclusivity. See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1225 (2d Cir. 1987) overruled on other grounds by Bristol-Myers Squibb Co., 973 F.2d at 1044 (evaluating length and exclusivity "in light of the product and its consumers").

IWLCA presented some evidence of advertising expenditures, pointing to deposition testimony that advertising costs were around $4,000 per tournament per year. (Doc. 144-7 at 8) (IWLCA suggesting a total of $4,000 per tournament but CSE only stating that "we spent something"). While Defendants claim that they, not IWLCA, spent money on advertising, it is undisputed that these expenditures were conducted at the direction of IWLCA. (Doc. 141 at 10-11). Ultimately, the record is largely undeveloped on this factor and remains neutral.

The third factor, consumer studies, is largely developed through the testimony of lacrosse club director Kristy Boyles. Ms. Boyles testified that she associates "Champions Cup" (as well

67

as IWLCA's other tournaments) with a single source: "IWLCA." (Doc. 114-11 at 41-42.) While probative testimony, at this stage the court refrains from credibility determinations and leaves for a jury the persuasiveness of such a small sampling of opinion. Anderson, 477 U.S. at 255 ("Credibility determinations . . . are jury functions, not those of a judge [ruling on summary judgment].").

The fourth factor is sales success. There is some sales data in the record. For example, in 2019 IWLCA adduced total revenue of $532,963 from the Recruiting Tournament Series, down from $763,675 two years earlier. (See Doc. 111-5 at 60.) The main problem with relying on this limited data, however, is that the court cannot determine whether it is "'impressive' or 'persuasive' evidence of secondary meaning without knowing how [it] compares with the norms of that industry." 2 J. McCarthy, supra, § 15:49; Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1148 (10th Cir. 2016) ("Sales volume, however, only suggests secondary meaning 'when presented in conjunction with other evidence[]' . . . .").

The record is bare on the fifth factor — unsolicited media coverage. As to the sixth factor — attempts to plagiarize — there is no evidence that anyone other than Defendants attempted to plagiarize the marks.[22] See Int'l Bancorp, 329 F.3d at 370

---

[22] IWLCA argues that Defendants can "hardly challenge the

(focusing plagiarism inquiry on attempts by third parties despite evidence of copying by defendant); Int'l Bancorp, 192 F. Supp. 2d at 482 (same); B & J Enters., Ltd. v. Giordano, 329 F. App'x. 411, 420 (4th Cir. 2009) (unpublished) (discussing plagiarism "prior to the defendants' activities); Dick's Sporting Goods, Inc. v. Dick's Clothing and Sporting Goods, Inc., 188 F.3d 501 (table), 1999 WL 639165, at *9 (4th Cir. 1999) (discussing intentional copying by defendant under plagiarism factor). Accordingly, while Defendants' intentional copying may lead to the inference of secondary meaning, IWLCA has not shown such an inference can be drawn by plagiarism by others.

At this stage, in balancing the Perini factors, there remains a genuine dispute of material fact as to the secondary meaning of CHAMPIONS CUP. As a result, partial summary judgment on the validity of CHAMPIONS CUP will be denied.

Defendants have offered no evidence regarding the validity of DEBUT. Defendants only claim, without support, that they never used DEBUT. (Doc. 111 at 7 n.2.) As a result, IWLCA is entitled to partial summary judgment on the validity of DEBUT.

---

distinctiveness" of its marks, including CHAMPIONS CUP, because of its attempts to register the marks with USPTO. (Doc. 113 at 13.) While this argument may be presented to a factfinder, IWLCA has not cited any legal authority that CSE's effort to register the marks is entitled to any estoppel effect.

### (2) Likelihood of Confusion

The remaining question is whether either party is entitled to judgment as a matter of law on the question of likelihood of confusion. IWLCA argues that Defendants' status as a former licensee paired with their continued use of its identical marks establishes likelihood of confusion as a matter of law. (Doc. 113 at 14-18.) IWLCA further contends that application of the Fourth Circuit's nine likelihood of confusion factors establishes its trademark infringement claim. (Id. at 18-21.) Defendants principally rely on the likelihood of confusion factors to argue that IWLCA has not established its infringement claim, and further contends that IWLCA's position regarding Defendants' status as a former licensee relies on "outdated" law that is otherwise inapplicable to them. (Doc. 111 at 10-21; Doc. 130 at 20.)

With respect to IWLCA's first argument — that Defendants' status as an ex-licensee coupled with their use of identical marks entitles IWLCA to judgment as a matter of law — IWLCA provides no authority that justifies disregarding the Fourth Circuit's likelihood of confusion factors. While the rationale underlying IWLCA's cited authority is sound, the court can adequately address the nature of the parties' relationship in the sixth factor, "the defendant's intent." See Pro. Golfers Ass'n of Am. v. Bankers Life and Cas. Co., 514 F.2d 665, 670 (5th Cir. 1975) ("A former licensee cannot mislead the public into believing that its

70

affiliation continues once the licensing arrangement has ceased. For once the contract ends, a licensee's right to the mark ends, and any subsequent use constitutes infringement." (internal citations omitted)).

A court assessing the likelihood of confusion must examine whether Defendants' use of the marks was "likely to produce confusion in the minds of consumers about the origin of the goods or services in question." CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006). The Fourth Circuit has set forth nine factors governing this inquiry:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

George & Co. LLC, 575 F.3d at 393. "Not all of these factors will be relevant in every trademark dispute, and there is no need for each factor to support [the plaintiff's] position on the likelihood of confusion issue." Synergistic, 470 F.3d at 171. "Rather, the confusion 'factors are only a guide — a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion.'" Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 154 (4th Cir. 2012) (quoting

71

Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 320 (4th Cir. 1992)).[23]

"Although summary judgment on the likelihood of confusion issue is certainly permissible in appropriate cases," Rosetta Stone, 676 F.3d at 153, it is "an inherently factual issue that depends on the facts and circumstances in each case." Lone Star, 43 F.3d at 933 (internal quotation marks omitted); see Adventis, Inc. v. Consol. Prop. Holdings, Inc., 124 F. App'x 169, 171 n.3 (4th Cir. 2005) (unpublished) ("This court has consistently held that the likelihood of confusion issue in an infringement claim is an inherently factual determination.").[24]

### (i) Strength of the Mark

The first factor — the strength of IWLCA's marks — is "'paramount' in determining the likelihood of confusion." Grayson O Co., 856 F.3d at 314. "If a mark lacks strength, a consumer is unlikely to associate the mark with a unique source and

---

[23] In some cases, there is a presumption of likelihood of consumer confusion. "But that presumption arises only when the copier 'intends to exploit the good will created by an already registered trademark." Shakespeare Co. v. Silstar Corp. of Am., 110 F.3d 234, 239 (4th Cir. 1997) (emphasis added; alteration omitted) (quoting AMP Inc. v. Foy, 540 F.2d 1181, 1186 (4th Cir. 1976)). Here, neither party argues application of a presumption, which is consistent with the fact that the marks were not registered at the time of Defendants' alleged infringement.

[24] Unpublished decisions of the Fourth Circuit cited herein are not precedential but "are entitled only to the weight they generate by the persuasiveness of their reasoning." See Collins v Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

consequently will not confuse the allegedly infringing mark with the senior mark." Id. at 315. A mark's overall strength or distinctiveness "comprises both conceptual strength and commercial strength." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 661 (4th Cir. 2018) (internal quotation marks omitted). Courts consider whether a mark is "conceptually strong" by "placing the mark" into the four categories of distinctiveness discussed above: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. See id. The strength of a mark for purposes of a likelihood of confusion inquiry, however, "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." George & Co., 575 F.3d at 393. Commercial strength is "a concept similar to the 'secondary meaning' inquiry considered in evaluating the mark's validity." George & Co., 575 F.3d at 395; see Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F.3d 88, 93 (4th Cir. 1997) ("[C]ourts must examine, in addition to the mark's characterization as suggestive or descriptive, the extent of secondary meaning a mark has acquired in the eyes of consumers.").

For the reasons already explained, IWLCA is entitled to a finding that PRESIDENTS CUP, CAPITAL CUP, NEW ENGLAND CUP, MIDWEST CUP, and DEBUT are at least descriptive with secondary meaning, and for PRESIDENTS CUP and CAPITAL CUP, are suggestive. With the factual issue of CHAMPIONS CUP still at issue, strength of that

73

mark remains a neutral factor.

### (ii) Similarity of the Marks

Defendants argue that, because it removed the "reference to IWLCA [on the marks]" and added "the reference to CSE," the "marks are far from identical, further weighing against likelihood of confusion." (Doc. 130 at 14-15.) IWLCA responds that displacing content outside the mark does not change the fact that Defendants still used the identical marks. (Doc. 133 at 25.)

In assessing similarity of the marks, the court's "focus [is] on whether there exists a similarity in sight, sound, and meaning which would result in confusion." George & Co., 575 F.3d at 396. "If one of two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the two marks." CareFirst, 434 F.3d at 271 (emphasis added). "Although pairings may decrease or eliminate the likelihood of confusion in some cases, simply pairing a registered trademark with another mark cannot alone avoid a finding of a likelihood of confusion." Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd., 799 F. Supp. 2d 558, 573 (M.D.N.C. 2011).

Defendants do not dispute that they refused to change the tournament names. Indeed, their promotional materials included them:

74



(Doc. 15-14 at 7.)

Unlike in CareFirst, where the similar portions of the marks were not identical (the plaintiff's mark was "CareFirst" and the defendant's mark was "First Care"), Defendants utilized marks identical to IWLCA's. CareFirst, 434 F.3d at 271-72. Defendants' substitution of CSE's name for that of IWLCA may reduce the likelihood of confusion when compared to not changing it at all. But merely reducing the likelihood of confusion does not mean a lack of, or de minimis, likelihood of confusion. Thus, as the dominant portion of Defendants' marks is identical to Plaintiff's marks, this factor favors Plaintiff.

### (iii) Similarity of Goods or Services

To satisfy the third factor, the goods or services offered by the parties "need not be identical or in direct competition with each other." George & Co., 575 F.3d at 397. Instead, courts look to the similarity of purpose between the parties' goods and

services.  _Pizzeria Uno Corp. v. Temple_, 747 F.2d 1522, 1535 (4th Cir. 1984).  Here, the services IWLCA and CSE offered — women's lacrosse tournaments catering primarily to aspiring college athletes — are the same.  Indeed, CSE even stated directly that the CSE tournaments "will look and feel the exact same" as the IWLCA tournaments conducted under the same marks.  (Doc. 15-14 at 4.)  Thus, this factor favors IWLCA.

### (iv) Similarity of Facilities

In examining the fourth factor, the similarity of the facilities used by the parties, courts examine whether "the parties compete[] in a similar manner in overlapping markets," _George & Co._, 575 F.3d at 397, or whether "there are basic differences between plaintiff's and defendant's modes of distributing their products at these facilities."  _CareFirst_, 434 F.3d at 273 (internal quotation marks omitted).  Here, too, there is no dispute that the parties' "modes" of providing their services are the same.  While CSE changed the location of some of the 2020 events, there is no indication these facilities were substantially different than the locations where IWLCA hosted its events in years prior. (_See_ Doc. 144-8.)  Therefore, this factor also favors IWLCA.

### (v) Similarity in Advertising

In considering the fifth factor, similarity in advertising, courts "look at a variety of factors: the media used, the geographic areas in which advertising occurs, the appearance of

76

the advertisements, and the content of the advertisements." CareFirst, 434 F.3d at 273. This factor appears in an unusual posture here given that, as the Recruiting Tournament Series host prior to 2020, CSE itself was charged with advertising, marketing, and promoting IWLCA's Recruiting Tournament Series. (See, e.g., Doc. 66-2 at 2.) Thus, when CSE used IWLCA's tournament marks to advertise its "own" tournaments in 2020, e.g., the "CSE Champions Cup" — and did so indisputably through the same channels that it had previously — the likelihood of confusion may have been significant. Therefore, IWLCA has shown similarity in advertising.

### (vi) Defendants' Intent to Confuse

Defendants argue that they did "everything in [their] power to disassociate [themselves] from the IWLCA," evincing no intent to capitalize on IWLCA's good will. (Doc. 111 at 17 (emphasis removed).) They argue they ceased to use IWLCA's name on tournament materials and publicly announced that IWLCA had "stepped away" from the tournaments. (Id.) Defendants point to numerous instances in the record where they highlight that their events are no longer affiliated with IWLCA. (See Doc. 130 at 18-19 (citing Doc. 130-1 at 30; Doc. 15-14 at 3-6, 10, 11, 13; Doc. 111-7 at 11, 13; Doc. 130-2 at 14-15; Doc. 119-5; Doc. 119-6). They further contend that they bear no affirmative duty by virtue of their being an ex-licensee to "avoid all possible confusion."

77

(Doc. 130 at 20 (citing Doc. 113 at 16).)

IWLCA counters that Defendants' ex-licensee status evidences their intent to capitalize on its good will. (Doc. 113 at 3-4.) IWLCA points to deposition testimony that Corrigan's team decided to continue using the marks because they felt they had an "ownership stake" in them. (Doc. 114-7 at 12.) IWLCA also cites to testimony by Corrigan that "[p]eople know those [marks]," (Doc. 114-7 at 13), and to Defendants' "misleading" statement that IWLCA was stepping away from "official involvement," claiming that this "wink and nod" evinces intent. (Doc. 133 at 27-28.)

The intent to confuse requires "an intent to capitalize on the good will associated with [the] mark." CareFirst, 434 F.3d at 273. "The intent of the defendant is sometimes a major factor in infringement cases." Pizzeria Uno, 747 F.2d at 1535. "If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation attempts to make [similar marks] so as deliberately to induce confusion." Id. When a party intends to "build off" another and "gain immediate recognition in the marketplace by borrowing from the goodwill" of another, intent to confuse deserves "great weight." Sea-Roy Corp. v. Parts R Parts, Inc., No. 1:94CV59, 1997 WL 1046282, at *39 (M.D.N.C. 1997).

Given the prior relationship between the parties, there can be no doubt that Defendants knew that the relevant market found

78

value in IWLCA's marks.  Nevertheless, CSE took several steps to distance IWLCA from the 2020 tournaments.  (See, e.g., Doc. 116-7 at 12 (Corrigan explaining CSE's "plan" to remove the IWLCA name from the tournaments).  This is at least sufficient evidence from which a reasonable juror could conclude that Defendants genuinely believed their efforts were sufficient "to head off any consumer confusion that might otherwise stem from the similarity of the marks."  Clear Def., L.L.C. v. ClearDefense Pest Control of Greensboro, LLC, No. 1:17CV01139, 2018 WL 5281912, at *9 (M.D.N.C. Oct. 24, 2018).  Thus, there exists a genuine dispute as to whether Defendants intended to confuse IWLCA's marks.

### (vii) Actual Confusion

"The seventh and most important factor is actual confusion." George & Co., 575 F.3d at 398; see RXD Media, LLC v. IP Application Dev. LLC, 986 F.3d 361, 373 (4th Cir. 2021) (describing actual confusion as "the most important factor in determining 'likelihood of confusion' in trademark infringement claims").  "Actual confusion can be demonstrated by both anecdotal and survey evidence."  RXD Media, LLC, 986 F.3d at 373 (citing Tools USA & Equip. Co. v. champ Frame Straightening Equip., Inc., 87 F.3d 654, 661 (4th Cir. 1996)).  "[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally."  Radiance Found., Inc. v. N.A.A.C.P., 786 F.3d 316, 324 (4th Cir. 2015) (internal quotation marks omitted)).  In

79

weighing the evidence of actual confusion,

> evidence of the number of instances of actual confusion
> must be placed against the background of the number of
> opportunities for confusion before one can make an
> informed decision as to the weight to be given the
> evidence. If there is a very large volume of contacts or
> transactions which could give rise to confusion and
> there is only a handful of instances of actual confusion,
> the evidence of actual confusion may receive relatively
> little weight.

George & Co., 575 F.3d at 398 (citing 2 McCarthy, supra, § 23:14).
In such cases, "[e]vidence of only a small number of instances of
actual confusion may be dismissed as *de minimis*." Id. (citing
Petro Stopping, 130 F.3d at 95).

The Fourth Circuit has emphasized, however, "that a trademark
owner need not demonstrate actual confusion" in order to succeed
on a trademark infringement claim. Lone Star, 43 F.3d at 933;
Clear Def., 2018 WL 5281912, at *9; Super Duper, Inc. v. Mattel,
Inc., 382 F. App'x 308, 313 (4th Cir. 2010) ("[T]he absence of
such proof does not preclude a party from proving a likelihood of
confusion based on a compilation of other evidence.").

Here, IWLCA has put little evidence of actual confusion into
the record.[25]  To be sure, it appears that some customers were
confused about whether the tournaments would be held and by whom
for a period of days, if not a few weeks, shortly after IWLCA and

---

[25] For the reasons explained earlier, the court does not consider IWLCA's
declarations offered to establish instances of actual confusion.  (See
Doc. 149 at 7 (citing Doc. 144-1 and Doc. 144-2 as instances of actual
confusion).)

CSE issued dueling announcements on April 18, 2020. (<u>See, e.g.,</u> Doc. 15-14 at 4 (CSE e-mail to club directors, coaches, and administrators noting that its communications "caused a lot of confusion").) But IWLCA has failed to provide any <u>instance</u> of actual confusion by club directors or other tournament participants. And the emails that IWLCA cites in support, far from establishing actual confusion, tend to show the opposite. (<u>See, e.g.,</u> Doc. 133 at 21 (citing Doc. 133-18 (club-director Kristen Mullady explaining that her club would not "attend these tournaments this year without the IWLCA being a part of these tournaments")).)[26]

On the other hand, Defendants point to an array of evidence that it supposes establishes lack of actual confusion. For example, it cites to depositions of coaches Kristie Boyles and Kathryn O'Mara as demonstrating that they understood that CSE was running the tournaments, not IWLCA. (Doc. 111 at 12 (citing Docs. 111-6, 111-7).) Defendants also point to other communications from coaches withdrawing from tournaments because IWLCA was not sponsoring the events, thus indicating, according to Defendants, that these individuals were not actually confused. (Doc. 111 at 13 (citing Docs. 111-8 through 111-13).) Defendants also point (in the context of the advertising factor) to IWLCA's town hall

---

[26] No party has lodged a hearsay objection to the emails.

events in April 2020 that clearly informed parents and coaches that IWLCA was not affiliated with Defendants' tournaments. (Doc. 111 at 19 (citing Doc. 111-1 at 11-12).)

IWLCA has failed to provide the court with evidence in support of this factor. Mindful of the need to view the parties' evidence in the light most favorable to the non-moving party, this factor leans in favor of Defendants.

### (viii) Quality of Defendants' Services

This factor is relevant in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." George & Co., 575 F.3d at 399 (quoting Sara Lee Corp., 81 F.3d at 467). Here, however, all indications are that CSE's 2020 tournaments were "priced" at substantially the same level as IWLCA's had been. Indeed, the record indicates that Defendants retained the same registration fees that teams had already paid for IWLCA's events before they were cancelled. (See, e.g., Doc. 19-1 (collecting refund request correspondence).) Accordingly, the eighth factor has little, if any, relevance in this case. See George & Co., 575 F.3d at 399 (observing that when a defendant's "goods are priced at or above the prices" of the plaintiff's goods, this factor "has no relevance"); BNC BanCorp v. BNCCORP, INC., No. 1:15CV793, 2016 WL 3365428, at *6 (M.D.N.C. June 16, 2016) (declining to consider the eighth factor in a case not involving cheap copies or knockoffs); see also Anheuser-Busch,

82

962 F.2d at 320 ("[N]ot all of the factors . . . [are] always relevant in any given case.").

### (ix) Sophistication of the Consuming Public

Defendants argue that the relevant market of consumers is "sophisticated and experienced," thus leading to the conclusion that it is unlikely the consuming public was confused. (Doc. 130 at 17). IWLCA counters, relying on a reasonable common-sense inference, but no actual evidence, that while many of the coaches may be sophisticated repeat players, many of the players and parents are not. (Doc. 149 at 8-9.) Thus, according to IWLCA, the consumer market is a mixed bag. (Id.)

The ninth factor is only relevant where, as here, "the relevant market is not the public at-large." George & Co., 575 F.3d at 400. "If the typical consumer in the relevant market is sophisticated in the use of — or possesses an expertise regarding — a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion." Sara Lee Corp., 81 F.3d at 467. "[I]n a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone, particularly without the benefit of trial." Perini Corp., 915 F.2d at 128.

Here, Defendants have proffered some evidence that the consumers had some level of sophistication that tends to favor a

83

finding that Defendant's use of the marks was unlikely to create confusion. Some evidence in the record indicates that club directors had been attending IWLCA tournament events for many years. (Doc. 111 at 18-19 (citing Doc. 111-6 at 3-4; Doc. 111-7 at 3-4).) Still, neither party has demonstrated as a matter of law that whatever sophistication the consumers had necessarily leads to the inference that it made them more or less likely to be confused. Accordingly, the sophistication of IWLCA's typical "consumer" weighs only slightly against a likelihood of confusion.

\* \* \*

In sum, there is sufficient evidence in the record to create a question of fact on the likelihood of confusion. Several important and disputed factors present fact issues that preclude summary judgment. The "likelihood of consumer confusion is an 'inherently factual' issue that depends on the unique facts and circumstances of each case." Anheuser-Busch, 962 F.2d at 318 (quoting Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1356 n.5 (9th Cir. 1985)). Whether CSE's use of IWLCA's mark created a likelihood of confusion is "indeed a question that the jury, consisting of ordinary consumers and using the nine factors as a guide, is well-suited to evaluate." Variety Stores, 888 F.3d at 666–67.

### (3) Damages

Defendants moved for summary judgment on the issue of

84

causation and damages. Specifically, Defendants contend that IWLCA has not presented any evidence that Defendants were the cause of "any harm" to IWLCA. (Doc. 111 at 29.) Defendants rely heavily on Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). IWLCA correctly points out, however, that Lexmark addressed the jurisdictional question of the right to sue, not what damages must be established at the summary judgment stage to create a fact issue on a trademark infringement case. (Doc. 133 at 30-31.)

The Lanham Act provides, for a violation of section 43(a) or (d), that a plaintiff may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). These remedies are "subject to the principles of equity." Id. The Fourth Circuit considers the following equitable factors:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

Synergistic Int'l, 470 F.3d at 175.

While acknowledging that its interrogatory answer was not complete because discovery had not yet closed, IWLCA listed as damages: royalty for Defendants' use of IWLCA's marks ($292,000), Defendants' profits from infringing conduct ($1,096,774),

85

interference with Polo Ground Contract ($85,000), and attorneys' fees. (Doc. 111-5 at 74-79.) Defendants contend that IWLCA is not entitled to any royalties because the IWLCA name was not used at any 2020 tournament. (Doc. 111 at 31 n.6.) This misunderstood position ignores that the IWLCA seeks recovery for Defendants' use of its tournament names, not "IWLCA." See 2 McCarthy, supra § 30:85 ("Usually, when the courts have awarded a reasonable royalty for past acts of infringement, it was for a period of continued use of a mark after a license ended." (emphasis added)).

Further, Defendants contend that IWLCA cannot prove harm because IWLCA did not host any tournaments in 2020 and thus did not lose profits. (Doc. 111 at 29-30.) But monetary remedies may derive from unjust enrichment in situations like this, where the infringer is not in direct competition with the trademark holder at the time of infringement. See, e.g., Synergistic Int'l, LLC v. Korman, No. 2:05CV49, 2007 WL 517677, at *11-12 (E.D. Va. Feb. 8, 2007) (utilizing disgorgement of profits when diversion of sales did not provide an adequate monetary remedy); Admiral Corp. v. Price Vacuum Stores, Inc., 141 F. Supp. 796, 801 (E.D. Pa. 1956) ("It seems scarcely equitable . . . for an infringer to reap the benefits of a trade-mark he has stolen, force the registrant to the expense and delay of litigation, and then escape payment of damages on the theory that the registrant suffered no loss."). Consequently, Defendants' motion for partial summary judgment on

86

causation and damages will be denied.

### b. IWCLA's UDTPA Claims

Under the UDTPA, "unfair or deceptive acts or practices in or affecting commerce" are unlawful. N.C. Gen. Stat. § 75-1.1(a). "In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Bumpers v. Cmty. Bank of N. Va., 747 S.E.2d 220, 226 (N.C. 2013) (alteration in original). An act or practice is considered unfair if it "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" and deceptive if it "has the capacity or tendency to deceive." Bob Timberlake Collection, Inc. v. Edwards, 626 S.E.2d 315, 322–23 (N.C. Ct. App. 2006) (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981)).

"North Carolina's UDTPA prohibits the same type of activity that the Lanham Act prohibits because trademark infringement and false designation undercut the mark holder's goodwill and the consumers' ability to distinguish among products." Camco Mfg., Inc. v. Jones Stephens Corp., 391 F. Supp. 3d 515, 528 (M.D.N.C. 2019) (internal quotation marks omitted); see Djarum v. Dhanraj Imports, Inc., 876 F. Supp. 2d 664, 668 (W.D.N.C. 2012); Microsoft Corp. v. Comp. Serv. & Repair, Inc., 312 F. Supp. 2d 779, 785

87

(E.D.N.C. 2004). The same questions of material fact that preclude resolution of the Lanham Act claim therefore also preclude disposition of the UDTPA claim, and, accordingly, both parties' cross-motions for summary judgment are denied.[27]

### c. Defendant Corrigan's Personal Liability

IWLCA moves for summary judgment on the issue of personal liability of CSE's President Defendant Lee Corrigan on IWLCA's trademark and UDTPA claims. (Doc. 111 at 22.) IWLCA argues that Corrigan's active participation in authorizing and directing the infringement of IWLCA's marks makes him personally liable for CSE's infringement. (Id.) IWLCA points to Corrigan's participation in the removal of "IWLCA" from the tournament marks and logos and Corrigan's emails announcing CSE's decision to hold "the same" tournaments in support. (Doc. 113 at 23; Doc. 116-16; Doc. 33-1.) In response, Defendants argue that Corrigan cannot be liable because he tried to distance CSE from IWLCA. (Doc. 130 at 28-29.)

In a corporate trademark infringement suit, "an officer of a corporation can be held personally liable for his own conduct in infringing on another's trademark." Life Techs. Corp. v. Govindaraj, 931 F.3d 259, 266 (4th Cir. 2019). Courts have imposed

---

[27] On all state law claims, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78-80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). No party has discussed the application of the Larsen presumption to a UDTPA claim based on trademark infringement, and because fact issues remain for the reasons noted, the court need not consider it at this stage.

personal liability where the corporate officer was the "active and conscious force" behind the infringing activity.  See, e.g., Cartier Int'l A.G. v. Daniel Markus, Inc., Civ. No. 10-1459, 2013 WL 5567150, at *7 (D.N.J. Oct. 8, 2013); Universal Furniture Intern., Inc. v. Frankel, 835 F. Supp. 2d 35, 44-50 (M.D.N.C. 2011) (applying personal liability under UDTPA for corporate officer under same logic as Lanham Act).

Defendants' own factual assertions at this stage point to personal involvement.  Should a jury find trademark infringement, there is evidence from which it could find Corrigan personally liable.  IWLCA's motion for partial summary judgment as to Corrigan's personal liability will therefore be denied.

### 3. Defendants' Motion for Summary Judgment

Defendants also move for summary judgment on IWCLA's claims for constructive trust (count IV), unjust enrichment (count VII), and breach of contract (count VIII).  (See Doc. 111 at 21, 26 n.4.) The parties agree that North Carolina law applies.

### a. IWLCA's Claim for Breach of Contract

The court first addresses IWLCA's breach of contract claim. Defendants argue that IWLCA's claim fails as a matter of law because IWLCA's contract theory is based on a breach of the 2018 RFP/Response, which Defendants contend is not an enforceable contract.  (Doc. 111 at 22-23.)  Defendants point to the text of the RFP/Response, contemporaneous communications between the

89

parties when the RFP/Response was discussed, and the course of performance to supposedly demonstrate that there was no meeting of the minds with respect to the RFP/Response. (Id. at 23-26.)[28] Instead, Defendants contend that the parties were operating under the terms of the 2013 contract. (Id. at 62.) Absent an enforceable contract supporting IWLCA's contract claim, Defendants contend, there is no issue of fact remaining.

In response, IWLCA contends that "[t]here is no dispute that no express, written contract existed at the time of the alleged breach." (Doc. 133 at 34.) IWLCA further argues that even if the parties were operating under the 2013 agreement, Defendants breached that agreement, too. (Id.) In its reply, Defendants contend that IWLCA's failure to explicitly engage with Defendants' position that the RPF/Response is unenforceable amounts to a concession on the claim. (Doc. 141 at 12.)

Under North Carolina law, a breach of contract claim involves (1) the existence of a valid contract and (2) breach of its terms. See McLamb v. T.P. Inc., 619 S.E.2d 577, 580 (N.C. Ct. App. 2005); Poor v. Hill, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). A valid contract requires an agreement based on a meeting of the minds and sufficient consideration. Creech ex rel. Creech v. Melnik, 556

---

[28] Defendants repeatedly rely on the declaration of Gothard Lane, former Executive Director of IWLCA, in which he discusses his understanding of the contract between the parties. While potentially probative, it cannot bind IWLCA as Defendants contend because he gave the statement after he had left IWLCA.

S.E.2d 587, 591 (N.C. Ct. App. 2001). Further, to be enforceable, a contract must be sufficiently definite. McClean v. Duke Univ., 376 F. Supp. 3d 585, 606 (M.D.N.C. 2019) (citing Brooks v. Hackney, 404 S.E.2d 854, 857 (N.C. 1991)). However, a contract "need not definitely and specifically contain in detail every fact to which the parties are agreeing." Sides v. Tidwell, 5 S.E.2d 316, 318 (N.C. 1939). "A contract for service must be certain and definite as to the nature and extent of the service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid, or it will not be enforced." Rider v. Hodges, 804 S.E.2d 242, 246 (N.C. Ct. App. 2017) (quoting Croom v. Goldsboro Lumber Co., 108 S.E. 735, 737 (N.C. 1921) (emphasis removed)).

A contract implied in fact "arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract." Snyder v. Freeman, 266 S.E.2d 593, 602 (N.C. 1980) (quoting 17 C.J.S. Contracts § 4b (1963)). Such a contract may be found where "a contract lapses but the parties continue to act as if they are performing under a contract," and neither party "clearly and manifestly indicates, through words or through conduct, that it no

91

longer wishes to continue to be bound" by the terms of the lapsed agreement.  See Celanese Acetate, LLC v. Lexcor, Ltd., 632 F. Supp. 2d 544, 550 (W.D.N.C. 2009).

To start, the court rejects Defendants' position that IWLCA conceded the validity of the contract because of an inadequate response to Defendants' motion for summary judgment.  While IWLCA did not engage at any length with Defendants' arguments, the court cannot read IWLCA's "even-if-the-2013-contract-governed" hedging as a concession.  Instead, IWLCA's position that there was no "express, written contract" is consistent with the complaint's allegation that the parties were operating under the terms of the 2018 RFP/Response.  (Doc. 15 ¶ 11 ("Upon the IWLCA's acceptance of CSE's proposal, the terms of the 2017 RFP and CSE's response to it became a binding and enforceable contract between CSE and the IWLCA to govern the 2018, 2019, and 2020 IWLCA Tournaments.").)  Further, implicit in IWLCA's decision not to move for summary judgment on this claim is its contention that there remain fact issues on the terms of the contract and breach.  Defendants have presented some evidence to suggest that the 2013 contract terms still governed, but that is disputed and thus does not eliminate a genuine dispute as to the terms of the contract.

IWLCA and CSE agree they were bound by an implied-in-fact contract.  It remains for a jury to determine whether there is an enforceable contract and, if so, its terms and any breach and

92

damages. See Trans. Impact, LLC v. Donovan Marine, Inc., No. 4:15-cv-125, 2016 WL 6267958, at *10-11 (E.D.N.C. Oct. 26, 2016) (determining necessarily that whether a breach is material is a triable issue of fact under North Carolina law). Defendants' motion for partial summary judgment on IWLCA's contract claim will therefore be denied.

### b. IWLCA's Claim for Unjust Enrichment

Defendants move for summary judgment on IWLCA's claim for unjust enrichment. Defendants argue that "the undisputed facts establish that the Parties' relationship was governed by the terms of the 2013 Contract." (Doc. 111 at 26 n.4.) IWLCA, in turn, argues that its unjust enrichment claim is pled in the alternative if a jury were to find there was no implied-in-fact contract. (Doc. 133 at 35-36.) IWLCA also points to the fact it enabled Defendants to collect registration fees and deposits as evidence of conferring a benefit to Defendants, and to its agreement to share profits as evidence of a lack of gratuitousness. (Id. (citing Doc. 15-2 at 7-8).)

Under North Carolina law, an unjust enrichment claim has three elements: "(1) plaintiff conferred a measurable benefit to defendant, (2) defendant knowingly and voluntarily accepted the benefit, and (3) the benefit was not given gratuitously." TSC Rsch. LLC v. Bayer Chems. Corp., 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008); see JPMorgan Chase Bank, Nat'l Ass'n v. Browning, 750 S.E.2d

555, 559 (N.C. Ct. App. 2013). Unjust enrichment applies in "circumstances where it would be unfair for the recipient to retain [benefits] without the contributor being repaid or compensated." Homeq v. Watkins, 572 S.E.2d 871, 873 (N.C. Ct. App. 2002) (quoting Collins v. Davis, 315 S.E.2d 759, 761 (N.C. 1984)). In this way, an unjust enrichment claim is "a claim in quasi contract," sometimes called a "contract implied in law." Rev O, Inc., v. Woo, 725 S.E.2d 45, 49 (N.C. Ct. App. 2012). Quasi-contract cannot be asserted where there is a contract between the parties, unless there is a clear indication the parties abandoned the contract and no longer intended to be bound by it. Geoscience Grp., Inc. v. Waters Const. Co., 759 S.E.2d 696, 702 (N.C. Ct. Apt. 2014); College Road Animal Hosp., PLLC v. Cottrell, 763 S.E.2d 319, 326 (N.C. Ct. App. 2014) (stating that where a party has a remedy in contract, quasi-contract will not be available as the basis of a claim for unjust enrichment).

Here, both parties claim that their relationship was governed by a contract, although they dispute its terms. To grant summary judgment on IWLCA's unjust enrichment claim, an enforceable contract must exist as a matter of law. Because fact issues remain as to the material terms of the parties' contract, if any, the court cannot find an enforceable contract exists. See Se. Caissons, LLC v. Choate Const. Co., 784 S.E.2d 650, 657 (N.C. Ct. App. 2016) ("[O]nly rarely do courts rule as a matter of law that

the parties' course of conduct created an implied contract"
(internal quotation marks and alterations omitted)).
Consequently, Defendants' motion for summary judgment as to
IWLCA's unjust enrichment claim will be denied.

### c. IWLCA's Claim for Constructive Trust

Finally, Defendants move for summary judgment on IWLCA's
claim for constructive trust. Defendants argue that "because there
is no unjust enrichment claim, and the Lanham Act/UDTPA claims are
deficient, the constructive trust claim likewise fails." (Doc.
111 at 26 n.4.) IWLCA, in turn, contests Defendants'
characterization of its unjust enrichment, Lanham Act, and UDTPA
claims and points to Defendants' retention of registration fees as
grounds for imposing a constructive trust. (Doc. 133 at 37.)

Under North Carolina law, "[a] constructive trust is a duty,
or relationship, imposed by courts of equity to prevent the unjust
enrichment of the holder of title to, or of an interest in,
property which such holder acquired through fraud, breach of duty
or some other circumstance making it inequitable for him to retain
it against the claim of the beneficiary of the constructive trust."
Wilson v. Crab Orchard Dev. Co., 171 S.E.2d 873, 882 (N.C. 1970).
Although a fiduciary relationship is often the basis of a
constructive trust claim, it is not necessary. See Variety
Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 723
S.E.2d 744, 752 (N.C. 2012). A trial court "may impose a

95

constructive trust, even in the absence of fraud or a breach of fiduciary duty, upon the showing of either (1) some other circumstance making it inequitable for the defendant to retain the funds . . . or (2) that the defendant acquired the funds in an unconscientious manner." Houston v. Tillman, 760 S.E.2d 18, 21 (N.C. Ct. App. 2014). "[A]ctual wrongdoing . . . is not necessary for imposition of a constructive trust." Id.

As noted above, there remain genuine issues of material fact with respect to IWLCA's unjust enrichment, Lanham Act, and UDTPA claims. Consequently, Defendants' motion for summary judgment on this claim will be denied.

### 5. IWLCA's Motion for Summary Judgment

IWLCA moves for summary judgment on each of CSE's remaining counterclaims: breach of contract (counterclaim I); tortious interference with contract (counterclaim II); and common law unfair competition and unfair trade practices under the UDTPA (counterclaims IV and V). (See Doc. 112 at 1.) CSE in response opposes summary judgment only as to its counterclaim for breach of contract. (Doc. 130 at 27-34.)

#### a. CSE's Counterclaims for Tortious Interference with Contract, Common Law Unfair Competition, and Violations of the UDTPA

In its responsive brief, CSE's states that it "dismisses its tortious interference counterclaim." (Id. at 7 n.2.) Because a voluntary dismissal at this stage can only be effected by a

96

stipulation of the parties, see Fed. R. Civ. P. 41(a)(1)(A), the court treats CSE's statement as a concession that IWLCA's motion for summary judgment should be granted. Because CSE's counterclaims for unfair competition under common law and the UDTPA were previously allowed to proceed only as predicated on an alleged tortious interference with contract, IWLCA II, 546 F. Supp. 3d at 456-57, those claims necessarily fall as a consequence. Thus, IWLCA's motion for summary judgment as to counterclaims II, IV, and V will be granted.

### b.    CSE's Counterclaim for Breach of Contract

CSE alleges that IWLCA breached the parties' contract by "unilaterally announcing the cancellation of the 2020 tournaments." (Doc. 66 ¶ 112.) CSE contends that IWLCA's cancellation breached a term of the 2013 contract under which they were allegedly operating, which provides: "Should inclement weather, an act of God or war, or some other condition exist that poses substantial risk to the safety and well being of Tournament participants and attendees, the IWLCA and CSE shall decide together to cancel a Tournament."[29] (Doc 66-2 at § D.) IWLCA proffers two basic arguments. First, it contends that because CSE proposed in a mediation days before IWLCA made the decision to cancel that all

---

[29] IWLCA maintains, and CSE does not contest, that the pandemic would constitute a "substantial risk to the safety and well being of Tournament participants and attendees" within the meaning of that provision. (See Doc. 113 at 30; Doc. 130 at 32.)

parties terminate their relationship and "go [their] separate ways," there was no contract on the day IWLCA announced the cancellation. (Doc. 113 at 28 (citing Doc. 114-15).) Alternatively, IWLCA argues that the cancellation provision's use of the term "shall decide together to cancel," rather than "shall decide together [whether or not] to cancel," must be construed as the parties' acknowledgment up front that upon the happening of a *force majeure* the tournament <u>will</u> be cancelled. (<u>Id.</u> at 29-30.) This, IWLCA contends, is the only way to construe that provision in light of that same agreement's opening recital that "this Agreement reserves to IWLCA the right . . . to make "all final decisions regarding the Tournaments." (<u>Id.</u>) In response, CSE contends that the contractual provision requires joint decision-making as to cancellation, objects to considering the parties' statements during mediation as inadmissible under Federal Rule of Civil Evidence 408(a)(2), and argues that in any event the mediation statement was only a proposal. (Doc. 130 at 31-34.)

The court has already determined that there is a genuine dispute as to the material terms of the parties' contract, if any. IWLCA's position, however, is that even if CSE is correct that the 2013 contract terms applied in 2020, CSE's counterclaim for breach must fail because the contract granted IWLCA the right to unilateral cancellation.

At the outset, the court rejects IWLCA's argument that CSE's

98

statement through the mediator made before the lawsuit was filed requires dismissal of this counterclaim. The admissibility of such a statement is immaterial at this stage, because on this record it is not clear that this was anything more than a mere proposal that each party go its separate way. (See Doc. 116-15.) Further, the undeveloped record surrounding IWLCA's alleged "acceptance" (see Doc. 116-17) demonstrates a continuing dispute over the use of the tournament names, indicating that no final agreement had been reached. In fact, IWLCA's own communications to its members immediately afterwards, on April 19, specifically stated that "clearly no agreement was reached with CSE." (Doc. 144-2 at 14.) Moreover, IWLCA's verified complaint alleges that its Board of Directors voted on April 13 to cancel the tournaments, and CSE's mediation proposal is dated April 14, the next day. (Doc. 15 ¶¶ 42, 43; see also Doc. 111 at 27 (Defendants alleging that IWLCA issued its public cancellation announcement "with no notice to CSE").) At a minimum, IWLCA cannot show that CSE's alleged abandonment of the parties' alleged agreement predated the board's decision. Finally, IWLCA's position conflicts with its claims that CSE committed breaches of its contract with IWLCA after the date of this statement. (See Doc. 15 ¶ 123; Doc. 111-5 at 51-59.) IWLCA has not explained why it would be entitled to have it both ways.

Turning to the merits of IWLCA's argument, "[u]nder North

99

Carolina law, interpretation of a written and unambiguous contract is a question of law for the court." Wall Recycling, LLC v. 3TEK Glob., LLC, 588 F. Supp. 3d 647, 662 (M.D.N.C. 2022) (citing Briggs v. Am. & Efird Mills, Inc., 111 S.E.2d 841, 843 (N.C. 1960)). "If the contract is ambiguous, however, interpretation is a question of fact, and resort to extrinsic evidence is necessary. 'An ambiguity exists in a contract if the "language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties."'" Crider v. Jones Island Club, Inc., 554 S.E.2d 863, 866 (N.C. Ct. App. 2001) (internal citations omitted). When construing contractual terms, a contract's plain language controls. See DeLoach v. Lorillard Tobacco Co., 391 F.3d 551, 558 (4th Cir. 2004) (noting that "as under general principles of contract law, our task is to 'give ordinary words their ordinary meanings.'" (quoting Internet East, Inc. v. Duro Commc'ns., Inc., 553 S.E.2d 84, 87 (N.C. Ct. App. 2001))). "[I]t is a fundamental rule of contract construction that the courts construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so." Gay v. Saber Healthcare Grp., L.L.C., 842 S.E.2d 635, 640 (N.C. Ct. App. 2020). Consistent with the plain-meaning principle is the well-established rule that "[w]hen general terms and specific statements are included in the same contract and there is a conflict, the general terms should give way to the specifics." Dev. Enterprises of Raleigh v. Ortiz,

Case 1:20-cv-00425-TDS-LPA   Document 179   Filed 09/26/23   Page 100 of 110

356 S.E.2d 922, 924 (N.C. Ct. App. 1987) (citing <u>Wood-Hopkins</u>
<u>Contracting Co. v. N.C. State Ports Auth.</u>, 202 S.E.2d 473, 476
(N.C. 1974)); <u>see</u> 11 Williston on Contracts § 32:10 (4th ed. 2023)
("When general and specific clauses conflict, the specific clause
governs the meaning of the contract."); Restatement (Second) of
Contracts § 203 cmt. e (noting that "[i]f the specific or exact
can be read as an exception or qualification of the general, both
are given some effect").

Here, the phrase "shall decide together to cancel a
Tournament" can be "fairly and reasonably susceptible to either of
the constructions asserted by the parties." <u>Crider</u>, 554 S.E.2d at
866. Focusing on the phrase "decide together," CSE argues that
both parties had veto power over whether to cancel the tournaments.
This interpretation is fair in the context of this provision, but
it could dilute the provision that reserved to IWLCA the power to
make "all final decisions regarding the Tournaments" and, in the
present context, present a Catch-22 for IWLCA: either comply with
state pandemic regulations barring large gatherings or be subject
to liability for breach.

However, the cancellation provision is a more specific
provision than the "all final decisions" provision. As a
consequence, one could interpret the "all final decisions" right
as qualified by the more specific cancellation provision. <u>See Ray</u>
<u>D. Lowder, Inc. v. N.C. State Highway Comm'n</u>, 217 S.E.2d 682, 693

(N.C. Ct. App. 1975) ("[T]he specific provisions ordinarily qualify the meaning of the general provisions." (quoting Restatement (First) of Contracts § 236(c))). An interpretation requiring joint decision-making could be inferred by the cancellation provision's position in the contract, as it is set out separately, apart from each party's individual responsibilities. (Compare Doc. 66-2 §§ A, B, with id. § D.) In light of the ambiguity in the cancellation provision and the potential conflict with the more general statement, if a jury finds that the cancellation provision is part of the parties' contract, it will be a question of fact as to the parties' intended meaning at the time of contract.

For these reasons, IWLCA's motion for summary judgment on CSE's counterclaim for breach of contract will be denied.[30]

**C.  Motions to Seal**

Finally, the parties move to seal certain portions of the record, (See Docs. 115, 118, and 134), and jointly seek leave to file briefs in support of the motions to seal, having both failed to timely do so.  (Doc. 131.)

"[T]he courts of this country recognize a general right to

---

[30] IWLCA argued CSE's failure to show damages for the first time in its reply brief on summary judgment.  (Doc. 149 at 14.)  As such, the court will not consider the argument at this time.  Clawson v. FedEx Ground Package Sys., Inc., 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

inspect and copy . . . judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978).  "The operations of the courts and the judicial conduct of judges are matters of utmost public concern," Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 839 (1978), "and the public's business is best done in public," Cochran v. Volvo Grp. N. Am., LLC, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013).  The right of public access derives from both the common law and the First Amendment. See Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 576 (4th Cir. 2004). "While the common law presumption in favor of access attaches to all 'judicial records and documents,' the First Amendment guarantee of access has been extended only to particular judicial records and documents." Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (citation omitted).  Accordingly, in any given case, some documents will "fall within the common law presumption of access," others will be "subject to the greater right of access provided by the First Amendment," and some "may not qualify as 'judicial records' at all." United States v. Moussaoui, 65 F. App'x 881, 889 (4th Cir. 2003) (unpublished) (citing United States v. Amodeo, 44 F.3d 141, 145–46 (2d Cir. 1995)).  "[D]ocuments filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." In re United States for an Order Pursuant to 18 U.S.C. Section 2703(D), 707 F.3d 283, 290 (4th Cir. 2013).

103

"However, to the extent the documents are not relevant to the adjudicative process, no right of access applies." Adjabeng v. GlaxoSmithKline, LLC, No. 1:12CV568, 2014 WL 459851, at *1 (M.D.N.C. 2014).

When a party makes a request to seal judicial records, a district court "must comply with certain substantive and procedural requirements." Washington Post, 386 F.3d at 576. Procedurally, the court must (1) give the public notice and a reasonable opportunity to challenge the request to seal; (2) "consider less drastic alternatives to sealing"; and (3) if it decides to seal, make specific findings and state the reasons for its decision to seal over the alternatives. Id. "As to the substance, the district court first 'must determine the source of the right of access with respect to each document,' because [o]nly then can it accurately weigh the competing interests at stake." Id. (citing Stone, 855 F.3d at 181).

Sealing confidential business information may be appropriate absent an improper purpose and countervailing interests. See Nixon, 435 U.S. at 598; Adjabeng, 2014 WL 459851, at *3. However, it is not enough to assert generally that exhibits contain "sensitive and confidential business information" without supplying "specific underlying reasons for the district court to understand how [Defendant's interest] reasonably could be affected by the release of such information." Trs. of Purdue Univ. v.

104

<u>Wolfspeed, Inc.</u>, No. 1:21CV840, 2023 WL 2776193, at \*2 (M.D.N.C. Feb. 28, 2023) (quoting <u>Washington Post</u>, 386 F.3d at 579).

Under this court's Local Rules, "[n]o motion to seal will be granted without a sufficient showing by the party claiming confidentiality as to why sealing is necessary and why less drastic alternatives will not afford adequate protection, with evidentiary support . . . ." M.D.N.C. L.R. 5.4(c)(3). However, "[i]f the filing party is not the party claiming confidentiality or is not claiming it as to all of the items, the filing party should so note, and the party claiming confidentiality must file a response within 14 days of the motion to seal that includes the materials required by LR 5.4(c)(3)." L.R. 5.4(c)(4)(b). Failure by a party claiming confidentiality to file materials in support of a request to seal "will result in denial of the motion to seal and unsealing of the materials without further notice." L.R. 5.4(c)(3).

IWLCA has moved pursuant to Local Rule 5.4(c) to seal an Index of Exhibits (Doc. 116) and all exhibits accompanying its motion for summary judgment (Docs. 116-1 to 116-31), its memorandum in opposition to Defendants' motion for summary judgment (Doc. 135), and all exhibits accompanying its memorandum in opposition (Docs. 135-1 through 135-19).[31] (<u>See</u> Doc. 115; Doc. 134.) IWLCA seeks

---

[31] IWLCA moved to seal docket entries 114-1 through 114-31 and 133-1 through 133-19 (IWLCA wrote "114-19" but the court presumes "133-19" is intended), which are redacted versions of the same exhibits in docket entries 116-1 through 116-31 and 135-1 through 135-19.

sealing only because it contends <u>Defendants</u> have claimed confidentiality for these documents during discovery. (Doc. 115 ¶ 6; Doc. 134 ¶ 6.) Defendants, in turn, move to seal exhibits contained in docket entries 119 and 119-1 through 119-6.[32] Defendants do so because, they say, <u>IWLCA</u> has claimed confidentiality during discovery. (Doc. 118 ¶ 4.)

Defendants filed their response to IWLCA's first motion to seal concurrently with the parties' joint motion seeking leave to file responses. (Doc. 132.) Although IWLCA represented that it would file its response to IWLCA's motion by January 11, 2023 (Doc. 131 ¶ 7), it failed to do so. The court will therefore grant the parties' joint motion, deny Defendants' motion to seal, <u>see</u> L.R. 5.4(c)(3), and consider Defendants' two responses together. (Docs. 132, 138.)

In the responses, Defendants support sealing docket entries 116-8, 116-12, 116-13, 116-16, 116-19, 116-20, and 116-22 through 116-28 (<u>see</u> Doc. 132 at 6), and docket entries 135-1, 135-4, and 135-19 (<u>see</u> Doc. 138 at 5). Defendants did not argue in support of sealing the remaining documents (Docs. 116, 116-1 through 116-7, 116-9 through 116-11, 116-14, 116-15, 116-17, 116-18, 116-21, 116-29 through 116-31, 133,[33] 135-2, 135-3, 135-5 through 135-18).

---

[32] Defendants label these Exhibits H-M and P. The redacted versions of these documents are docket entries 111-8 through 111-13 and 111-16.
[33] IWLCA filed a version of its memorandum in opposition to Defendants' motion for summary judgment under seal. (Doc. 135.) Upon review of

According to Defendants, the exhibits contain "confidential, proprietary, sensitive, financial and/or otherwise confidential business information." (Doc. 132 at 2-3; Doc. 138 at 2.)

IWLCA's motions to seal are overbroad, as Defendants support sealing only some exhibits at issue. As a result, the court will consider only those exhibits that Defendants support sealing. The court will first consider the several exhibits that Defendants support sealing but, as noted above, were uncited by IWLCA (Docs. 116-8, 116-19, 116-22, 116-23, 116-24, and 116-26). These exhibits played no role in the adjudicative process and thus no public right of access attaches. See In re United States, 707 F.3d at 290; Adjabeng, 2014 WL 459851, at *1. Even so, docket entries 116-8 and 116-19 contain internal financial information related to CSE employees and CSE revenues and expenses and justify sealing on the ground they contain proprietary business information. As for the rest, the exhibits warrant sealing, at a minimum, because of the nonexistent role they played in the adjudicative process on summary judgment.

The court turns next to the exhibits upon which the parties relied. Docket entry 116-27 is an Excel spreadsheet containing the identity and contact information for 2020 tournament

---

both versions (Docs. 133 and 135), however, the court discerns no difference between the two.

participants.    Defendants  argue  that  this  document  contains
customer  lists  that  warrant  sealing.   The  court  agrees  and  finds
no  less  drastic  remedy  than  sealing.   However,  Defendants  contend
that  docket  entries  116-12,  116-13,  116-16,  116-25,  116-28,  135-
4,  and  135-19  contain  "confidential  business  communications,"  that
docket  entry  135-1  pertains  to  "proprietary  advertising  and
business  methods,"  and  that  docket  entry  116-20  contains  "highly
sensitive  contractual  terms."  (Doc.  132  at  2,  Doc.  138  at  2).
Review  of  these  exhibits — consisting  of  emails  and  one  marketing
piece — does  not  support  these  claims.   That  the  exhibits  may  be
probative  for  purposes  of  this  lawsuit  does  not  render  them
confidential  or  sensitive.  Nixon,  435  U.S.  at  598  (noting  interest
in  protecting  litigant's  competitive  standing);  Doe  v.  Pub.
Citizen,  749  F.3d  246,  271  (4th  Cir.  2014)  (rejecting  reputational
harm  as  a  basis  for  sealing  and  noting  that  "when  parties  call  on
the  courts,  they  must  accept  the  openness  that  goes  with  subsidized
dispute  resolution  by  public  (and  publicly  accountable)  officials"
(internal  quotation  marks  omitted)).   In  fact,  most  of  these  emails
are  external  to  coaches,  and  the  one  internal  email  (Doc.  116-16)
is  not  confidential,  as  it  simply  shows  a  back-and-forth  by  CSE
employees  as  they  coordinate  removing  IWLCA  from  the  tournament
logos.   Further,  Defendants  have  not  pointed  to  anything  specific
in  the  contract  (Doc.  116-20)  that  warrants  sealing,  especially
when  the  parties'  disputed  contract  is  argued  publicly  and  at

108

length in their motions for summary judgment. Thus, Defendants have not made the requisite showing that sealing docket entries 116-12, 116-13, 116-16, 116-20, 116-25, 116-28, 135-1, 135-4, and 135-19 is warranted.

**III. CONCLUSION**

For the reasons stated,

IT IS ORDERED that IWLCA's motion for summary judgment (Doc. 112) is GRANTED IN PART as to the validity of the marks PRESIDENTS CUP, CAPITAL CUP, NEW ENGLAND CUP, MIDWEST CUP, and DEBUT; and GRANTED as to Defendants' counterclaims for tortious interference with contract (counterclaim II) and common law unfair competition and unfair trade practices under the UDTPA (counterclaims IV and V); but is otherwise DENIED;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (Doc. 110) is DENIED;

IT IS FURTHER ORDERED that IWLCA's motion to seal (Doc. 115) as to docket entries 116-8, 116-19, 116-22 through 116-24, 116-26, and 116-27 is GRANTED, and they shall be SEALED; and as to docket entries 116, 116-1 through 116-7, 116-9 through 116-18, 116-20, 116-21, 116-25, and 116-28 through 116-31 is DENIED and the clerk shall unseal these docket entries without further notice;

IT IS FURTHER ORDERED that IWLCA's motion to seal (Doc. 134) is DENIED, and the clerk shall unseal docket entries 135 and 135-1 through 135-19 without further notice;

109

IT IS FURTHER ORDERED that Defendants' motion to seal (Doc. 118) is DENIED, and the clerk shall unseal docket entries 119 and 119-1 through 119-6 without further notice;

IT IS FURTHER ORDERED that the parties' joint motion for leave to file briefs in support of the motions to seal (Doc. 131) is GRANTED; and

IT IS FURTHER ORDERED that Defendants' motions to strike (Doc. 142; Doc. 151) are GRANTED in that the court will disregard the declarations and documents at issue, and DENIED with respect a request for an award of attorney's fees.

/s/   Thomas D. Schroeder
United States District Judge

September 26, 2023